UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------- X

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE NEW JERSEY INSURANCE COMPANY, ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, AND NORTHBROOK INDEMNITY COMPANY,

                                Plaintiffs,

            -against-

ARTUR AVETISYAN, ZINOVY AYZENBERG, DANIEL BATUROV, ALEXANDER BLANTZ, ALEXANDR CHERNYSHEV, LEVY DAVIDOV, TATYANA FEDEROV, OLGA GINDINOVA, JANE GOMBERG, NAUM GOMBERG, ANNA GORBACHEVA, LENNY KAGAN, ALBERT KHAIMOV, MURDAKHAY KHAIMOV, YEFIM KLIKSHTEYN, ZLATISLAV KOMISARCHIK, ALEXANDRA MATLYUK, GREGORY MILLER, EDWARD MOLDOVANKSY, INESSA MUCHNIK, SERGE OGAN, IGOR SARNOV, BRUNO SKAPARS, ACE ORTHOPEDIC SERVICES, INC., ADVANCED ORTHOPEDIC SOLUTIONS INC., ADVANCED PHARMACY, INC., ALMATCARE MEDICAL SUPPLY INC., AOM MEDICAL SUPPLY, INC., AVA CUSTOM SUPPLY INC., BA2RO INC., DAILY MEDICAL EQUIPMENT DISTRIBUTION CENTER, INC., EAST 19 MEDICAL SUPPLY CORP., GERRITSEN MEDCARE INC., HELPFUL MEDICAL SUPPLY, CORP., LENEX SERVICES INC., LIDA'S MEDICAL SUPPLY INC., LIFE EQUIPMENT INC., MED EQUIPMENTS SERVICE, INC., ORION SUPPLIES INC., PROMPT MEDICAL SUPPLY INC., RIGHT CHOICE MEDICAL SUPPLY INC., SKAPARS HEALTH PRODUCTS INC., SMART CHOICE MEDICAL SUPPLY, INC., TOP Q INC., VOORHIES HEALTH CARE PRODUCTS, INC., WELL CARE MEDICAL EQUIPMENT LLC, XVV, INC., IGAL BLANTZ, GALA TRADING INC., IG&NAT SERVICES, INC., JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20,

                                Defendants.

-------------------------------------------------------------------------------- X

CIVIL ACTION

No: 17-CV-4275

COMPLAINT

(TRIAL BY JURY DEMANDED)


       Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Northbrook Indemnity Company (collectively "**Plaintiffs**" or "**Allstate**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants Artur Avetisyan, Zinovy

Ayzenberg, Daniel Baturov, Alexander Blantz, Alexandr Chernyshev, Levy Davidov, Tatyana

Federov, Olga Gindinova, Jane Gomberg, Naum Gomberg, Anna Gorbacheva, Lenny Kagan,

Albert Khaimov, Murdakhay Khaimov, Yefim Kliksteyn, Zlatislav Komisarchik, Alexandra

Matlyuk, Gregory Miller, Edward Moldovanksy, Inessa Muchnik, Serge Ogan, Igor Sarnov,

Bruno Skapars, (collectively **"Retail Owners"),** Ace Orthopedic Services, Inc., Advanced

Orthopedic Solutions Inc., Advanced Pharmacy, Inc., Almatcare Medical Supply Inc., AOM

Medical Supply, Inc., AVA Custom Supply Inc., BA2RO Inc., Daily Medical Equipment

Distribution Center, Inc., East 19 Medical Supply Corp., Gerritsen Medcare Inc., Helpful

Medical Supply, Corp., Lenex Services Inc., Lida's Medical Supply Inc., Life Equipment Inc.,

Med Equipments Service, Inc., Orion Supplies Inc., Prompt Medical Supply Inc., Right Choice

Medical Supply Inc., Skapars Health Products Inc., Smart Choice Medical Supply, Inc., Top Q

Inc., Voorhies Health Care Products, Inc., Well Care Medical Equipment LLC, XVV, Inc.,

(collectively "**Retailers**"**;** Retail Owners and Retailers are collectively referred to as "**Retail

Defendants**"), Igal Blantz, John Does 1 through 20, (collectively "**Wholesale Owners**"), Gala

Trading Inc., IG&NAT Services, Inc., ABC Corporations 1 through 20 (collectively

"**Wholesalers**;" Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale

Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to

herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from at least 2008 and continuing through the date of

the filing of this Complaint, Defendants engaged in separate, but fundamentally similar schemes

to defraud automobile insurance companies, including Plaintiffs, through New York State's No-

fault system.

2.      This action seeks to recover more than $1,900,000.00 that Defendants stole from

Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices.  As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, ankle braces, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.     At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by the Retailers was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, entered into separate arrangements with one or more of the Wholesale Defendants and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     On information and belief, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or

3

orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Retailers;

(ii) fabricating and/or falsifying DME prescriptions by:

   (a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices;

   (b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME and/or orthotic devices; and

   (c) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and

(iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.     The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.     Pursuant to the fraudulent prescriptions, the Retailers routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Claimants" or "No-fault Claimants"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.     On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were

transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      On information and belief, in many instances, the Retail Owners submitted to Plaintiffs, through their respective Retailers, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided one or more of the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices.  Other times, the Wholesale Defendants provided the Retailers with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to Retailers.  In fact, irrespective of whether any DME and/or orthotic devices were actually provided to Retailers, the wholesale invoices typically reflected prices that were up to 20 times the actual prices that the Retailers paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow the Retailers to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11.     On information and belief, in some instances, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, one or more of the Retailers issued checks to the Wholesale Defendants for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false

wholesale invoice amounts.  In reality, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned to the Retailers up to approximately 98% of the wholesale invoice amounts.  These covert cash transactions were facilitated through various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiffs.

12.     On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which the Retailers received fraudulent prescriptions for DME and/or orthotic devices.

13.     On information and belief, in other instances, the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.     On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, the Retail Owners, through their respective Retailers, generated and

submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by the Retail Owners through their respective Retailers in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, the Retail Owners, through their respective Retailers, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiffs, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retail Owners, through their respective Retailers, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which the Retail Owners, through their respective Retailers, billed Plaintiffs.

19.     On information and belief, in many instances and pursuant to the agreements between the Retailer Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retailer Defendants then

submitted to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.  On information and belief, in other instances where the patient did not sign the delivery receipt, the Retailers, working with the No-fault Clinics, arranged for the No-fault patient's signature to be forged on the delivery receipt, thereby falsely representing that the patient acknowledged receipt of the billed-for DME and/or orthotic devices.

20.    At all relevant times mentioned herein, Defendants collectively utilized a common fraudulent blueprint as a business plan, sharing common documentation, using the same fraudulent billing codes, using prescriptions from the same No-fault Clinics, with the same battery of DME prescribed to nearly every patient, making the same misrepresentations, and engaging in virtually identical patterns of fraud that were not the product of happenstance, but instead evidence of related and parallel fraudulent billing schemes that trace back to a common genesis and framework.

21.    In order to execute the same fraudulent blueprint, at all relevant times mentioned herein, the Retail Owners, through their respective Retailers, undertook distinctly common actions, including but not limited to one or more of the following:  (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) paying fees to the Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by

Claimants to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that the Retail Owners, through their respective Retailers, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices.

22.     At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, engaged in a fraudulent billing scheme involving the same or similar material misrepresentations and/or omitted material statements in No-fault claims submitted to Plaintiffs for payment.   In that regard, each and every bill and supporting documentation submitted by the Retailers contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants; (ii) false and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; (v) false and misleading wholesale invoices that greatly inflated the true cost and/or quantity of the DME and/or orthotic devices purportedly supplied to No-fault Claimants, and which failed to provide a meaningful description of the DME and/or orthotic devices provided (i.e., make and model) and/or additional information necessary to determine whether the charges submitted are legitimate; and (vi) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as

alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby the Retailers paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.  On information and belief, all of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the Retailers could submit to Plaintiffs and other insurers under the No-fault Law.

23.    By way of further example and not limitation of Defendants' nearly identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, many containing the same typos, misspellings and stray marks, and purporting to document the delivery of the same or similar battery of DME and/or orthotic devices.  By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

24.    In furtherance of the schemes to defraud alleged herein, Defendants undertook identifiable fraudulent actions pursuant to a common multiple part blueprint under the same reimbursement system billing for the same DME, following the same billing protocol, using the same billing codes and making the same multiple misrepresentations.

25.    By way of further example and not limitation that Defendants engaged in a common, uniform scheme to defraud, nearly all of the Retail Defendants submitted bills to Plaintiffs for reimbursement using the same types of codes that were not recognized by, or otherwise listed in, the relevant New York State Medicaid fee schedule ("phantom codes") in

effect at the time the Retailers purported to supply the listed items to patients.  By billing under the same phantom codes for the same items, the Retailers charged Plaintiffs inflated amounts for cheap DME, materially misrepresenting the amounts that they were entitled to receive, and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for reimbursement.  By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the Retailers submitted fraudulent bills for Non-Fee Schedule items, often using the same phantom codes for the same items.

26.     The use of identical, non-existent product codes to bill for the same items across multiple Retailers cannot be the result of coincidence, but rather, indicates the use of a common blueprint and parallel scheme to defraud.

27.     In addition to utilizing the same phantom codes for the same items, the Retail Defendants engaged in other types of billing fraud that were identical in scope.  For example, nearly half of the Retailers, as identified further below, routinely submitted bills to Plaintiffs for "eggcrate mattresses" (a Non-Fee Schedule item), which is nothing more than a thin, foam mattress *pad*, using code E0272, which is a Fee Schedule code reserved for a "Foam Rubber Mattress"; and/or code E0184, which is a Fee Schedule code reserved for a "Dry Pressure Mattress".  By selecting an existing fee schedule code for a *mattress* that the foregoing Retailers did not actually provide, the identified Retailers materially misrepresented the amounts they were entitled to receive and further deceived Plaintiffs in paying amounts in excess of what the No-fault Law would have otherwise allowed for reimbursement, in exactly the same way.

28.     On information and belief, in these and in other ways set forth herein, the Defendants engaged in a pattern of similar and/or concerted conduct to defraud insurers in general, and Plaintiffs in particular.

29.     In carrying out the scheme to defraud, Defendants stole in excess of $1,900,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

30.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

31.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices.  Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs to the Retailers for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

32.     On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault

Law.  In exchange for their services, the Retailers accepted (and continue to accept) assignments of benefits from Claimants and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

33.    In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., the Retailers submitted (and continue to submit) bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

34.    Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Retailers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

35.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

36.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

37.    Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by

promulgation of Regulation 83,  the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Claimants under the No-fault law.  11 N.Y.C.R.R. § 68.1.

38.     Effective July 11, 2007, the WCB established a fee schedule for DME and orthotic devices, which adopts the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). The Fee Schedule was, and is, in effect at all relevant times mentioned herein.

39.     With respect to items that are not on the Fee Schedule (hereinafter " Non-Fee Schedule" items ), the regulations further provide:

> [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

*Id.*

40.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  For Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public.  11 N.Y.C.R.R. § 68.1.; 12 N.Y.C.R.R. § 442.2(a).

41.     Pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

42.     Moreover, to be eligible for reimbursement under the No-fault law, all claims for reimbursement must include a description of the "full particulars of the nature and extent of

the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

43.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by the Retail Owners, through their respective Retailers, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiffs, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

44.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of  fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Claimants.

45.     As set forth in the "Non-Fee Schedule Scheme to Defraud" below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, the Retailers were utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes");  (ii) the charges reflected on the Retailers' bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were

reimbursable pursuant to the Fee Schedule, when they were not.  In doing so, the Retail Owners identified in the "Non-Fee Schedule Scheme to Defraud" section below, through their respective Retailers, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

46.     In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, also routinely submitted fraudulent bills to Plaintiffs for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fabricated or custom-fit DME and/or orthotic devices.

47.     On information and belief, the Retailers and Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

48.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Claimants with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

49.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud – although that would be troubling enough – rather, they adopted identical fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale invoices for inexpensive, low quality items, to generating bills that contained codes not

recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

50.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because the Retail Owners, through the Retailers, submitted (1) false and fraudulent insurance claims to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME and/or orthotic devices the Retail Defendants never actually supplied to No-fault Claimants.  Such claims continue to be submitted by and/or in the name of the Retailers and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

51.     By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $2.6 million of unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, Retailer, date of service and the amount billed.

## **NATURE OF THE ACTION**

52.     This action is brought pursuant to:

i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**NATURE OF RELIEF SOUGHT**

53.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

54.    Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the Retailers' unpaid No-fault claims because:

i)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and

ii)    The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

55.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $1,900,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

**THE PARTIES**

A.    **Plaintiffs**

56.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook,

Illinois.

57.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.     Plaintiff Allstate New Jersey Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.     Plaintiff Allstate New Jersey Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.     Plaintiff Northbrook Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

63.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.     The Individual Retail Owner Defendants**

64.     Artur Avetisyan ("Avetisyan"), is a natural person residing in the State of New

19

York, is the principal, officer, and/or director of Retailer AVA Custom Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

65.     Zinovy Ayzenberg ("Ayzenberg") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Med Equipments Service, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

66.     Daniel Baturov ("Baturov") is a natural person residing in the State of New York, is a corporate officer of BA2RO Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

67.     Alexander Blantz ("A. Blantz") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Lenex Services Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities. On information and belief, A. Blantz is a relative of Wholesaler Owner Igal Blantz.

68.     Alexandr Chernyshev ("Chernyshev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Gerritsen Medcare Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

69.     Levy Davidov ("Davidov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Top Q Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

70.     Tatyana Federov ("Federov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Helpful Medical Supply, Corp. and, at all times relevant herein, operated, managed, and/or controlled its activities.

71.     Olga Gindinova ("Gindinova") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer BA2RO Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

72.     Jane Gomberg ("J. Gomberg") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer East 19 Medical Supply Corp., and, at all times relevant herein, operated, managed, and/or controlled its activities.

73.     Naum Gomberg ("N. Gomberg") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailers Orion Supplies Inc., and Prompt Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled their activities.

74.     Anna Gorbacheva ("Gorbacheva") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer AOM Medical Supply, Inc., and, at, all times relevant herein, operated, managed, and/or controlled its activities.

75.     Lenny Kagan ("Kagan") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Voorhies Health Care Products, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

76.     Albert Khaimov ("A. Khaimov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Life Equipment Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

77.     Murdakhay Khaimov ("M. Khaimov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Advanced Pharmacy, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

78.     Yefim Klikshteyn ("Klikshteyn") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer XVV, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

79.      Zlatislav Komisarchik ("Komisarchik") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Advanced Orthopedic Solutions

Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

80.     Alexandra Matlyuk ("Matlyuk") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Almatcare Medical Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

81.     Gregory Miller ("Miller") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Daily Medical Equipment Distribution Center, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

82.     Edward Moldovansky ("Moldovansky") is a natural person residing in the State of New Jersey, is the principal, officer, and/or director of Retailers Right Choice Medical Supply Inc. and Smart Choice Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled their activities. In furtherance of the scheme to defraud alleged herein, Defendant Moldovansky transacted business and/or contracted to provide services within the State of New York.

83.     Inessa Muchnik ("Muchnik") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Lida's Medical Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

84.     Serge Ogan ("Ogan") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Ace Orthopedic Services, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

85.     Igor Sarnov ("Sarnov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Well Care Medical Equipment LLC, and, at all times relevant herein, operated, managed, and/or controlled its activities.

86.     Bruno Skapars ("Skapars") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Skapars Health Products Inc., and, at all times

relevant herein, operated, managed, and/or controlled its activities.

**C.**     **The Individual Wholesale Owner Defendants**

87.     Igal Blantz ("I. Blantz") is a natural person residing in the State of New York, is the principal, officer and/or director of Wholesaler Gala Trading Inc., and, at all times relevant herein, operated, managed and/or controlled its activities. On information and belief, I. Blantz is a relative of Retail Owner A. Blantz.

**D.**     **The Retailer Defendants**

88.     Ace Orthopedic Services, Inc. ("Ace Orthopedic Services") was incorporated on July 13, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 80 Avenue O, Brooklyn New York 11204. Ace Orthopedic is operated, managed, and/or controlled by Defendant Ogan and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

89.     Advanced Orthopedic Solutions Inc. ("Advanced Orthopedic Solutions") was incorporated on May 17, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 70 East Sunrise Highway, Suite 500, Valley Stream New York 11581. Advanced Orthopedic is operated, managed, and/or controlled by Defendant Komisarchik and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

90.     Advanced Pharmacy, Inc. ("Advanced Pharmacy") was incorporated on January 27, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 69-29 Myrtle Avenue, Glendale New York 11385. Advanced Pharmacy is operated, managed, and/or controlled by Defendant M. Khaimov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or

orthotic devices under the No-fault Law.

91.     Almatcare Medical Supply Inc. ("Almatcare Medical Supply") was incorporated on November 17, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2442 Nostrand Avenue, Brooklyn New York 11210.  Almatcare Medical Supply is operated, managed, and/or controlled by Defendant Matlyuk and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

92.     AOM Medical Supply, Inc. ("AOM Medical Supply") was incorporated on October 21, 2013, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2083 East 19th Street, Second Floor, Brooklyn New York 11229.  AOM Medical Supply is operated, managed, and/or controlled by Defendant Gorbacheva and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

93.     AVA Custom Supply Inc. ("AVA Custom Supply") was incorporated on January 22, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 3426 Guider Avenue, First Floor, Brooklyn New York 11235.  AVA Custom Supply is operated, managed, and/or controlled by Defendant Avetisyan and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

94.     BA2RO Inc. ("BA2RO") was incorporated on August 19, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 8006 20th Avenue, Brooklyn New York 11214.  BA2RO is operated, managed, and/or controlled by Defendants Gindinova and Baturov, and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the

No-fault Law.

95.     Daily Medical Equipment Distribution Center, Inc. ("Daily Medical") was incorporated on May 5, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2515 65th Street, Brooklyn New York 11204.   Daily Medical is operated, managed, and/or controlled by Defendant Miller and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

96.     East 19 Medical Supply Corp. ("East 19 Medical Supply") was incorporated on September 23, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2083 East 19th Street, Brooklyn New York 11229.  East 19 Medical Supply is operated, managed, and/or controlled by Defendant J. Gomberg and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

97.     Gerritsen Medcare Inc. ("Gerritsen Medcare") was incorporated on January 11, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2628B Gerritsen Avenue, Brooklyn New York 11229.   Gerritsen Medcare is operated, managed, and/or controlled by Defendant Chernyshev and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

98.     Helpful Medical Supply, Corp. ("Helpful Medical Supply") was incorporated on June 8, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2921 Avenue S, Brooklyn New York 11229.  Helpful Medical Supply is operated, managed, and/or controlled by Defendant Federov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or

orthotic devices under the No-fault Law.

99.     Lenex Services Inc. ("Lenex Services") was incorporated on January 30, 2014, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1675 East 36th Street, Brooklyn New York 11234.  Lenex Services is operated, managed, and/or controlled by Defendant A. Blantz and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

100.    Lida's Medical Supply Inc. ("Lida's Medical Supply") was incorporated on October 24, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2515 65th Street, Brooklyn New York 11234.  Lida's Medical Supply is operated, managed, and/or controlled by Defendant Muchnik and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

101.    Life Equipment Inc. ("Life Equipment") was incorporated on December 31, 2010, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 68-30 Myrtle Avenue, Glendale New York 11385.  Life Equipment is operated, managed, and/or controlled by Defendant A. Khaimov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

102.    Med Equipments Service, Inc. ("Med Equipments Service") was incorporated on July 2, 2008, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2082B East 28th Street, Brooklyn New York 11229.  Med Equipments Service is operated, managed, and/or controlled by Defendant Ayzenberg and submitted fraudulent claims to Plaintiffs seeking reimbursement for

DME and/or orthotic devices under the No-fault Law.

103.   Orion Supplies Inc. ("Orion Supplies") was incorporated on October 20, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 3814 Shore Parkway, Suite 2C, Brooklyn New York 11235.   Orion Supplies is operated, managed, and/or controlled by Defendant N. Gomberg and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

104.   Prompt Medical Supply Inc. ("Prompt Medical Supply") was incorporated on February 19, 2013, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2009 Avenue U, Brooklyn New York 11229.   Prompt Medical Supply is operated, managed, and/or controlled by Defendant N. Gomberg and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

105.   Right Choice Medical Supply Inc. ("Right Choice Medical Supply") was incorporated on December 23, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2684 Coney Island Avenue, Brooklyn New York 11235.   Right Choice Medical Supply is operated, managed, and/or controlled by Defendant Moldovansky and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

106.   Skapars Health Products Inc. ("Skapars Health Products") was incorporated on April 24, 2014, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2375A East 24th Street, Brooklyn New York 11229.   Skapars Health Products is operated, managed, and/or controlled by

Defendant Skapars and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

107.    Smart Choice Medical Supply, Inc. ("Smart Choice Medical Supply") was incorporated on May 27, 2014, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2684 Coney Island Avenue, Brooklyn New York 11235.  Smart Choice Medical Supply is operated, managed, and/or controlled by Defendant Moldovanksy and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

108.    Top Q, Inc. ("Top Q") was incorporated on March 29, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 147-19 Union Turnpike, Flushing New York 11367.  Top Q is operated, managed, and/or controlled by Defendant Davidov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

109.    Voorhies Health Care Products, Inc. ("Voorhies") was incorporated on December 5, 2012, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2217 Voorhies Avenue, Brooklyn New York 11235.  Voorhies is operated, managed, and/or controlled by Defendant Kagan and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

110.    Well Care Medical Equipment LLC ("Well Care") was incorporated on May 20, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 276 5th Avenue, Suite 704, New York New York 10001.  Well Care is operated, managed, and/or controlled by Defendant Sarnov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices

under the No-fault Law.

111.    XVV, Inc. ("XVV") was incorporated on September 15, 2010, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 136 Highlawn Avenue, Brooklyn New York 11223.  XVV is operated, managed, and/or controlled by Defendant Klikshteyn and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**E.    The Wholesale Defendants**

112.    Gala Trading Inc. ("Gala Trading") was incorporated on February 2, 2014, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 10 Bay 50th Street, Brooklyn, New York. Gala Trading is operated, managed and/or controlled by Defendant I. Blantz and supplies Retailer Lenex Services, and other retailers unknown to Plaintiffs, with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices provided to the Retailers.  These wholesale invoices (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

113.    IG&NAT Services, Inc. ("IG&NAT Services") was incorporated on February 25, 2010, and is a wholesale DME supply company authorized to do business in the State of New York, with its principal place of business located at 4701 New Utrecht Avenue, Brooklyn, New York 11219.  IG&NAT Services is operated, managed and/or controlled by Defendant John Doe 1 and supplies Retailer Med Equipments Service, and other retailers unknown to Plaintiffs, with

basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices provided to the Retailers.  These wholesale invoices (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers, in turn, can submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.

**F.      The John Doe Defendants**

114.    John Doe 1 is the principal, officer and/or director of Wholesaler IG&NAT Services and, at all times relevant herein, operated, managed, and/or controlled its activities.

115.    On information and belief, John Does 2 through 20 are the principals, officers, and/or directors of the ABC Corporations 1 through 20.  On information and belief, John Doe Defendants 2 through 20, through the ABC Corporations 1 through 20, entered into kickback and/or other financial compensation agreements with the Retailers to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiffs.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**G.      The ABC Corporations**

116.    On information and belief, the ABC Corporations 1 through 20 are additional corporations that purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers.  These wholesale invoices:  (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number,

make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement.  These ABC Corporations 1 through 20 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

117.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

118.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

119.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

120.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

121.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

122.    Plaintiffs underwrite automobile insurance in New York State.

123.    As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles

and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

124.    On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, the Retailers accept assignments of benefits from the Claimants covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

125.    To process and verify the claims submitted by the Retailers, Plaintiffs required, and the Retailers submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to No-fault claimants for which the Retailers were seeking reimbursement from Plaintiffs.

126.    In nearly all instances, the prescriptions submitted in support of the Retailers' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

127.    In certain instances, one or more of the Retailer Defendants, including Lenex Services and Med Equipments Service, also submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement, which reflected inflated prices well in excess of what the Retailers actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

128.    Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process the Retailers' claims within 30 days of receipt of proof of claim.

129.    To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and paid

the Retailers based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

130.    The No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendant of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).   For DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided.  12 N.Y.C.R.R. § 442.2.

131.    With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2.

132.    On information and belief, the Retailers were created as the centerpieces of elaborate schemes to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received the same or similar battery of DME and/or orthotic devices.

133.    The DME and/or orthotic devices that the Retailers purported to provide, and for

which they billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, the Retail Owners, through their respective Retailers, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

134.    On information and belief, the Retail Owners created and controlled the Retailers, which were part of separate, but substantially similar well-organized illegal enterprises that engaged in fundamentally similar, systematic and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices.  The components of each enterprise followed practices that were part of a racketeering scheme dictated by the Retail Owners, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to No-fault claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the wholesale costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges

submitted are legitimate;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs containing generic item descriptions, concealing the manufacturer, make, model, size and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered/duplicated in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, the Retailers, through their Retail Owners and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Allstate in particular;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers;

- Unlike legitimate retail DME companies, the Retailers claimed to conduct their daily operations from locations that in some cases had no signage or that were shuttered with no indication that any business

was conducted at that location; and/or

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided the Retailers with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in some instances, actually serving as the vehicle through which Defendants laundered the money back to the Retail Owners through the use of check cashing establishments.

135.   In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Claimant.

136.   The members of each enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, the Retail Owners engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their Health Care Practitioners ("HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the Retailers could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

36

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Claimants;

- Submitted or caused to be submitted, on behalf of the Retailers, prescription forms in support of requests for payment for DME and/or orthotic devices, which they knew to be fabricated and/or fraudulently altered/duplicated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

137.    By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

138.    By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which the Retail Owners were

able to submit fraudulent bills to Plaintiffs for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and quality of the DME and/or orthotic devices reflected in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Converted the checks they received from the Retailers to cash and returned to the Retailers up to 98% of the wholesale invoice amounts;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

139.    At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction and control, caused fraudulent wholesale invoices to be provided to the Retailers, which they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

140.    At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which the Retail Owners, through their respective Retailers, were able to further the scheme to defraud alleged in this Complaint.

141.    At all relevant times mentioned herein, the Wholesaler Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiffs, in particular, in connection with fraudulent claims.

142.    At all relevant times mentioned herein, the Retail Owners knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

143.     At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, directly or through others acting under and pursuant to their direction, instruction and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

144.     At all relevant times mentioned herein, the Retail Owners and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## **THE MECHANICS OF THE SCHEME TO DEFRAUD**

145.     On information and belief, beginning in 2008 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to No-fault Claimants.

146.     The Retail Owners incorporated, owned and/or controlled their respective Retailers for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

147.     On information and belief, each of the Retailers, through their respective Retail Owners, engaged in virtually identical and parallel schemes to defraud, wherein the Retail Owners: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) obtained fraudulently inflated wholesale invoices from the Wholesale Defendants that the Retailers, in turn, would use to substantiate bogus claims for

reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, the Retail Owners, through their respective Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar battery of DME and/or orthotic devices.

148.    Each DME enterprise alleged in this Complaint carried out its scheme to defraud though substantially similar means.

149.    With the DME Retailers in place, Defendants devised and carried out fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

150.    Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or

predetermined course of treatment and regardless of whether such items were medically necessary.

151.    Such prescriptions are issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

152.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with the Retailers, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the Retailers by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

153.    In furtherance of the scheme to defraud alleged herein, the prescriptions for DME and/or orthotic devices from the No-fault Clinics were forged by the mangers, owners and/or controllers of the Clinic.  By way of example and not limitation, Exhibits "5" and "6" in the accompanying Compendium of Exhibits are affidavits executed by two physicians, Azu Ajudua, M.D. ("Ajudua") and Barry Dublin, M.D. ("Dublin"), respectively, in connection with an action captioned *Government Employees Insurance Co. v. Champ Medical Supply, Inc.*, Docket No. 16-cv-04823 (NG)(SMG) (E.D.N.Y. Aug 29, 2016), in which the physicians acknowledge the fraudulent nature of the prescriptions that were generated by the No-fault Clinics, including the following:

- The purported signatures on the prescription forms submitted to insurers by DME retailers to support their claims are fraudulent, in that they are mere photocopies of the physicians' original signatures, affixed to bogus prescription forms;

- The physicians never prescribed much of the DME that appear on prescription forms with the physicians' signatures, which the DME retailers submitted to insurers in support of claims for reimbursement;

- Prescriptions for one or two DME which were written by the physicians were fraudulently altered, with as many as five to six additional DME added to the original prescription, by someone other than the physician;

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were basic, inexpensive items, not the sophisticated and expensive items the DME retailers purportedly provided, and for which the DME retailers submitted bills and sought reimbursement;

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were inexpensive, flexible DME and/or orthotics intended to supplement a physical therapy regimen, whereas the devices the DME retailers purportedly provided, and billed for, were expensive, rigid items that would impede the prescribed physical therapy routine.

154.    On information and belief, in furtherance of the scheme to defraud alleged herein, the use of multiple prescriptions bearing identical signatures is not an isolated incident unique to any one Retailer; rather, multiple Retailers submitted prescriptions to insurers, in general, and Plaintiffs, in particular, bearing the *same* identical HCP signatures, further evidencing a common source, blueprint, mechanism, and plan.  By way of example and not limitation, Exhibit "7" in the attached Compendium of Exhibits is a representative sample of prescription forms submitted by Retailer Defendants Daily Medical, Lenex Services, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Top Q, Well Care, and XVV in support of claims for reimbursement to Plaintiffs, wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

155.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did

not provide the No-fault Claimants directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

156. In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the No-fault Claimants.

157. Similarly, as part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, and lumbar cushions, which the Retailers then used to unilaterally determine the DME provided to Claimants in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

158. By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to No-fault Claimants.

159. By way of example and not limitation, on information and belief, when a HCP

43

issued a prescription for a "cervical collar", the HCP intended for the Claimant to receive a basic, inexpensive, circular foam collar, which carries a maximum reimbursement rate of $6.80 under the Fee Schedule, using HCPCS Code L0120. Instead, the Retailers would purport to provide a complex, expensive, hard plastic collar with multiple posts and with occipital and mandibular supports, which carries a maximum reimbursement rate of $233.00 under the Fee Schedule, using HCPCS Code L0180, in order to bill insurance companies, in general, and Allstate, in particular, the maximum amount under the Fee Schedule, regardless of medical necessity.

160.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

161.    In some instances, the Retailers forged or caused to be forged the No-fault Claimant's signature on the delivery receipt.

162.    In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

163.    In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

164.    On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or

knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked.

165.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

166.    In other instances, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers entered into agreements with one or more of the Wholesale Defendants whereby the Wholesale Defendants supplied the Retailers with invoices that were used to document false, inflated and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

167.    In furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by the Wholesale Defendants to the Retailers included artificial prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

168.    To the extent the Retailers provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from the Wholesale Defendants.

169.    The wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, upwards of 10 to 20 times the actual prices that the Retailers paid for the DME and/or orthotic devices when they were actually provided.

170.    In furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by the Wholesale Defendants to the Retailers intentionally omitted the make,

model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

171.    In some instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by the Wholesale Defendants to the Retailers were never actually provided to the Retailers; rather, the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

172.    On information and belief, the wholesale invoices were provided to one or more of the Retailers to camouflage the conversion of the Retailers' checks payable to the Wholesale Defendants, which the Wholesale Defendants cashed at check cashing establishments or through other means.

173.    On information and belief, one or more of the Retailers would issue checks to the Wholesale Defendants for the full amount of the inflated wholesale invoice.  The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the profits of the scheme for themselves.

174.    On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers requested that the Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items when, in fact, they did not.

175.    In furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

176.     The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

177.     In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

178.     In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

179.     In many cases, the Retailers never actually provided the DME for which they billed Plaintiffs.

180.     In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

181.     In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesale Defendants and/or other suppliers, the Retailers, as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesalers and provided to Claimants.

182.     By way of example and not limitation, and as set forth in the "Non-Fee Schedule

Scheme to Defraud" section below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, the Retailers were utilizing the exact same phantom codes for which there was no published fee schedule;  (ii) the charges reflected on the Retailers' bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in the Retailers' bills corresponded with the equipment purportedly provided.

183.    In addition, as set forth  in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills to Plaintiffs (i) in support of expensive custom-fabricated DME and/or orthotic devices, such as LSOs, knee, wrist, elbow and shoulder braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that the Retailer never actually provided.

184.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

185.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, such as LSOs, knee, wrist, elbow, and shoulder braces

that were never provided.   In other instances, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed.   By way of example and not limitation, Exhibit "8" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for expensive custom fabricated DME and/or orthotic devices that were never provided.   In addition, Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for supports and/or braces that required fittings and adjustments which they never performed.

186.    Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

**1.    Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule**

187.    In furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, including, but not limited to, Advanced Pharmacy, Almatcare Medical Supply, AVA Custom Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerritsen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Right Choice Medical Supply, Skapars Health Products, Smart Choice Medical Supply, Top Q, Voorhies, and Well Care, routinely submitted bills for Non-Fee Schedule items, wherein they

misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing exact same phantom codes for the same items that were not listed on the relevant Fee Schedule in existence at the time.  *See* Exhibit "2."

188.    By way of example and not limitation one or more of the Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, BA2RO, Daily Medical, East 19 Medical Supply, Helpful Medical Supply, Lida's Medical Supply, Life Equipment, Orion Supplies, Prompt Medical Supply, Smart Choice Medical Supply, Voorhies, and Well Care, routinely submitted bills to Plaintiffs for "Heat Lamp, with stand, includes bulb, or infrared element" and/or "Heat Lamp" units using phantom codes E0200 and E0205**,** respectively, which are not recognized in the Fee Schedule, in amounts ranging from $74.62 to $453.60, notwithstanding that, to the extent any DME was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00.   Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above listed Retailers submitted fraudulent bills for a heat lamp unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

189.    By billing under the same phantom codes for the heat lamp units one or more of the Retail Owners, through their respective Retailers, billed and were paid nearly *ten times* what they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

190.    By way of further example and not limitation, one or more of the Retail Owners, through their respective Retailers, including, but not limited to AVA Custom Supply, BA2RO, Daily Medical, Helpful Medical Supply, Lenex, Med Equipments Service, and Smart Choice Medical Supply routinely submitted bills to Plaintiffs for "portable (overtub type)" and/or

"nonportable (built-in type)" "whirlpools," using phantom codes E1300 and E1310, respectively, which were not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $74.00 to $818.00, notwithstanding that, to the extent anything was provided, the whirlpools are inexpensive "jet spas," for which the usual and customary price charged to the general public is  no more than $40.00.  Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above-listed Retailers submitted fraudulent bills for whirlpools using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

191.   By billing under the same phantom codes for the whirlpools, one or more of the Retail Owners through their respective Retailers, billed and were paid almost six times more than they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

192.   Separate and apart from billing for the same heat lamps and whirlpools under the same phantom codes not recognized under the Fee Schedule, one or more of the Retail Owners, through their respective Retailers, routinely submitted bills for other Non-Fee Schedule items using the same phantom codes in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive.  By way of example and not limitation:

- The Retail Owners, through their respective Retailers, including but not limited to Almatcare Medical Supply, BA2RO, Daily Medical, East 19 Medical Supply, Helpful Medical Supply, Lida's Medical Supply, Orion Supplies, Prompt Medical Supply, Smart Choice Medical Supply, and Well Care, routinely submitted bills to Plaintiffs for "Water Circulating Heat Pad with Pump" units using phantom code E0217, in amounts ranging from $420.00 to $1,295.64, notwithstanding that, to the extent anything was provided, the water circulating units were cheap aqua relief systems reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $200.00. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed

Retailers submitted fraudulent bills for a water circulation unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to BA2RO, Daily Medical, Helpful Medical Supply, Lenex Services, Med Equipments Service, and Well Care, routinely submitted bills to Plaintiffs for TENS/EMS units and/or EMS Units with accessory kits, using phantom codes E0720, E0745, and E0762, in amounts ranging from $95.37 to $1,256.00, notwithstanding that, to the extent anything was provided, the stimulator units are actually cheap "digital therapy machines" and/or TENS/EMS units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for stimulator units using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Daily Medical, and Orion Supplies, routinely submitted bills to Plaintiffs for "Deep Tissue Massagers", in amounts ranging from $32.00 to $225.31 using phantom code L1399, notwithstanding that, to the extent any DME was provided, the DME purportedly supplied were simple and inexpensive hand massagers, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00. Exhibit "14" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for massagers using the same phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Almatcare Medical Supply, Daily Medical, Med Equipments Service, Prompt Medical Supply, and Smart Choice Medical Supply routinely submitted bills to Plaintiffs for "Shoulder Brace (custom)" in amounts ranging from $80.00 to $690.00 using phantom code L3652, notwithstanding that, to the extent any DME was provided, the shoulder braces purportedly supplied were simple inexpensive, one-size-fits-all braces, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for shoulder braces using the same phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to AVA Custom Supply, Helpful Medical Supply, and Voorhies routinely submitted bills to Plaintiffs for "TENS/EMS Placement Belts" and/or "TENS Unit Belts" in amounts ranging from $26.25 to $318.34 using phantom code E0731, notwithstanding that, to the extent any DME was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for EMS/TENS placement belts using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Lenex Services and Med Equipments Service, routinely submitted bills to Plaintiffs for "custom fabricated" wrist orthoses, in amounts ranging from $76.00 to $152.00 using phantom code L3800, notwithstanding that, to the extent any DME was provided, the wrist orthoses purportedly supplied were simple, one-size-fits-all wrist supports, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $8.00. Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for wrist supports using the same phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to BA2RO and Top Q, routinely submitted bills to Plaintiffs for "Bed Boards" in amounts ranging from $48.51 to $97.02 using phantom code E0273, notwithstanding that, to the extent any DME was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for bed boards using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers; including but not limited to Daily Medical, routinely submitted bills to Plaintiffs for "Orthopedic Cervical Double Loop Pillow" and/or "Cervical Pillow" in amounts ranging from $24.00 to $98.00 using phantom codes L0943 and E0943, notwithstanding that, to the extent any DME was provided, the pillows purportedly supplied were simple, inexpensive,

foam rolls, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $10.00. Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailer submitted fraudulent bills for cervical pillows using the same phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers; including but not limited to Med Equipments Service, routinely submitted bills to Plaintiffs for EMS Accessory Kits, in amounts ranging from $46.00 to $92.00, using phantom code K0118, notwithstanding that, to the extent any DME was provided, the accessory kits purportedly supplied were simple kits consisting of a battery, conductive fluid, and replacement electrodes/wires, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailer submitted fraudulent bills for EMS accessory kits using the same phantom code not recognized under the relevant Fee Schedule in existence at the time.

193. By submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

194. Consequently, by submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time for the same items, the Retail Owners, through their respective Retailers, uniformly, deliberately and materially misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise

allowed for medically necessary DME and/or orthotic devices.

195.    In addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, the Retailers' bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, where any wholesale invoices were supplied at all, for DME and/or orthotic devices that were inexpensive and of poor quality.

**2.    Fraudulent Billing Using Code 1399**

196.    In furtherance of the scheme to defraud alleged herein, many of the Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, AVA Custom Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerritsen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Smart Choice Medical Supply, Top Q, Voorhies, and Well Care,, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399, which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs.  Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for Non-Fee Schedule items using Fee Schedule Code E1399.

197.    By way of example and not limitation, the Retail Owners, through their respective Retailers, including Almatcare Medical Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerritsen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Smart Choice Medical Supply, and Top Q, routinely submitted bills to Plaintiffs for massagers using code E1399, in amounts ranging from $43.40 to $299.85, falsely representing that the

amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the massagers were simple, hand-held massagers for which the usual and customary price charged to the general public did not exceed $20.00. Exhibit "22" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for massagers using Fee Schedule Code E1399.

198. By way of further example and not limitation:

- The Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, Daily Medical, East 19 Medical Supply, Lida's Medical Supply, Med Equipments Service, Orion Supplies, Prompt Medical Supply, and Well Care, routinely submitted bills to Plaintiffs for hydrotherapy whirlpools using code E1399, in amounts ranging from $168.25 to $628.00, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the whirlpools are inexpensive "jet spas," reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $40.00. Exhibit "23" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for hydrotherapy whirlpools using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, East 19 Medical Supply, Lenex Services, Med Equipments Service, Orion Supplies, Prompt Medical Supply, and Smart Choice Medical Supply, routinely submitted bills to Plaintiffs for EMS belts using code E1399, in amounts ranging from $18.00 to $73.00, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "24" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for EMS belts using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, BA2RO, Lenex Services, Life Equipment, Med Equipments Service, and Top Q, routinely submitted bills to Plaintiffs for car seats using code E1399 in amounts ranging from $31.50 to $189.00, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the car seats purportedly supplied were inexpensive bubble pads or other material for which the usual and customary price charged to the general public is not more than $13.00. Exhibit "25" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for car seats using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medial Supply, BA2RO, Gerritsen Medcare, Lida's Medical Supply, and Top Q, routinely submitted bills to Plaintiffs for lumbar and/or general use cushions using code E1399 in amounts ranging from $22.04 to $99.99, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the lumbar cushions purportedly supplied were inexpensive cushions for which the usual and customary price charged to the general public is not more than $10.00. Exhibit "26" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for lumbar and/or general use cushions using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, BA2RO, Daily Medical, and Lida's Medical Supply, routinely submitted bills to Plaintiffs for EMS units using code E1399, in amounts ranging from $162.97 to $299.85, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the EMS Units are actually cheap "digital therapy machines" and/or EMS Units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "27" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for EMS units using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Lenex Services, Lida's Medical Supply, and Med

Equipments Service, routinely submitted bills to Plaintiffs for bed boards using code E1399 in amounts ranging from $73.35 to $108.00, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the bed boards purportedly supplied were inexpensive thin pieces of cardboard or other material for which the usual and customary price charged to the general public is not more than $30.00.  Exhibit "28" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for bed boards using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, Daily Medical, and Lida's Medical Supply, routinely submitted bills to Plaintiffs for infrared heating lamps using code E1399, in amounts ranging from $134.92 to $357.00, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00.  Exhibit "29" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for infrared heating lamps using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Med Equipments Service and Voorhies, routinely submitted bills to Plaintiffs for hot/cold packs using code E1399 in amounts ranging from $24.99 to $36.00, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the hot/cold packs purportedly supplied were inexpensive, one-time use, disposable packs for which the usual and customary price charged to the general public is not more than $5.00.  Exhibit "30" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for hot/cold packs using Fee Schedule Code E1399.

- The Retail Owners, through their respective Retailers, including, but not limited to, Almatcare Medical Supply, Gerritsen Medcare, and Lida's Medical Supply, routinely submitted bills to Plaintiffs for mattress pads using code E1399, in amounts ranging from $50.43 to $155.52, falsely representing that this amount was the lesser of the

usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the mattress pads purportedly provided were actually cheap, foam bubble mattress pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $22.00. Exhibit "31" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for mattress pads using Fee Schedule Code E1399.

### 3.   Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes

199.   In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items. By way of example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AOM Medical Supply, AVA Custom Supply, BA2RO, Daily Medical, East 19 Medical Supply, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Smart Choice Medical Supply, Top Q, Voorhies, and Well Care, routinely submitted bills to Plaintiffs for "egg crate mattresses," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount ranging from $97.50 to $155.67 (depending on the year the DME was provided), and/or Fee Schedule code E0184, which is reserved for a "Dry Pressure Mattress," reimbursable in the maximum amount of $153.13.

200.   The Retailers never provided a Foam Rubber mattress to any No-fault Claimant.

201.   The Retailers never provided a Dry Pressure Mattress to any No-fault Claimant.

202.   To the extent any DME and/or orthotic device was provided, the Retailers

provided simple bubble mattress pads, which they described as "egg crate mattresses," for which the usual and customary price charged to the general public did not exceed $22.00.

203.    By submitting bills using codes E0272 and/or E0184, the Retail Owners, through their respective Retailers, materially misrepresented that they provided Foam Rubber or Dry Pressure mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of seven times what would otherwise have been a permissible charge for the Non-Fee Schedule item.   Exhibit "32" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for egg crate mattresses by billing for the Non-Fee Schedule DME under a Fee Schedule code.

204.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to East 19 Medical Supply, Helpful Medical Supply, Lenex Services, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Smart Choice Medical Supply, and Well Care, routinely submitted bills to Plaintiffs for "bed boards," which is a Non-Fee Schedule item, using Fee Schedule code E0274, which is reserved for an Overbed Table—an item that is customarily used in conjunction with a hospital bed—reimbursable in the maximum amount of $101.85.

205.    The Retailers never provided an Overbed Table to any No-fault Claimant.

206.    To the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, thin pieces of foldable cardboard or other material, which they described as "bed boards," for which the usual and customary price charged to the general public did not exceed $30.00.

207.    By submitting bills using code E0274, the Retail Owners, through their respective

Retailers, materially misrepresented that they provided Overbed Tables, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts more than three times what would otherwise have been a permissible charge for the Non-Fee Schedule item.   Exhibit "33" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for bed boards by billing for the non-Fee Schedule DME under a Fee Schedule code.

<u>FEE SCHEDULE SCHEME TO DEFRAUD</u>

1.      **Fraudulent Billing for Custom Fabricated or Custom Fit DME and/or Orthotic Devices.**

208.    The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform to another person's needs. *See* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (Jul. 1, 2016), at 3.

209.    Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings and patterns.  *Id.*

210.    To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements.  *Id.*

211.    In furtherance of the scheme to defraud, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, despite the fact that, to the extent anything was provided, the DME and/or orthotic devices were cheap, one-size-fits-all items that were not

custom fabricated to the Claimants' measurements.

212.    In addition to submitting bills for custom fabricated devices that were never provided, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided.  *See id.* at 3, 119.

213.    In furtherance of the scheme to defraud, the Retailers routinely include measurement sheets with the bills submitted to Plaintiffs in an effort to create the illusion that a customized fitting was conducted for the Claimant in connection with providing the custom fabricated or pre-fabricated item.

214.    On information and belief, the measurements were, in many cases, never performed and/or unnecessary as the fabrication or fitting required under the Fee Schedule code was never done.

215.    On information and belief, the Retailers created and included the measurement sheets with their bill submissions for the purpose of created a fraudulent justification for billing under Fee Schedule codes with expensive reimbursement rates when, in fact, the requirements for reimbursement under such codes were never met.  By way of example and not limitation, Defendant Life Equipment routinely bills under codes requiring a customized fitting, but never performs any customization.

216.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs that require a customized fitting, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

217.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, the Retail Owners, through their respective Retailers, including but not limited to Advanced Orthopedic Solutions, Ava Custom Supply, Daily Medical, Helpful Medical Supply, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Right Choice Medical Supply, Smart Choice Medical Supply, Skapars Health Products, and Well Care, routinely submitted fraudulent bills for LSOs using codes L0629, L0632, L0634 and/or L0636, which are reserved for more complex custom fabricated DME and/or orthotic devices, which they did not provide. Exhibit "34" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0629, L0632, L0634 and/or L0636.

218.    By billing LSOs under codes L0629, L0632, L0634 and/or L0636, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not, and/or that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimants' measurements, tracings and patterns, which they did not.

219.    Separate and apart from billing for custom fabricated LSOs, the Retail Owners, through their respective Retailers, including but not limited to Ace Orthopedic Services, Advanced Pharmacy, Almatcare Medical Supply, AOM Medical Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerristen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Skapars Health Products, Top Q, Voorhies, Well Care, and XVV, routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a

customized fitting, including, but not limited to, L0627, L0630, L0631, L0633, L0635 and/or L0637, notwithstanding that a customized fitting was never performed. Exhibit "35" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0627, L0630, L0631, L0633, L0635, and/or L0637.

220.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

221.    Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace that requires a customized fitting, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

222.    The Retail Owners, through their respective Retailers, including but not limited to Ace Orthopedic Services, Advanced Pharmacy, AOM Medical Supply, BA2RO, Daily Medical, East 19 Medical Supply, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Right Choice Medical Supply, Skapars Health Products, Top Q, Voorhies, Well Care, and XVV, routinely submitted bills for knee braces using codes L1810, L1820, L1830, L1831, L1832, L1844, L1845 and/or L1848, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed, or for custom fabricated knee braces that were never supplied. By way of example and not limitation, Exhibit "36" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for knee braces using codes L1810, L1820, L1830, L1831, L1832, L1844, L1845 and/or L1848.

223. To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all knee braces, which were not custom made to the Claimants' measurements and for which no customized fitting was ever performed.

224. Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support that requires a customized fitting, to $935.49, under code L3673, for more complex custom fabricated DME and/or orthotic devices.

225. In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to Advanced Orthopedics, AOM Medical Supply, Daily Medical, East 19 Medical Supply, Helpful Medical Supply, Lida's Medical Supply, Orion Supplies, Prompt Medical Supply, Smart Choice Medical Supply, Skapars Health Products and Well Care, routinely submitted fraudulent bills for shoulder supports using codes L3671 and/or L3674, which are reserved for more complex custom fabricated DME and/or orthotic devices, which were not provided. Exhibit "37" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using code L3671 and/or L3674.

226. By billing shoulder supports under codes L3671 and/or L3674, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not; and/or that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimant's measurements, tracings and patterns, which they

did not do.

227.    Separate and apart from billing for custom fabricated shoulder supports, to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to AVA Custom Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerristen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Skapars Health Products, Top Q, Voorhies and XVV, routinely submitted fraudulent bills for shoulder supports using codes L3650, L3652, L3670, L3675 and/or L3960 notwithstanding that a customized fitting was never performed.  Exhibit "38" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using codes L3650, L3652, L3670, L3675 and/or L3960.

228.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all shoulder supports for which no customized fitting was ever performed.

229.    Under the relevant Fee Schedule in existence at the time, the permissible charges for wrist supports range from $47.50, under code L3908, for a prefabricated wrist support that requires a customized fitting, to $1,472.96, under code L3901, for more complex custom fabricated DME and/or orthotic devices.

230.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for wrist supports, the Retail Owners, through their respective Retailers, including but not limited to BA2RO, Daily Medical, Lenex Services, Lida's Medical Supply, Life Equipment, Prompt Medical Supply, Skapars Health Products, Well Care and XVV, routinely submitted fraudulent

66

bills for wrist supports using codes L3806, L3807, L3808, L3809, L3908 and/or L3984, despite the fact that the billed for item was never provided or not provided as billed and/or provided pursuant to a predetermined course of treatment, irrespective of medical necessity.  Exhibit "39" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for wrist supports using code L3806, L3807, L3808, L3809, L3908 and/or L3984.

231.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all wrist supports, which were not custom made to the Claimants' measurements and for which no customized fittings were ever performed.

232.    Under the relevant Fee Schedule in existence at the time, the permissible charges for elbow supports range from $48.00 under code L3700, for basic, prefabricated supports, to $1092.33 under code L3740 for more complex custom fabricated DME and/or orthotic devices.

233.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for elbow supports, the Retail Owners, through their respective Retailers, including but not limited to Daily Medical, Helpful Medical Supply, Lenex Services, Med Equipments Service, Orion Supplies and Skapars Health Products, routinely submitted fraudulent bills for elbow supports using codes L3702, L3710 and/or L3763, despite the fact that the billed for item was never provided or not provided as billed and/or provided pursuant to a predetermined course of treatment, irrespective of medical necessity.  Exhibit "40" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for elbow supports using codes L3702, L3710 and/or L3763.

234.    To the extent any DME and/or orthotic devices were provided, the Retail Owners,

through their respective Retailers, provided cheap, elastic, one-size-fits-all elbow supports, which were not custom made to the Claimants' measurements and for which no customized fittings were ever performed.

235.    Under the relevant Fee Schedule in existence at the time, the permissible charges for ankle braces ranged from $45.00, under code L1902, for basic, prefabricated ankle braces, to $750.00, under code L1970, for more complex items that are custom fabricated.

236.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for ankle braces, the Retail Owners, through their respective Retailers, including  but not limited to BA2RO, Daily Medical, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Med Equipments Service, Skapars Health Products, Voorhies, Well Care, and XVV, routinely submitted fraudulent bills for ankle braces using codes L1902, L1904, L1906, L1910, L1951, L1971 and/or L1980, despite the fact that the billed for items were never provided or not provided as billed and/or provided pursuant to a predetermined course of treatment, irrespective of medical necessity.   Exhibit "41" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for ankle braces using codes L1902, L1904, L1906, L1910, L1951, L1971 and/or L1980.

237.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, elastic, one-size-fits-all ankle braces, which were not custom made to the Claimants' measurements and for which no customized fittings were ever performed.

**2.    Fraudulent Billing of Cervical Traction Units**

238.    The Retailers, including but not limited to Ace Orthopedic Services, Advanced

Orthopedic Solutions, Advanced Pharmacy, Almatcare Medical Supply, AOM Medical Supply, AVA Custom Supply, BA2RO, Daily Medical, East 19 Medical Supply, Gerritsen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Right Choice Medical Supply, Smart Choice Medical Supply, Right Choice Medical Supply, Skapars Health Products, Top Q, Voorhies, Well Care, and XVV, routinely submitted fraudulent bills to Plaintiffs for cervical traction units under Fee Schedule Codes E0855 and/or E0849.

239.    On information and belief, the cervical traction units purportedly provided by the Retailers are inexpensive replicas or knockoffs of a trademarked cervical traction unit (the "Posture Pump") manufactured and sold by Posture Pro, Inc., and/or other suppliers, with a wholesale price that is a fraction of the cost associated with the authentic device.  By way of example and not limitation, Exhibit "42" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the Retailers submitted fraudulent bills for a cervical traction device.

240.    In particular, the cervical traction units provided by Retailers Ace Orthopedic Services, Advanced Pharmacy, Life Equipment, Top Q and XVV are replicas or "knockoffs" of the Posture Pump, which were sold and distributed to the Retailers by Comfortland Medical. Inc. ("Comfortland"), under the brand name Comfortmax Cervical Hometrac.

241.    On or about August 15, 2013, Comfortland was sued for patent infringement of the Posture Pump in the matter of *Posture Pro, Inc. v. Comfortland Medical, Inc.*, 13-cv-1252 (JVS) (AN) (hereinafter the "Comfortland Action"), for distributing a knockoff of the Posture Pump cervical traction unit under its Comfortmax Cervical Hometrac brand, which was of inferior quality to the Posture Pump model and which infringed upon the patent held by Posture Pro.

242.    Retailers Ace Orthopedic Services, Advanced Pharmacy, Lida's Medical Supply, Life Equipment, Top Q, and XVV purchased the Comfortmax or similar unit from Comfortland, and continue to supply the knockoff device(s) and bill insurers, including Plaintiffs. By way of example and not limitation, Exhibit "43" in the accompanying Compendium of Exhibits is a representative sample of claims submitted to one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for Comfortmax cervical traction devices.

243.    On information and belief, to the extent the Retailers provided a cervical traction unit purportedly trademarked and/or manufactured by Posture Pro, the legitimate acquisition cost of such item is $65.00.

244.    In each of the foregoing bills in Exhibits "43" and "44", to the extent anything was supplied to No-fault Claimants at all, the Retailers provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, regardless of medical necessity and misrepresented the nature, quality and cost of the items in each of the bills submitted to Plaintiffs.

245.    By billing cervical traction units under codes E0855 and E0849, the Retail Owners, through their respective Retailers, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.

**3.    Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

246.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

247.    By way of example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to Almatcare Medical Supply, BA2RO, Daily Medical, East

70

19 Medical Supply, Gerristen Medcare, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service, Orion Supplies, Prompt Medical Supply, Smart Choice Medical Supply, Top Q, Voorhies, Well Care, and XVV, routinely submitted bills to Plaintiffs for cervical collars under codes L0172, L0174, and L0180 in amounts up to and including $466.00, which were not provided as billed, if any were provided at all. By way of example and not limitation, Exhibit "44" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for cervical collars under codes L0172, L0174, and/or L0180 in amounts ranging from $75.00 to $466.00.

248.    Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic, flexible, foam collars, to $322.50, under code L0200, for more complex cervical collars with occipital and mandibular supports meant for patients with severe neck injuries.

249.    To the extent any DME and/or orthotic device was provided, the Retail Owners, through their respective Retailers, provided basic, inexpensive collars that were not medically necessary, inappropriate for the patient and not prescribed by the physician, which should have been billed, if at all, for $6.80 under code L0120.

250.    By billing for cheap, inexpensive foam cervical collars under codes L0172, L0174 and L0180, the Retail Owners, through their respective Retailers, falsely represented that they provided semi-rigid, thermoplastic, two-piece collars, and/or other complex, medically necessary collars, when they did not.

251.    By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to East 19 Medical Supply, Helpful Medical Supply, Lenex Services, Lida's Medical Supply, Life Equipment, Med Equipments Service,

Orion Supplies, Prompt Medical Supply, Smart Choice Medical Supply, Voorhies, and XVV, routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for "lumbar cushions" using codes E2611, E2612, E2614, and E2619, in amounts up to and including $609.75, which they did not provide as billed, if anything was provided at all.  Exhibit "45" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for lumbar cushions under codes E2611, E2612, E2614, and/or E2619 in amounts ranging from $46.39 to $609.75.

252.    Under the relevant Fee Schedule in existence at the time, codes E2611, E2612, E2614 and E2619 are reserved for DME satisfying the description of "Wheelchair Back Cushion" and/or other wheelchair accessories, and are specifically reserved for support used in connection with a wheelchair.

253.    None of the No-fault Claimants who purportedly received a lumbar cushion or replacement cushion cover from one or more of the Retailers, billed under codes E2611, E2612, E2614, and/or E2619, was wheelchair bound.

254.    To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

255.    By billing lumbar cushions under codes E2611, E2612, E2614, and/or E2619, the Retail Owners, through their respective Retailers, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

## ADVANCED PHARMACY'S FRAUDULENT BILLING FOR PHARMACEUTICALS UNDER THE PHARMACY FEE SCHEDULE

256.    In addition to submitting fraudulent claims for reimbursement of DME and/or orthotic devices as part of the Fee Schedule scheme to defraud described herein, Retailer Advanced Pharmacy also submitted fraudulent claims for pharmaceuticals as part of a separate,

but related Fee Schedule scheme to defraud.

257.    On information and belief, in furtherance of the scheme to defraud Plaintiffs, Advanced Pharmacy dispensed medically unnecessary medications to No-fault Claimants and deliberately overcharged for pain relief patches and compound drug medications, for which significantly cheaper, substantially equivalent over-the-counter medications were available.

258.    By way of example and not limitation, Advanced Pharmacy routinely dispenses MaC Patches (hereinafter "Pain Relief Patches") and bills insurers exorbitant prices exceeding $1,000.00 per bill, notwithstanding that the same or nearly identical patches are commercially available in prices that are a small fraction of the cost.

259.    On information and belief, Advanced Pharmacy also dispenses compound medications and bills insurers exorbitant prices exceeding $1,000.00 per bill, notwithstanding that much cheaper pain creams are available in prices that are fraction of the cost.  Moreover, on information and belief, such compound medications are medically unnecessary as they are routinely billed in the same formulation, pursuant to a formulaic and fraudulent prescription from the No-fault Clinic, and are not tailored specifically for the patients' needs.

260.    On information and belief, in furtherance of the scheme to defraud and to maximize and exploit reimbursement under the payment formulas of the No-fault law, the referring HCPs never prescribe the less expensive over-the-counter or commercially available equivalent medications; instead, in exchange for kickbacks and/or other financial consideration, the HCPs issue identical, formulaic prescriptions for expensive Pain Relief Patches and/or compound products to facilitate excessive billing for medications that are not medically necessary.

261.    Under 12 N.Y.C.R.R. § 440.5(a), entitled the Pharmacy Fee Schedule, the maximum reimbursement or payment for prescription drugs or medicines,

including all brand name and generic prescription drugs or medicines, shall be the Average Wholesale Price for the national drug code for the prescription drug or medicine on the day it was dispensed minus twelve percent of the Average Wholesale price plus a dispensing fee of four dollars for brand name drugs or medicines or minus twenty percent of the Average Wholesale Price plus a dispensing fee of five dollars for generic drugs or medicines set forth fee schedule.

Average Wholesale Price ("AWP") is defined under 12 N.Y.C.R.R. 440.2 as:

[T]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwar Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee.

For compound medications, reimbursement is calculated at the ingredient level, with each ingredient identified using the applicable National Drug Code ("NDC") of the drug product, and the corresponding quantity.  *See* 12 N.Y.C.R.R. 440.5(d).

262.    On information and belief, in each instance where Advanced Pharmacy submitted bills to insurers, in general, and Plaintiffs, in particular, for pharmaceuticals, Advanced Pharmacy billed the items at the full AWP, without applying any of the required deductions in accordance with the Pharmacy Fee Schedule. Moreover, on information and belief, the bills contained inflated AWP prices for the Pain Relief Patches and/or individual ingredients in the compound medications Advanced Pharmacy purportedly supplied to No-fault Claimants.

263.    By way of example and not limitation, in contravention of 12 N.Y.C.R.R. § 440.5, which provides the maximum permissible charge for pharmaceuticals, Retailer Advanced Pharmacy, on information and belief, routinely billed for dollar amounts greater than those allowed under the Pharmacy Fee Schedule.  Exhibit "46" in the accompanying Compendium of Exhibits is a representative sample of claims where Advanced Pharmacy billed one or more Plaintiffs for Pain Relief Patches and/or compound medications in amounts greater than the dollar amounts allowed under the Pharmacy Fee Schedule.

74

264.     By submitting bills to Plaintiffs for pharmaceuticals in excess of the relevant Fee Schedule in existence at the time, M. Khaimov, through Advanced Pharmacy, deliberately misrepresented the amounts Advanced Pharmacy was entitled to receive under the No-fault Law, to the extent that the Pain Relief Patches and/or compound medications were provided at all.

## MONEY LAUNDERING SCHEME

265.     Defendants knew that the money paid by insurers, in general, and Plaintiffs, in particular, to the Retailers represented the proceeds and profits of their unlawful activity.

266.     To ensure that they would ultimately receive their ill-gotten gains, on information and belief, one or more of the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

267.     These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesale Defendants, check brokers (who acted as intermediaries between the check cashers and the Retail and Wholesale Defendants in order to conceal the true beneficiaries of the transactions) and check cashers.

268.     As described herein, on information and belief, the Defendant Retailers and Defendant Wholesalers generated significant amounts of cash through transactions with check cashers and/or other financial arrangements.  This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between the Defendant Retailers and Wholesale Defendants that were essential to foster the illusion that the Retailers actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between the Defendant Retailers and No-fault Clinics, which were necessary to induce the clinics to supply the Defendant Retailers with prescriptions for bogus DME and/or orthotic devices; and (iii) the Defendant Retailers' and Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate

tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

269. As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000 floor that would have triggered compulsory reporting to the government. These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii) presented by "brokers" who acted as intermediaries between the check cashers, Retailers and Wholesale Defendants in order to conceal the true beneficiaries of the transactions.

270. On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesale Defendants was returned to the Retailers. In particular, in furtherance of the scheme to defraud, to create the illusion that the Retailers paid the grossly inflated prices on the invoices provided by the Wholesale Defendants, the Retailers issued checks to the Wholesale Defendants, among others, for the full amounts reflected on the wholesale invoice(s). The Retailers used those checks to demonstrate to Plaintiffs, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

271. In reality, on information and belief, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned cash to the Retailers up to 98% of the wholesale invoice amounts.

272. Through these transactions, the Retailers were able to surreptitiously obtain cash,

which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesale Defendants in exchange for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

273.    To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- The Retail Owners, through their respective Retailers, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that the Retailers actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesale Defendants, reflecting prices far in excess of those actually paid by the Retailers, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, the Retail Owners, through their respective Retailers, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- The Retail Owners, through their respective Retailers, submitted false delivery receipts in support of their bills that purported to demonstrate the No-fault Claimants' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the No-fault Claimants signed them, or, in some instances, they contained forged signatures;

- The Retail Owners, through their respective Retailers, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Claimants, and/or additional information necessary to determine whether the charges submitted by the Retailers were legitimate.

274.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent

claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $1,900,000.00 based upon the fraudulent bill submissions.

275.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS OGAN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

276.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

277.    At all times relevant herein, Ace Orthopedic Services was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

278.    From, in or about July 13, 2015 through the date of the filing of this Complaint, Defendant Ogan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Ace Orthopedic Services enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set

forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

279.     At all relevant times mentioned herein, Defendant Ogan, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Ace Orthopedic Services  enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

280.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Ogan required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

281.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
## (Racketeering Acts)

282.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Ogan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

283.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Ace Orthopedic Services continues to pursue collection on the fraudulent billing to the present day.

284.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Ogan, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Ace Orthopedic Services enterprise based upon materially false and misleading information.

285.   Through the Ace Orthopedic Services enterprise, Defendant Ogan submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Ogan, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Ogan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Ace Orthopedic Services enterprise through the filing

80

of this Complaint.

286.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Ogan, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

287.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

288.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

289.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $14,000.00, the exact amount to be determined at trial.

290.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Ogan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS OGAN AND ACE ORTHOPEDIC

### (Common Law Fraud)

291.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

292.     Defendants Ace Orthopedic Services and Ogan made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company for payment.

293.     On information and belief, each and every bill and supporting documentation submitted by Defendants Ace Orthopedic Services and Ogan to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

294.     On information and belief, Defendants Ace Orthopedic Services and Ogan intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Ace Orthopedic Services was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed

and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Ogan, through Ace Orthopedic Services, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Ogan, through Ace Orthopedic Services, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

295.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Ace Orthopedic Services' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

296.     Defendants Ace Orthopedic Services and Ogan knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

297.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Ace Orthopedic Services and Ogan.

298.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Ace Orthopedic Services' claims for No-fault insurance benefits submitted in connection therewith.

299.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Ace Orthopedic Services and Ogan  evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

300.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $14,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ACE ORTHOPEDIC SERVICES AND OGAN

### (Unjust Enrichment)

301.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

302.    By reason of their wrongdoing, Defendants Ace Orthopedic Services and Ogan have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

303.    Plaintiffs are therefore entitled to restitution from Defendants Ace Orthopedic Services and Ogan in the amount by which they have been unjustly enriched.

304.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $14,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

305.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

306.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company by Defendants Ace Orthopedic Services and Ogan.

307.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Ace Orthopedic Services and Ogan purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Ace Orthopedic Services and Ogan  could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Ogan, through Ace Orthopedic Services, to Ace Orthopedic Services  to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Ace Orthopedic Services; and (v) knowingly supporting the negotiation and

85

performance of kickback agreements between Ogan through Ace Orthopedic Services and the No-fault Clinics.

308.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Ace Orthopedic Services and Ogan to obtain fraudulently inflated payments from Plaintiffs, among others.

309.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

310.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Ace Orthopedic Services in an amount to be determined at trial, but in no event less than $14,000.00.

311.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

312.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive

damages, plus interest, costs and other relief the Court deems just.

## FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KOMISARCHIK, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

313.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

314.    At all times relevant herein, Advanced Orthopedic Solutions was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

315.    From, in or about May 17, 2016 through the date of the filing of this Complaint, Defendant Komisarchik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Advanced Orthopedic Solutions enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

316.    At all relevant times mentioned herein, Defendant Komisarchik, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Advanced Orthopedic Solutions enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

317.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Komisarchik required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

318.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

319.    The racketeering acts set forth herein were carried out on a continued basis for more than a one year period, were related and similar and were committed as part of the ongoing scheme of Defendants Komisarchik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

320.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Advanced Orthopedic Solutions continues to pursue collection on the fraudulent billing to the present day.

321.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Komisarchik, with the

knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Advanced Orthopedic Solutions enterprise based upon materially false and misleading information.

322.    Through the Advanced Orthopedic Solutions enterprise, Defendant Komisarchik submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Komisarchik, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Komisarchik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Advanced Orthopedic Solutions enterprise through the filing of this Complaint.

323.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Komisarchik, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

324.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

325.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

326.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire

and Casualty Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $3,000.00, the exact amount to be determined at trial.

327.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Komisarchik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS KOMISARCHIK AND ADVANCED ORTHOPEDIC SOLUTIONS**

**(Common Law Fraud)**

328.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

329.    Defendants Advanced Orthopedic Solutions and Komisarchik made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff Allstate Fire and Casualty Insurance Company for payment.

330.    On information and belief, each and every bill and supporting documentation submitted by Defendants Advanced Orthopedic Solutions and Komisarchik to Plaintiff set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

331.    On information and belief, Defendants Advanced Orthopedic Solutions and Komisarchik  intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false

representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Advanced Orthopedic Solutions  was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiff that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Komisarchik, through Advanced Orthopedic Solutions, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Komisarchik, through Advanced Orthopedic Solutions, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

332.    The foregoing was intended to deceive and mislead Plaintiff into paying Defendant Advanced Orthopedic Solutions' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

333.    Defendants Advanced Orthopedic Solutions and Komisarchik knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

334.     Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff was led to believe existed as a result of the acts of fraud and deception of Defendants Advanced Orthopedic Solutions and Komisarchik.

335.     Had Plaintiff known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Advanced Orthopedic Solutions' claims for No-fault insurance benefits submitted in connection therewith.

336.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Advanced Orthopedic Solutions and Komisarchik evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

337.     By reason of the foregoing, Plaintiff Allstate Fire and Casualty Insurance Company has sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $3,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ADVANCED ORTHOPEDIC SOLUTIONS AND KOMISARCHIK

### (Unjust Enrichment)

338.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

339.     By reason of their wrongdoing, Defendants Advanced Orthopedic Solutions and Komisarchik have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiff Allstate Fire and Casualty Insurance Company that are the result of

unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

340.    Plaintiff is therefore entitled to restitution from Defendants Advanced Orthopedic Solutions and Komisarchik in the amount by which they have been unjustly enriched.

341.    By reason of the foregoing, Plaintiff Allstate Fire and Casualty Insurance Company has sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $3,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

342.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

343.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiff Allstate Fire and Casualty Insurance Company by Defendants Advanced Orthopedic Solutions and Komisarchik.

344.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Advanced Orthopedic Solutions and Komisarchik purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Advanced Orthopedic Solutions and Komisarchik  could mail fraudulent bills to Plaintiff and

other insurers; (iii) kicking back a portion of the amounts paid by Defendant Komisarchik, through Advanced Orthopedic Solutions, to Advanced Orthopedic Solutions to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through Advanced Orthopedic Solutions; and (v) knowingly supporting the negotiation and performance of kickback agreements between Komisarchik through Advanced Orthopedic Solutions  and the No-fault Clinics.

345.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Advanced Orthopedic Solutions and Komisarchik to obtain fraudulently inflated payments from Plaintiff, among others.

346.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiff into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

347.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiff Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Advanced Orthopedic Solutions in an amount to be determined at

trial, but in no event less than $3,000.00.

348.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

349.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS M. KHAIMOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

350.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

351.    At all times relevant herein, Advanced Pharmacy was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

352.    From, in or about January 27, 2016 through the date of the filing of this Complaint, Defendant M. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Advanced Pharmacy enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

353.    At all relevant times mentioned herein, Defendant M. Khaimov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Advanced Pharmacy enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

354.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant M. Khaimov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

355.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

356.    The racketeering acts set forth herein were carried out on a continued basis for more than a one year period, were related and similar and were committed as part of the ongoing scheme of Defendants M. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to

defraud insurers, and, if not stopped, such acts will continue into the future.

357.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Advanced Pharmacy continues to pursue collection on the fraudulent billing to the present day.

358.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant M. Khaimov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Advanced Pharmacy enterprise based upon materially false and misleading information.

359.    Through the Advanced Pharmacy enterprise, Defendant M. Khaimov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant M. Khaimov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants M. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Advanced Pharmacy enterprise through the filing of this Complaint.

360.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant M. Khaimov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

361. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

362. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

363. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $11,000.00, the exact amount to be determined at trial.

364. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants M. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS M. KHAIMOV AND ADVANCED PHARMACY

### (Common Law Fraud)

365. The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

366. Defendants Advanced Pharmacy and M. Khaimov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, and Allstate Fire and Casualty Insurance Company for payment.

367. On information and belief, each and every bill and supporting documentation submitted by Defendants Advanced Pharmacy and M. Khaimov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly

supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

368.     On information and belief, Defendants Advanced Pharmacy and M. Khaimov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Advanced Pharmacy was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant M. Khaimov, through Advanced Pharmacy, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on

the prescriptions, all of which was designed to permit Defendant M. Khaimov, through Advanced Pharmacy, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

369.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Advanced Pharmacy's claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

370.   Defendants Advanced Pharmacy and M. Khaimov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

371.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Advanced Pharmacy and M. Khaimov.

372.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Advanced Pharmacy's claims for No-fault insurance benefits submitted in connection therewith.

373.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Advanced Pharmacy and M. Khaimov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

374.   By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## ELEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ADVANCED PHARMACY AND M. KHAIMOV

### (Unjust Enrichment)

375.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

376.    By reason of their wrongdoing, Defendants Advanced Pharmacy and M. Khaimov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

377.    Plaintiffs are therefore entitled to restitution from Defendants Advanced Pharmacy and M. Khaimov in the amount by which they have been unjustly enriched.

378.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWELFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

379.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

380.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and

abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Advanced Pharmacy and M. Khaimov.

381.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Advanced Pharmacy and M. Khaimov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Advanced Pharmacy and M. Khaimov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant M. Khaimov, through Advanced Pharmacy, to Advanced Pharmacy to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Advanced Pharmacy; and (v) knowingly supporting the negotiation and performance of kickback agreements between M. Khaimov through Advanced Pharmacy and the No-fault Clinics.

382.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Advanced Pharmacy and M. Khaimov to obtain fraudulently inflated payments from Plaintiffs, among others.

383.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

384.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Advanced Pharmacy in an amount to be determined at trial, but in no event less than $11,000.00.

385.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

386.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### THIRTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MATLYUK, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

387.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

388.    At all times relevant herein, Almatcare Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18

U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

389.    From, in or about November 17, 2015 through the date of the filing of this Complaint, Defendant Matlyuk, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Almatcare Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

390.    At all relevant times mentioned herein, Defendant Matlyuk, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Almatcare Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

391.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Matlyuk required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for

medical supplies.

392.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

393.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Matlyuk, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

394.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Almatcare Medical Supply continues to pursue collection on the fraudulent billing to the present day.

395.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Matlyuk, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Almatcare Medical Supply enterprise based upon materially false and misleading information.

396.    Through the Almatcare Medical Supply  enterprise, Defendant Matlyuk submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and

supporting documents that were sent by Defendant Matlyuk, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Matlyuk, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Almatcare Medical Supply enterprise through the filing of this Complaint.

397.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Matlyuk, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

398.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

399.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

400.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $19,000.00, the exact amount to be determined at trial.

401.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Matlyuk, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MATLYUK AND ALMATCARE MEDICAL SUPPLY

## (Common Law Fraud)

402.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

403.    Defendants Almatcare Medical Supply and Matlyuk made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Insurance Company for payment.

404.    On information and belief, each and every bill and supporting documentation submitted by Defendants Almatcare Medical Supply and Matlyuk to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

405.    On information and belief, Defendants Almatcare Medical Supply and Matlyuk intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Almatcare Medical Supply   was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Matlyuk, through Almatcare Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Matlyuk, through Almatcare Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

406. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Almatcare Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

407. Defendants Almatcare Medical Supply and Matlyuk knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

408. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material

misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Almatcare Medical Supply and Matlyuk.

409.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Almatcare Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

410.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Almatcare Medical Supply and Matlyuk evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

411.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $19,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALMATCARE MEDICAL SUPPLY AND MATLYUK

### (Unjust Enrichment)

412.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

413.    By reason of their wrongdoing, Defendants Almatcare Medical Supply and Matlyuk  have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and

Allstate New Jersey Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

414. Plaintiffs are therefore entitled to restitution from Defendants Almatcare Medical Supply and Matlyuk in the amount by which they have been unjustly enriched.

415. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $19,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

416. The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

417. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Insurance Company by Defendants Almatcare Medical Supply and Matlyuk.

418. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale

invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Almatcare Medical Supply and Matlyuk purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Almatcare Medical Supply and Matlyuk could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Matlyuk, through Almatcare Medical Supply, to Almatcare Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Almatcare Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Matlyuk through Almatcare Medical Supply and the No-fault Clinics.

419. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Almatcare Medical Supply and Matlyuk to obtain fraudulently inflated payments from Plaintiffs, among others.

420. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

421.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Insurance Company to pay money based upon the fraudulent charges submitted through Almatcare Medical Supply  in an amount to be determined at trial, but in no event less than $19,000.00.

422.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

423.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS GORBACHEVA, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

424.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

425.    At all times relevant herein, AOM Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

426.    From, in or about October 21, 2013 through the date of the filing of this Complaint, Defendant Gorbacheva, one or more of the ABC Corporations 1 through 20 and one

or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the AOM Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

427.    At all relevant times mentioned herein, Defendant Gorbacheva, together with others unknown to Plaintiffs, exerted control over and directed the operations of the AOM Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company  that were based, in part, on the utilization of fraudulent wholesale invoices.

428.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Gorbecheva required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

429.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

430.   The racketeering acts set forth herein were carried out on a continued basis for more than a three-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Gorbecheva, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

431.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as AOM Medical Supply continues to pursue collection on the fraudulent billing to the present day.

432.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Gorbecheva, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the AOM Medical Supply enterprise based upon materially false and misleading information.

433.   Through the AOM Medical Supply  enterprise, Defendant Gorbecheva submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Gorbecheva, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Gorbecheva, one or more of the ABC Corporations 1

114

through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the AOM Medical Supply enterprise through the filing of this Complaint.

434.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Gorbecheva, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

435.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

436.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

437.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $13,000.00, the exact amount to be determined at trial.

438.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Gorbacheva, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**EIGHTEENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS GORBECHEVA AND AOM MEDICAL SUPPLY**

**(Common Law Fraud)**

439.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as

though fully set forth herein.

440.    Defendants AOM Medical Supply and Gorbecheva made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company for payment.

441.    On information and belief, each and every bill and supporting documentation submitted by Defendants AOM Medical Supply and Gorbecheva to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

442.    On information and belief, Defendants AOM Medical Supply and Gorbecheva intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts AOM Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to

the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Gorbecheva, through AOM Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Gorbecheva, through AOM Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

443.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant AOM Medical Supply's claims under the No-fault Law.   Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

444.    Defendants AOM Medical Supply and Gorbecheva knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

445.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants AOM Medical Supply and Gorbecheva.

446.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant AOM Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

447.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants AOM Medical Supply and Gorbecheva evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

448.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $14,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### NINETEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS AOM MEDICAL SUPPLY AND GORBECHEVA

### (Unjust Enrichment)

449.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

450.    By reason of their wrongdoing, Defendants AOM Medical Supply and Gorbecheva have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

451.    Plaintiffs are therefore entitled to restitution from Defendants AOM Medical Supply and Gorbecheva in the amount by which they have been unjustly enriched.

452.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $14,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**TWENTIETH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

453.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

454.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company and Allstate Property and Casualty Insurance Company by Defendants AOM Medical Supply and Gorbecheva.

455.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants AOM Medical Supply and Gorbecheva purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants AOM Medical Supply and Gorbecheva  could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Gorbecheva,  through AOM Medical Supply,

119

to AOM Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through AOM Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Gorbecheva through AOM Medical Supply and the No-fault Clinics.

456.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants AOM Medical Supply and Gorbecheva to obtain fraudulently inflated payments from Plaintiffs, among others.

457.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

458.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through AOM Medical Supply in an amount to be determined at trial, but in no event less than $14,000.00.

459.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

460.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## TWENTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVETISYAN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

461.     The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

462.     At all times relevant herein, AVA Custom Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

463.     From, in or about January 22, 2016 through the date of the filing of this Complaint, Defendant Avetisyan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the AVA Custom Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.   Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

464.     At all relevant times mentioned herein, Defendant Avetisyan, together with others

unknown to Plaintiffs, exerted control over and directed the operations of the AVA Custom Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

465.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Avetisyan required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

466.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

467.    The racketeering acts set forth herein were carried out on a continued basis for more than a one year period, were related and similar and were committed as part of the ongoing scheme of Defendants Avetisyan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

468.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as AVA Custom Supply continues to pursue collection on the fraudulent billing to the present day.

469.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Avetisyan, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the AVA Custom Supply enterprise based upon materially false and misleading information.

470.    Through the AVA Custom Supply enterprise, Defendant Avetisyan submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Avetisyan, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Avetisyan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the AVA Custom Supply enterprise through the filing of this Complaint.

471.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Avetisyan, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

472.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §

1961(1)(B).

473.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

474.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Fire and Casualty Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $5,000.00, the exact amount to be determined at trial.

475.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Avetisyan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### TWENTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS AVETISYAN AND AVA CUSTOM SUPPLY

### (Common Law Fraud)

476.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

477.     Defendants AVA Custom Supply and Avetisyan made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company for payment.

478.     On information and belief, each and every bill and supporting documentation submitted by Defendants AVA Custom Supply and Avetisyan to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were

intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

479.     On information and belief, Defendants AVA Custom Supply and Avetisyan intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts AVA Custom Supply  was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Avetisyan,  through AVA Custom Supply,  paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Avetisyan, through AVA Custom Supply,  to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

480.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant AVA Custom Supply's claims under the No-fault Law.   Specific examples of the

billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

481.    Defendants AVA Custom Supply and Avetisyan knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

482.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants AVA Custom Supply and Avetisyan.

483.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant AVA Custom Supply's claims for No-fault insurance benefits submitted in connection therewith.

484.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants AVA Custom Supply and Avetisyan evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

485.    By reason of the foregoing, Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $6,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS AVA CUSTOM SUPPLY AND AVETISYAN

### (Unjust Enrichment)

486.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as

though fully set forth herein.

487.     By reason of their wrongdoing, Defendants AVA Custom Supply and Avetisyan have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

488.     Plaintiffs are therefore entitled to restitution from Defendants AVA Custom Supply and Avetisyan in the amount by which they have been unjustly enriched.

489.     By reason of the foregoing, Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $6,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**TWENTY-FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

490.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

491.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company by Defendants AVA Custom Supply and Avetisyan.

492.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in

furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants AVA Custom Supply and Avetisyan purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants AVA Custom Supply and Avetisyan   could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Avetisyan, through AVA Custom Supply,  to AVA Custom Supply  to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through AVA Custom Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Avetisyan  through AVA Custom Supply   and the No-fault Clinics.

493.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants AVA Custom Supply and Avetisyan to obtain fraudulently inflated payments from Plaintiffs, among others.

494.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

495.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Fire and Casualty Insurance Company and Allstate Insurance Company to pay money based upon the fraudulent charges submitted through AVA Custom Supply in an amount to be determined at trial, but in no event less than $6,000.00.

496.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

497.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### TWENTY-FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS GINDINOVA AND BATUROV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

498.     The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

499.     At all times relevant herein, BA2RO was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

500.     From, in or about August 19, 2011 through the date of the filing of this Complaint, Defendants Gindinova and Baturov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the BA2RO enterprise through a pattern of racketeering activity, including the

129

numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

501.    At all relevant times mentioned herein, Defendants Gindinova and Baturov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the BA2RO  enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

502.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Gindinova and Baturov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

503.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

504.    The racketeering acts set forth herein were carried out on a continued basis for more than a five-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Gindinova and Baturov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

505.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as BA2RO continues to pursue collection on the fraudulent billing to the present day.

506.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Gindinova and Baturov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the BA2RO enterprise based upon materially false and misleading information.

507.    Through the BA2RO  enterprise, Defendants Gindinova and Baturov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendants Gindinova and Baturov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Gindinova and Baturov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a

continuous series of predicate acts of mail fraud, extending from the formation of the BA2RO enterprise through the filing of this Complaint.

508.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Gindinova and Baturov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

509.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

510.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

511.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $108,000.00, the exact amount to be determined at trial.

512.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Gindinova and Baturov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**TWENTY-SIXTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS GINDINOVA, BATUROV, AND BA2RO**

**(Common Law Fraud)**

513.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as

though fully set forth herein.

514.     Defendants BA2RO, Gindinova and Baturov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

515.     On information and belief, each and every bill and supporting documentation submitted by Defendants BA2RO, Gindinova and Baturov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

516.     On information and belief, Defendants BA2RO, Gindinova and Baturov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts BA2RO  was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to

the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Gindinova and Baturov, through BA2RO, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendants Gindinova and Baturov, through BA2RO, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

517. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants BA2RO's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

518. Defendants BA2RO, Gindinova and Baturov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

519. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants BA2RO, Gindinova and Baturov.

520. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendants BA2RO's claims for No-fault insurance benefits submitted in connection therewith.

521.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants BA2RO, Gindinova and Baturov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

522.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $108,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**TWENTY-SEVENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS BA2RO, GINDINOVA, AND BATUROV**

**(Unjust Enrichment)**

523.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

524.     By reason of their wrongdoing, Defendants BA2RO, Gindinova and Baturov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

525.     Plaintiffs are therefore entitled to restitution from Defendants BA2RO, Gindinova and Baturov in the amount by which they have been unjustly enriched.

526.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $108,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### TWENTY-EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

527.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

528.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants BA2RO, Gindinova and Baturov.

529.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants BA2RO, Gindinova and Baturov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants BA2RO, Gindinova and Baturov   could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Gindinova and Baturov,   through BA2RO,   to

BA2RO  to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through BA2RO; and (v) knowingly supporting the negotiation and performance of kickback agreements between Gindinova and Baturov  through BA2RO  and the No-fault Clinics.

530.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants BA2RO, Gindinova and Baturov to obtain fraudulently inflated payments from Plaintiffs, among others.

531.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

532.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through BA2RO in an amount to be determined at trial, but in no event less than $108,000.00.

533.    On information and belief, the Wholesale Defendants' (one or more of the ABC

Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

534.    By reason of the foregoing, Plaintiffs Allstate Insurance, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

## TWENTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MILLER, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

535.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

536.    At all times relevant herein, Daily Medical was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

537.    From, in or about May 5, 2011 through the date of the filing of this Complaint, Defendant Miller, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Daily Medical enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

538.    At all relevant times mentioned herein, Defendant Miller, together with others

unknown to Plaintiffs, exerted control over and directed the operations of the Daily Medical enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company that were based, in part, on the utilization of fraudulent wholesale invoices.

539.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Miller required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

540.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

541.    The racketeering acts set forth herein were carried out on a continued basis for more than a six year period, were related and similar and were committed as part of the ongoing

scheme of Defendants Miller, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

542.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Daily Medical continues to pursue collection on the fraudulent billing to the present day.

543.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Miller, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Daily Medical enterprise based upon materially false and misleading information.

544.     Through the Daily Medical enterprise, Defendant Miller submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Miller, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Miller, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Daily Medical enterprise through the filing of this Complaint.

545.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Miller,

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

546.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

547.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

548.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company,  Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company,  Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $778,000.00, the exact amount to be determined at trial.

549.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Miller, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**THIRTIETH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MILLER AND DAILY MEDICAL**

**(Common Law Fraud)**

550.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

551.    Defendants Daily Medical and Miller made material misrepresentations and/or

omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company for payment.

552.   On information and belief, each and every bill and supporting documentation submitted by Defendants Daily Medical and Miller to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

553.   On information and belief, Defendants Daily Medical and Miller  intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Daily Medical was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to

the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Miller, through Daily Medical, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Miller, through Daily Medical, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

554.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Daily Medical's claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

555.   Defendants Daily Medical and Miller knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

556.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Daily Medical and Miller.

557.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Daily Medical's claims for No-fault insurance benefits submitted in connection therewith.

558.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Daily

Medical and Miller evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

559.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $778,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS DAILY MEDICAL AND MILLER

### (Unjust Enrichment)

560.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

561.    By reason of their wrongdoing, Defendants Daily Medical and Miller have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company, that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

562.    Plaintiffs are therefore entitled to restitution from Defendants Daily Medical and Miller in the amount by which they have been unjustly enriched.

563.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $778,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### THIRTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

564.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

565.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company, by Defendants Daily Medical and Miller.

566.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that

Defendants Daily Medical and Miller   purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Daily Medical and Miller could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Miller, through Daily Medical, to Daily Medical to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Daily Medical; and (v) knowingly supporting the negotiation and performance of kickback agreements between Miller through Daily Medical and the No-fault Clinics.

567.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Daily Medical and Miller to obtain fraudulently inflated payments from Plaintiffs, among others.

568.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

569.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate

146

Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company, to pay money based upon the fraudulent charges submitted through Daily Medical in an amount to be determined at trial, but in no event less than $778,000.00.

570.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

571.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## THIRTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS J. GOMBERG, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

572.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

573.    At all times relevant herein, East 19 Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

574.    From, in or about September 23, 2016 through the date of the filing of this Complaint, Defendant J. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the East 19 Medical Supply enterprise through a pattern of racketeering activity, including the

numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

575. At all relevant times mentioned herein, Defendant J. Gomberg, together with others unknown to Plaintiffs, exerted control over and directed the operations of the East 19 Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

576. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant J. Gomberg required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

577. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

578.    The racketeering acts set forth herein were carried out on a continued basis for more than a half year period, were related and similar and were committed as part of the ongoing scheme of Defendants J. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

579.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as East 19 Medical Supply continues to pursue collection on the fraudulent billing to the present day.

580.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant J. Gomberg, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the East 19 Medical Supply enterprise based upon materially false and misleading information.

581.    Through the East 19 Medical Supply enterprise, Defendant J. Gomberg submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant J. Gomberg, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants J. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the East 19 Medical Supply

149

enterprise through the filing of this Complaint.

582.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant J. Gomberg, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

583.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

584.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

585.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $8,000.00, the exact amount to be determined at trial.

586.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants J. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### THIRTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS J. GOMBERG AND EAST 19 MEDICAL SUPPLY

### (Common Law Fraud)

587.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

588.    Defendants East 19 Medical Supply and J. Gomberg made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company for payment.

589.    On information and belief, each and every bill and supporting documentation submitted by Defendants East 19 Medical Supply and J. Gomberg to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

590.    On information and belief, Defendants East 19 Medical Supply and J. Gomberg intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts East 19 Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant J. Gomberg, through East 19 Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant J. Gomberg, through East 19 Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

591.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant East 19 Medical Supply's claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

592.   Defendants East 19 Medical Supply and J. Gomberg knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

593.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants East 19 Medical Supply and J. Gomberg.

594.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant East 19 Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

595.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants East 19

Medical Supply and J. Gomberg  evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

596.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $8,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EAST 19 MEDICAL SUPPLY AND J. GOMBERG

### (Unjust Enrichment)

597.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

598.    By reason of their wrongdoing, Defendants East 19 Medical Supply and J. Gomberg have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

599.    Plaintiffs are therefore entitled to restitution from Defendants East 19 Medical Supply and J. Gomberg in the amount by which they have been unjustly enriched.

600.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and

Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $8,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## THIRTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

#### (Aiding and Abetting)

601.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

602.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company by Defendants East 19 Medical Supply and J. Gomberg.

603.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants East 19 Medical Supply and J. Gomberg purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants East 19 Medical Supply and J. Gomberg  could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant J. Gomberg, through East 19 Medical Supply, to East 19 Medical Supply to create the impression of an actual sale in furtherance of the money

laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through East 19 Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between J. Gomberg through East 19 Medical Supply and the No-fault Clinics.

604.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants East 19 Medical Supply and J. Gomberg to obtain fraudulently inflated payments from Plaintiffs, among others.

605.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

606.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company to pay money based upon the fraudulent charges submitted through East 19 Medical Supply in an amount to be determined at trial, but in no event less than $8,000.00.

607.    On information and belief, the Wholesale Defendants' (one or more of the ABC

Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

608.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### THIRTY-SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS CHERNYSHEV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

609.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

610.    At all times relevant herein, Gerritsen Medcare was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

611.    From, in or about January 11, 2017 through the date of the filing of this Complaint, Defendant Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Gerritsen Medcare enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

612.    At all relevant times mentioned herein, Defendant Chernyshev, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Gerritsen

Medcare enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

613.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Chernyshev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

614.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

615.   The racketeering acts set forth herein were carried out on a continued basis for more than a half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

616.   On information and belief, this pattern of racketeering activity poses a specific

threat of repetition extending indefinitely into the future, inasmuch as Gerritsen Medcare continues to pursue collection on the fraudulent billing to the present day.

617.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Chernyshev, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Gerritsen Medcare enterprise based upon materially false and misleading information.

618.    Through the Gerritsen Medcare enterprise, Defendant Chernyshev submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Chernyshev, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Gerritsen Medcare enterprise through the filing of this Complaint.

619.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Chernyshev, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

620.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

621. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

622. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $4,000.00, the exact amount to be determined at trial.

623. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Chernyshev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**THIRTY-EIGHTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS CHERNYSHEV AND GERRITSEN MEDCARE**

**(Common Law Fraud)**

624. The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

625. Defendants Gerritsen Medcare and Chernyshev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

626. On information and belief, each and every bill and supporting documentation submitted by Defendants Gerritsen Medcare and Chernyshev to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants

and the consumer public.

627.   On information and belief, Defendants Gerritsen Medcare and Chernyshev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Gerritsen Medcare was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Chernyshev, through Gerritsen Medcare, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Chernyshev, through Gerritsen Medcare, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

628.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Gerritsen Medcare's claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

629.    Defendants Gerritsen Medcare and Chernyshev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

630.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Gerritsen Medcare and Chernyshev.

631.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Gerritsen Medcare's claims for No-fault insurance benefits submitted in connection therewith.

632.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Gerritsen Medcare and Chernyshev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

633.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $4,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS GERRITSEN MEDCARE AND CHERNYSHEV

**(Unjust Enrichment)**

634.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

635.    By reason of their wrongdoing, Defendants Gerritsen Medcare and Chernyshev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

636.    Plaintiffs are therefore entitled to restitution from Defendants Gerritsen Medcare and Chernyshev in the amount by which they have been unjustly enriched.

637.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $4,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FORTIETH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

638.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

639.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Gerritsen Medcare and Chernyshev.

640.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Gerritsen Medcare and Chernyshev purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Gerritsen Medcare and Chernyshev could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Chernyshev, through Gerritsen Medcare, to Gerritsen Medcare to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Gerritsen Medcare; and (v) knowingly supporting the negotiation and performance of kickback agreements between Chernyshev through Gerritsen Medcare  and the No-fault Clinics.

641.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Gerritsen Medcare and Chernyshev to obtain fraudulently inflated payments from Plaintiffs, among others.

642.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or

orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

643.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Gerritsen Medcare in an amount to be determined at trial, but in no event less than $4,000.00.

644.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

645.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS FEDEROV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

646.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

647.    At all times relevant herein, Helpful Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

648.    From, in or about June 8, 2015 through the date of the filing of this Complaint, Defendant Federov, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 2 through 20, knowingly conducted and participated in the affairs of the Helpful Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

649.    At all relevant times mentioned herein, Defendant Federov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Helpful Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

650.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Federov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

651.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent

claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

652.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Federov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

653.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Helpful Medical Supply continues to pursue collection on the fraudulent billing to the present day.

654.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Federov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Helpful Medical Supply enterprise based upon materially false and misleading information.

655.    Through the Helpful Medical Supply enterprise, Defendant Federov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Federov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Federov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate

166

acts of mail fraud, extending from the formation of the Helpful Medical Supply enterprise through the filing of this Complaint.

656.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Federov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

657.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

658.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

659.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $21,000.00, the exact amount to be determined at trial.

660.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Federov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### FORTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS FEDEROV AND HELPFUL MEDICAL SUPPLY

### (Common Law Fraud)

661.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as

though fully set forth herein.

662.     Defendants Helpful Medical Supply and Federov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

663.     On information and belief, each and every bill and supporting documentation submitted by Defendants Helpful Medical Supply and Federov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

664.     On information and belief, Defendants Helpful Medical Supply and Federov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Helpful Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to

the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Federov, through Helpful Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Federov, through Helpful Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

665. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Helpful Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

666. Defendants Helpful Medical Supply and Federov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

667. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Helpful Medical Supply and Federov.

668. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Helpful Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

169

669.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Helpful Medical Supply and Federov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

670.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $21,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS HELPFUL MEDICAL SUPPLY AND FEDEROV

### (Unjust Enrichment)

671.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

672.    By reason of their wrongdoing, Defendants Helpful Medical Supply and Federov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

673.    Plaintiffs are therefore entitled to restitution from Defendants Helpful Medical Supply and Federov in the amount by which they have been unjustly enriched.

674.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $21,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FORTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

675. The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

676. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Helpful Medical Supply and Federov.

677. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Helpful Medical Supply and Federov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Helpful Medical Supply and Federov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Federov, through Helpful Medical Supply, to Helpful

Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Helpful Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Federov through Helpful Medical Supply and the No-fault Clinics.

678.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Helpful Medical Supply and Federov to obtain fraudulently inflated payments from Plaintiffs, among others.

679.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

680.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs  Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Helpful Medical Supply in an amount to be determined at trial, but in no event less than $21,000.00.

681.    On information and belief, the Wholesale Defendants' (one or more of the ABC

Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

682.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS A. BLANTZ, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

683.     The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

684.     At all times relevant herein, Lenex Services was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

685.     From, in or about January 30, 2014 through the date of the filing of this Complaint, Defendant A. Blantz, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Lenex Services enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

686.     At all relevant times mentioned herein, Defendant A. Blantz, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Lenex Services enterprise and utilized that control to conduct the pattern of racketeering activities that consisted

of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

687.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant A. Blantz required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

688.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

689.    The racketeering acts set forth herein were carried out on a continued basis for more than a three-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants A. Blantz, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

690. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Lenex Services continues to pursue collection on the fraudulent billing to the present day.

691. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant A. Blantz, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Lenex Services enterprise based upon materially false and misleading information.

692. Through the Lenex Services enterprise, Defendant A. Blantz submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant A. Blantz, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants A. Blantz, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Lenex Services enterprise through the filing of this Complaint.

693. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant A. Blantz, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

694. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §

1961(1)(B).

695.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

696.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $133,000.00, the exact amount to be determined at trial.

697.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants A. Blantz, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### FORTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS A. BLANTZ AND LENEX SERVICES

### (Common Law Fraud)

698.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

699.    Defendants Lenex Services and A. Blantz made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company for payment.

700.   On information and belief, each and every bill and supporting documentation submitted by Defendants Lenex Services and A. Blantz to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

701.   On information and belief, Defendants Lenex Services and A. Blantz intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Lenex Services was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby,

Defendant A. Blantz, through Lenex Services, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant A. Blantz, through Lenex Services, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

702.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Lenex Services' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

703.    Defendants Lenex Services and A. Blantz knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

704.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Lenex Services and A. Blantz.

705.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Lenex Services' claims for No-fault insurance benefits submitted in connection therewith.

706.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Lenex Services and A. Blantz evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

707.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty

Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $133,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### FORTY-SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS LENEX SERVICES AND A. BLANTZ

### (Unjust Enrichment)

708.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

709.   By reason of their wrongdoing, Defendants Lenex Services and A. Blantz  have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

710.   Plaintiffs are therefore entitled to restitution from Defendants Lenex Services and A. Blantz in the amount by which they have been unjustly enriched.

711.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $133,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### FORTY-EIGHTH CLAIM FOR RELIEF

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND
JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

712.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

713.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company by Defendants Lenex Services and A. Blantz.

714.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Lenex Services and A. Blantz  purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Lenex Services and A. Blantz  could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant A. Blantz, through Lenex Services, to Lenex Services to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Lenex Services; and (v) knowingly supporting the negotiation and performance of kickback agreements between A.

Blantz through Lenex Services and the No-fault Clinics.

715.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Lenex Services and A. Blantz to obtain fraudulently inflated payments from Plaintiffs, among others.

716.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

717.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Lenex Services in an amount to be determined at trial, but in no event less than $133,000.00.

718.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

719.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive

181

damages, plus interest, costs and other relief the Court deems just.

## FORTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MUCHNIK, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

720.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

721.    At all times relevant herein, Lida's Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

722.    From, in or about October 24, 2016 through the date of the filing of this Complaint, Defendant Muchnik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Lida's Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

723.    At all relevant times mentioned herein, Defendant Muchnik, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Lida's Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance

Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company that were based, in part, on the utilization of fraudulent wholesale invoices.

724.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Muchnik required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

725.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

726.   The racketeering acts set forth herein were carried out on a continued basis for more than a half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Muchnik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

727.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Lida's Medical Supply continues to pursue collection on the fraudulent billing to the present day.

728.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Muchnik, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Lida's Medical Supply enterprise based upon materially false and misleading information.

729.    Through the Lida's Medical Supply enterprise, Defendant Muchnik submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant Muchnik, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Muchnik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Lida's Medical Supply enterprise through the filing of this Complaint.

730.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Muchnik, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

731.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

732.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

733.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $273,000.00, the exact amount to be determined at trial.

734.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Muchnik, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MUCHNIK AND LIDA'S MEDICAL SUPPLY

### (Common Law Fraud)

735.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

736.    Defendants Lida's Medical Supply and Muchnik made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company for payment.

737.    On information and belief, each and every bill and supporting documentation submitted by Defendants Lida's Medical Supply and Muchnik to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly

supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

738.    On information and belief, Defendants Lida's Medical Supply and Muchnik intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Lida's Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Muchnik, through Lida's Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on

the prescriptions, all of which was designed to permit Defendant Muchnik, through Lida's Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

739. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Lida's Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

740. Defendants Lida's Medical Supply and Muchnik knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

741. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Lida's Medical Supply and Muchnik.

742. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Lida's Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

743. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Lida's Medical Supply and Muchnik evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

744. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of

$273,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS LIDA'S MEDICAL SUPPLY AND MUCHNIK

## (Unjust Enrichment)

745.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

746.    By reason of their wrongdoing, Defendants Lida's Medical Supply and Muchnik have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

747.    Plaintiffs are therefore entitled to restitution from Defendants Lida's Medical Supply and Muchnik in the amount by which they have been unjustly enriched.

748.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $273,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FIFTY-SECOND CLAIM FOR RELIEF

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND
JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

749.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

750.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company by Defendants Lida's Medical Supply and Muchnik.

751.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Lida's Medical Supply and Muchnik purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Lida's Medical Supply and Muchnik could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Muchnik, through Lida's Medical Supply, to Lida's Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Lida's Medical Supply; and (v) knowingly supporting the negotiation and performance of

189

kickback agreements between Muchnik through Lida's Medical Supply and the No-fault Clinics.

752.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Lida's Medical Supply and Muchnik to obtain fraudulently inflated payments from Plaintiffs, among others.

753.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

754.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company to pay money based upon the fraudulent charges submitted through Lida's Medical Supply in an amount to be determined at trial, but in no event less than $273,000.00.

755.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

756.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive

damages, plus interest, costs and other relief the Court deems just.

### FIFTY-THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS A. KHAIMOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

757.   The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

758.   At all times relevant herein, Life Equipment was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

759.   From, in or about December 31, 2010 through the date of the filing of this Complaint, Defendant A. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Life Equipment enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

760.   At all relevant times mentioned herein, Defendant A. Khaimov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Life Equipment enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

761.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant A. Khaimov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

762.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

763.   The racketeering acts set forth herein were carried out on a continued basis for more than a six-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants A. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

764.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Life Equipment continues to pursue collection on the fraudulent billing to the present day.

765.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant A. Khaimov, with the

knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Life Equipment enterprise based upon materially false and misleading information.

766.    Through the Life Equipment enterprise, Defendant A. Khaimov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant A. Khaimov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants A. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Life Equipment enterprise through the filing of this Complaint.

767.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant A. Khaimov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

768.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

769.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

770.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate

Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $20,000.00, the exact amount to be determined at trial.

771.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants A. Khaimov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS A. KHAIMOV AND LIFE EQUIPMENT

### (Common Law Fraud)

772.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

773.    Defendants Life Equipment and A. Khaimov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

774.    On information and belief, each and every bill and supporting documentation submitted by Defendants Life Equipment and A. Khaimov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

775.    On information and belief, Defendants Life Equipment and A. Khaimov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of

material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Life Equipment was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant A. Khaimov, through Life Equipment, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant A. Khaimov, through Life Equipment, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

776. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Life Equipment's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

777.    Defendants Life Equipment and A. Khaimov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

778.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Life Equipment and A. Khaimov.

779.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Life Equipment's claims for No-fault insurance benefits submitted in connection therewith.

780.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Life Equipment and A. Khaimov  evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

781.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LIFE EQUIPMENT AND A. KHAIMOV

### (Unjust Enrichment)

782.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

783.    By reason of their wrongdoing, Defendants Life Equipment and A. Khaimov have

been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

784.    Plaintiffs are therefore entitled to restitution from Defendants Life Equipment and A. Khaimov in the amount by which they have been unjustly enriched.

785.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FIFTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

#### (Aiding and Abetting)

786.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

787.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Life Equipment and A. Khaimov.

788.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic

devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Life Equipment and A. Khaimov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Life Equipment and A. Khaimov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant A. Khaimov, through Life Equipment, to Life Equipment to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Life Equipment; and (v) knowingly supporting the negotiation and performance of kickback agreements between A. Khaimov through Life Equipment and the No-fault Clinics.

789.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Life Equipment and A. Khaimov to obtain fraudulently inflated payments from Plaintiffs, among others.

790.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

791.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused

Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Life Equipment in an amount to be determined at trial, but in no event less than $20,000.00.

792.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

793.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FIFTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AZYENBERG, IG&NAT SERVICES, INC., ABC CORPORATIONS 1 THROUGH 20, JOHN DOE 1 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

794.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

795.    At all times relevant herein, Med Equipments Service was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

796.    From, in or about July 2, 2008 through the date of the filing of this Complaint, Defendant Azyenberg, IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Med Equipments Service enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits

accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

797.    At all relevant times mentioned herein, Defendant Azyenberg, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Med Equipments Service enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

798.    On information and belief, IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Azyenberg required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

799.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by IG&NAT Services, Inc., John Doe 1, one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

800.    The racketeering acts set forth herein were carried out on a continued basis for

more than an eight-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Azyenberg, IG&NAT Services, Inc., John Doe 1 one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

801.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Med Equipments Service continues to pursue collection on the fraudulent billing to the present day.

802.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Azyenberg, with the knowledge and intent of IG&NAT Services, Inc., John Doe 1 one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Med Equipments Service enterprise based upon materially false and misleading information.

803.   Through the Med Equipments Service enterprise, Defendant Azyenberg submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant Azyenberg, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Azyenberg, IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Med Equipments Service enterprise through the filing of this Complaint.

804.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Azyenberg, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

805.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

806.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

807.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $112,000.00, the exact amount to be determined at trial.

808.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Azyenberg, IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**FIFTY-EIGHTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS AZYENBERG AND MED EQUIPMENTS SERVICE**

**(Common Law Fraud)**

809.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

810.    Defendants   Med   Equipments   Service   and   Azyenberg   made   material

misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company for payment.

811.    On information and belief, each and every bill and supporting documentation submitted by Defendants Med Equipments Service and Azyenberg to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

812.    On information and belief, Defendants Med Equipments Service and Azyenberg intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Med Equipments Service was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Azyenberg, through Med Equipments Service, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Azyenberg, through Med Equipments Service, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

813.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Med Equipments Service's claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

814.    Defendants Med Equipments Service and Azyenberg knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

815.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Med Equipments Service and Azyenberg.

816.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Med Equipments Service's claims for No-fault insurance benefits submitted in connection therewith.

817.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Med

Equipments Service and Azyenberg evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

818.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $113,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MED EQUIPMENTS SERVICE AND AZYENBERG

### (Unjust Enrichment)

819.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

820.    By reason of their wrongdoing, Defendants Med Equipments Service and Azyenberg have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company, that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

821.    Plaintiff are therefore entitled to restitution from Defendants Med Equipments Service and Azyenberg in the amount by which they have been unjustly enriched.

822.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $113,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS IG&NAT SERVICES, INC., JOHN DOE 1, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

#### (Aiding and Abetting)

823.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

824.    On information and belief, the Wholesale Defendants (IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company by Defendants Med Equipments Service and Azyenberg.

825.    On information and belief, the acts taken by the Wholesale Defendants (IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the

DME and/or orthotic devices that Defendants Med Equipments Service and Azyenberg purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Med Equipments Service and Azyenberg could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Azyenberg, through Med Equipments Service, to Med Equipments Service to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Med Equipments Service; and (v) knowingly supporting the negotiation and performance of kickback agreements between Azyenberg through Med Equipments Service and the No-fault Clinics.

826.   On information and belief, the conduct of the Wholesale Defendants (IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Med Equipments Service and Azyenberg to obtain fraudulently inflated payments from Plaintiffs, among others.

827.   On information and belief, the Wholesale Defendants (IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

828.   On information and belief, the conduct of the Wholesale Defendants (IG&NAT

Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company  to pay money based upon the fraudulent charges submitted through Med Equipments Service in an amount to be determined at trial, but in no event less than $113,000.00.

829.    On information and belief, the Wholesale Defendants' (IG&NAT Services, Inc., John Doe 1, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

830.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SIXTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS N. GOMBERG, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

831.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

832.    At all times relevant herein, Orion Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

833.    From, in or about October 20, 2011 through the date of the filing of this Complaint, Defendant N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of

the Orion Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

834.    At all relevant times mentioned herein, Defendant N. Gomberg, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Orion Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

835.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant N. Gomberg required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

836.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent

claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
## (Racketeering Acts)

837.    The racketeering acts set forth herein were carried out on a continued basis for more than a five-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

838.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Orion Supplies continues to pursue collection on the fraudulent billing to the present day.

839.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant N. Gomberg, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Orion Supplies enterprise based upon materially false and misleading information.

840.    Through the Orion Supplies enterprise, Defendant N. Gomberg  submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant N. Gomberg, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of

predicate acts of mail fraud, extending from the formation of the Orion Supplies enterprise through the filing of this Complaint.

841.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant N. Gomberg, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

842.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

843.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

844.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $52,000.00, the exact amount to be determined at trial.

845.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SIXTY-SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS N. GOMBERG, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

846.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as

though fully set forth herein.

## THE RICO ENTERPRISE

847.    At all times relevant herein, Prompt Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

848.    From, in or about February 19, 2013 through the date of the filing of this Complaint, Defendant N. Gomberg,  one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Prompt Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

849.    At all relevant times mentioned herein, Defendant N. Gomberg, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Prompt Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

850.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the

212

purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant N. Gomberg required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

851.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

852.    The racketeering acts set forth herein were carried out on a continued basis for more than a four year period, were related and similar and were committed as part of the ongoing scheme of Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

853.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Prompt Medical Supply continues to pursue collection on the fraudulent billing to the present day.

854.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant N. Gomberg, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Prompt Medical Supply

enterprise based upon materially false and misleading information.

855.    Through the Prompt Medical Supply enterprise, Defendant N. Gomberg submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant N. Gomberg, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Prompt Medical Supply enterprise through the filing of this Complaint.

856.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant N. Gomberg, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

857.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

858.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

859.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $97,000.00, the exact amount to be determined at trial.

860.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants N. Gomberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS N. GOMBERG, ORION SUPPLIES, AND PROMPT MEDICAL SUPPLY

### (Common Law Fraud)

861.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

862.    Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg  made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company for payment.

863.    On information and belief, each and every bill and supporting documentation submitted by Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

864.    On information and belief, Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg  intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material

215

misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Orion Supplies and Prompt Medical Supply were entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant N. Gomberg, through Orion Supplies and Prompt Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant N. Gomberg, through Orion Supplies and Prompt Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

865.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Orion Supplies and Prompt Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

866.    Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

867.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg.

868.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendants Orion Supplies and Prompt Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

869.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

870.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $150,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### SIXTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ORION SUPPLIES, PROMPT MEDICAL SUPPLY, AND N. GOMBERG

### (Unjust Enrichment)

871.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as

217

though fully set forth herein.

872.    By reason of their wrongdoing, Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

873.    Plaintiffs are therefore entitled to restitution from Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg in the amount by which they have been unjustly enriched.

874.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $150,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTY-FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

#### (Aiding and Abetting)

875.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

876.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and

abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company by Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg.

877.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg  could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant N. Gomberg, through Orion Supplies and Prompt Medical Supply, to Orion Supplies and Prompt Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Orion Supplies and Prompt Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between N. Gomberg through Orion Supplies and Prompt Medical Supply and the No-fault Clinics.

878.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is

critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Orion Supplies, Prompt Medical Supply, and N. Gomberg  to obtain fraudulently inflated payments from Plaintiffs, among others.

879.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

880.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Orion Supplies and Prompt Medical Supply in an amount to be determined at trial, but in no event less than $150,000.00.

881.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

882.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SIXTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MOLDOVANSKY, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

883.     The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

884.     At all times relevant herein, Right Choice Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

885.     From, in or about December 23, 2015 through the date of the filing of this Complaint, Defendant Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Right Choice Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.   Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

886.     At all relevant times mentioned herein, Defendant Moldovansky, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Right Choice Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

887.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as

well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Moldovansky required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

888.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

889.    The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

890.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Right Choice Medical Supply continues to pursue collection on the fraudulent billing to the present day.

891.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Moldovansky, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice

to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Right Choice Medical Supply enterprise based upon materially false and misleading information.

892.    Through the Right Choice Medical Supply  enterprise, Defendant Moldovansky submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Moldovansky, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Right Choice Medical Supply enterprise through the filing of this Complaint.

893.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Moldovansky, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

894.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

895.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

896.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $8,000.00, the exact amount to be determined at trial.

897.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MOLDOVANSKY, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

898.    The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

899.    At all times relevant herein, Smart Choice Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

900.    From, in or about May 27, 2014 through the date of the filing of this Complaint, Defendant Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Smart Choice Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

901.    At all relevant times mentioned herein, Defendant Moldovansky, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Smart Choice Medical Supply enterprise and utilized that control to conduct the pattern of racketeering

activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

902.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Moldovansky required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

903.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

904.    The racketeering acts set forth herein were carried out on a continued basis for more than a three year period, were related and similar and were committed as part of the ongoing scheme of Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

905.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Smart Choice Medical Supply continues to pursue collection on the fraudulent billing to the present day.

906.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Moldovansky, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Smart Choice Medical Supply enterprise based upon materially false and misleading information.

907.    Through the Smart Choice Medical Supply enterprise, Defendant Moldovansky submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Moldovansky, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Smart Choice Medical Supply enterprise through the filing of this Complaint.

908.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Moldovansky, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

909.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. §

1961(1)(B).

910. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

911. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $19,000.00, the exact amount to be determined at trial.

912. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Moldovansky, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MOLDOVANSKY, RIGHT CHOICE MEDICAL SUPPLY, AND SMART CHOICE MEDICAL SUPPLY

### (Common Law Fraud)

913. The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

914. Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company for payment.

915.   On information and belief, each and every bill and supporting documentation submitted by Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

916.   On information and belief, Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Right Choice Medical Supply and Smart Choice Medical Supply were entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed

and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Moldovansky, through Right Choice Medical Supply and Smart Choice Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Moldovansky, through Right Choice Medical Supply and Smart Choice Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

917.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Right Choice Medical Supply and Smart Choice Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

918.   Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

919.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky.

920.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendants Right Choice Medical Supply and Smart Choice Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

921.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky evinces a high degree

of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

922.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $27,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS RIGHT CHOICE MEDICAL SUPPLY, SMART CHOICE MEDICAL SUPPLY, AND MOLDOVANSKY

### (Unjust Enrichment)

923.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

924.    By reason of their wrongdoing, Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky  have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

925.    Plaintiffs are therefore entitled to restitution from Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky in the amount by which they have been unjustly enriched.

926.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $27,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### SEVENTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

927.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

928.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company by Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky.

929.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale

invoices so that Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Moldovansky, through Right Choice Medical Supply and Smart Choice Medical Supply, to Right Choice Medical Supply and Smart Choice Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Right Choice Medical Supply and Smart Choice Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Moldovansky through Right Choice Medical Supply and Smart Choice Medical Supply and the No-fault Clinics.

930.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Right Choice Medical Supply, Smart Choice Medical Supply, and Moldovansky to obtain fraudulently inflated payments from Plaintiffs, among others.

931.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

932.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Right Choice Medical Supply and Smart Choice Medical Supply in an amount to be determined at trial, but in no event less than $27,000.00.

933.　On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

934.　By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SKAPARS, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

935.　The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

936.　At all times relevant herein, Skapars Health Products was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

937.　From, in or about April 24, 2014 through the date of the filing of this Complaint, Defendant Skapars, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Skapars Health Products  enterprise through a pattern of racketeering activity, including the numerous

acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

938. At all relevant times mentioned herein, Defendant Skapars, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Skapars Health Products enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

939. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Skapars required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

940. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

941.    The racketeering acts set forth herein were carried out on a continued basis for more than a three year period, were related and similar and were committed as part of the ongoing scheme of Defendants Skapars, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

942.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Skapars Health Products continues to pursue collection on the fraudulent billing to the present day.

943.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Skapars, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Skapars Health Products enterprise based upon materially false and misleading information.

944.    Through the Skapars Health Products  enterprise, Defendant Skapars submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Skapars, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Skapars, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Skapars Health Products enterprise

through the filing of this Complaint.

945.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Skapars, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

946.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

947.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

948.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $32,000.00, the exact amount to be determined at trial.

949.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Skapars, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS SKAPARS AND SKAPARS HEALTH PRODUCTS

### (Common Law Fraud)

950.     The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

951.   Defendants Skapars Health Products and Skapars made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company for payment.

952.   On information and belief, each and every bill and supporting documentation submitted by Defendants Skapars Health Products and Skapars to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

953.   On information and belief, Defendants Skapars Health Products and Skapars intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Skapars Health Products was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to

the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Skapars, through Skapars Health Products, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Skapars, through Skapars Health Products, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

954.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Skapars Health Products' claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

955.   Defendants Skapars Health Products and Skapars knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

956.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Skapars Health Products and Skapars.

957.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Skapars Health Products' claims for No-fault insurance benefits submitted in connection therewith.

958.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Skapars Health Products and Skapars evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

959.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $34,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS SKAPARS HEALTH PRODUCTS AND SKAPARS

### (Unjust Enrichment)

960.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

961.    By reason of their wrongdoing, Defendants Skapars Health Products and Skapars have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

962.    Plaintiffs are therefore entitled to restitution from Defendants Skapars Health Products and Skapars in the amount by which they have been unjustly enriched.

963.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $34,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**SEVENTY-FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

964.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

965.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company by Defendants Skapars Health Products and Skapars.

966.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Skapars Health Products and Skapars purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Skapars Health Products and Skapars could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking

back a portion of the amounts paid by Defendant Skapars, through Skapars Health Products, to Skapars Health Products to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Skapars Health Products; and (v) knowingly supporting the negotiation and performance of kickback agreements between Skapars through Skapars Health Products  and the No-fault Clinics.

967.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Skapars Health Products and Skapars to obtain fraudulently inflated payments from Plaintiffs, among others.

968.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

969.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company  to pay money based upon the fraudulent charges submitted through

Skapars Health Products in an amount to be determined at trial, but in no event less than $34,000.00.

970.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

971.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS DAVIDOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

972.     The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

973.     At all times relevant herein, Top Q was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

974.     From, in or about March 29, 2016 through the date of the filing of this Complaint, Defendant Davidov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Top Q enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference.  Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

975.    At all relevant times mentioned herein, Defendant Davidov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Top Q enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

976.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Davidov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

977.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

978.    The racketeering acts set forth herein were carried out on a continued basis for more than a one year period, were related and similar and were committed as part of the ongoing scheme of Defendants Davidov, one or more of the ABC Corporations 1 through 20 and one or

more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

979.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Top Q continues to pursue collection on the fraudulent billing to the present day.

980.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Davidov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Top Q enterprise based upon materially false and misleading information.

981.    Through the Top Q enterprise, Defendant Davidov  submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Davidov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Davidov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Top Q enterprise through the filing of this Complaint.

982.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Davidov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

983.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

984.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

985.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $20,000.00, the exact amount to be determined at trial.

986.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Davidov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS DAVIDOV AND TOP Q

### (Common Law Fraud)

987.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

988.    Defendants Top Q and Davidov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

989.    On information and belief, each and every bill and supporting documentation

submitted by Defendants Top Q and Davidov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

990.   On information and belief, Defendants Top Q and Davidov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Top Q was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Davidov, through Top Q, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and

chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Davidov, through Top Q, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

991.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Top Q's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

992.   Defendants Top Q and Davidov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

993.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Top Q and Davidov.

994.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Top Q's claims for No-fault insurance benefits submitted in connection therewith.

995.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Top Q and Davidov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

996.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as

yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**SEVENTY-SEVENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS TOP Q AND DAVIDOV**

**(Unjust Enrichment)**

997.    The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

998.    By reason of their wrongdoing, Defendants Top Q and Davidov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

999.    Plaintiffs are therefore entitled to restitution from Defendants Top Q and Davidov in the amount by which they have been unjustly enriched.

1000.  By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**SEVENTY-EIGHTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20**

**(Aiding and Abetting)**

1001.  The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

248

1002.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Top Q and Davidov.

1003.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Top Q and Davidov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Top Q and Davidov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Davidov, through Top Q, to Top Q to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Top Q; and (v) knowingly supporting the negotiation and performance of kickback agreements between Davidov through Top Q  and the No-fault Clinics.

1004.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no

opportunity for Defendants Top Q and Davidov to obtain fraudulently inflated payments from Plaintiffs, among others.

1005.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1006.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Top Q in an amount to be determined at trial, but in no event less than $20,000.00.

1007.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1008.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SEVENTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS KAGAN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1009.   The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

250

## THE RICO ENTERPRISE

1010.  At all times relevant herein, Voorhies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1011.  From, in or about December 5, 2012 through the date of the filing of this Complaint, Defendant Kagan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Voorhies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1012.  At all relevant times mentioned herein, Defendant Kagan, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Voorhies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1013.  On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in

the Complaint. One or more of the ABC Corporations furnished documents that Defendant Kagan required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1014.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1015.   The racketeering acts set forth herein were carried out on a continued basis for more than a four-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Kagan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1016.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Voorhies continues to pursue collection on the fraudulent billing to the present day.

1017.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Voorhies, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Voorhies enterprise based upon materially false and misleading information.

1018.   Through the Voorhies enterprise, Defendant Kagan submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Kagan, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.   By virtue of those activities, Defendants Kagan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Voorhies enterprise through the filing of this Complaint.

1019.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Kagan, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1020.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1021.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1022.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company and Northbrook Indemnity Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $56,000.00, the exact amount to be determined at trial.

1023.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Kagan, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KAGAN AND VOORHIES

### (Common Law Fraud)

1024.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1025.   Defendants Voorhies and Kagan made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company for payment.

1026.   On information and belief, each and every bill and supporting documentation submitted by Defendants Voorhies and Kagan to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1027.  On information and belief, Defendants Voorhies and Kagan intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or

omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Voorhies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Kagan, through Voorhies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Kagan, through Voorhies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1028.  The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Voorhies' claims under the No-fault Law.  Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1029.  Defendants Voorhies and Kagan knew the foregoing material misrepresentations

to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1030.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Voorhies and Kagan.

1031.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Voorhies' claims for No-fault insurance benefits submitted in connection therewith.

1032.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Voorhies and Kagan evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1033.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company,  Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $56,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**EIGHTY-FIRST CLAIM FOR RELIEF**

**AGAINST DEFENDANTS VOORHIES AND KAGAN**

**(Unjust Enrichment)**

1034.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

256

1035.   By reason of their wrongdoing, Defendants Voorhies and Kagan have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company,  Allstate New Jersey Insurance Company,  Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1036.   Plaintiffs are therefore entitled to restitution from Defendants Voorhies and Kagan in the amount by which they have been unjustly enriched.

1037.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company,  Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $56,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### EIGHTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

#### (Aiding and Abetting)

1038.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1039.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire

and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company,  Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company and Northbrook Indemnity Company by Defendants Voorhies and Kagan.

1040.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Voorhies and Kagan purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Voorhies and Kagan could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Kagan, through Voorhies, to Voorhies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Voorhies; and (v) knowingly supporting the negotiation and performance of kickback agreements between Kagan through Voorhies  and the No-fault Clinics.

1041.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Voorhies and Kagan to obtain fraudulently inflated payments from

Plaintiffs, among others.

1042.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1043.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company Northbrook Indemnity Company to pay money based upon the fraudulent charges submitted through Voorhies in an amount to be determined at trial, but in no event less than $56,000.00.

1044.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1045.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS SARNOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1046.   The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1047.  At all times relevant herein, Well Care was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1048.  From, in or about May 20, 2015 through the date of the filing of this Complaint, Defendant Sarnov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the Well Care enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1049.  At all relevant times mentioned herein, Defendant Sarnov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Well Care enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1050.  On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant

Sarnov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1051.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

1052.   The racketeering acts set forth herein were carried out on a continued basis for more than a two year period, were related and similar and were committed as part of the ongoing scheme of Defendants Sarnov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1053.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Well Care continues to pursue collection on the fraudulent billing to the present day.

1054.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Sarnov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Well Care enterprise based upon materially false and misleading information.

1055.   Through the Well Care enterprise, Defendant Sarnov submitted hundreds of

fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.  The bills and supporting documents that were sent by Defendant Sarnov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Sarnov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Well Care enterprise through the filing of this Complaint.

1056.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Sarnov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1057.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1058.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1059.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $12,000.00, the exact amount to be determined at trial.

1060.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Sarnov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2

through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SARNOV AND WELL CARE

### (Common Law Fraud)

1061.  The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1062.  Defendants Well Care and Sarnov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

1063.  On information and belief, each and every bill and supporting documentation submitted by Defendants Well Care and Sarnov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1064.  On information and belief, Defendants Well Care and Sarnov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Well Care was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Sarnov, through Well Care, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Sarnov, through Well Care, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1065. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Well Care's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1066. Defendants Well Care and Sarnov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1067. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a

result of the acts of fraud and deception of Defendants Well Care and Sarnov.

1068.  Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Well Care's claims for No-fault insurance benefits submitted in connection therewith.

1069.  Furthermore, the far reaching pattern of fraudulent conduct by Defendants Well Care and Sarnov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1070.  By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $12,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS WELL CARE AND SARNOV

### (Unjust Enrichment)

1071.  The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1072.  By reason of their wrongdoing, Defendants Well Care and Sarnov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1073.  Plaintiffs are therefore entitled to restitution from Defendants Well Care and

Sarnov in the amount by which they have been unjustly enriched.

1074.   By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $12,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

1075.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1076.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants Well Care and Sarnov.

1077.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Well Care and Sarnov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Well Care and Sarnov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Sarnov, through Well Care, to Well Care to create the impression of an actual sale

in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Well Care; and (v) knowingly supporting the negotiation and performance of kickback agreements between Sarnov through Well Care and the No-fault Clinics.

1078.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Well Care and Sarnov to obtain fraudulently inflated payments from Plaintiffs, among others.

1079.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1080.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Well Care in an amount to be determined at trial, but in no event less than $12,000.00.

1081.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1082.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### EIGHTY-SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS KLIKSHTEYN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 2 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1083.   The allegations of paragraphs 1 through 275 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1084.   At all times relevant herein, XVV was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1085.   From, in or about January 11, 2016 through the date of the filing of this Complaint, Defendant Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, knowingly conducted and participated in the affairs of the XVV enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1086.   At all relevant times mentioned herein, Defendant Klikshteyn, together with others unknown to Plaintiffs, exerted control over and directed the operations of the XVV enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting

documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1087.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Klikshteyn required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1088.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 2 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1089.   The racketeering acts set forth herein were carried out on a continued basis for more than a six-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1090.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as XVV continues to pursue

collection on the fraudulent billing to the present day.

1091.  As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Klikshteyn, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341.  The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the XVV enterprise based upon materially false and misleading information.

1092.  Through the XVV enterprise, Defendant Klikshteyn submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants.   The bills and supporting documents that were sent by Defendant Klikshteyn, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service.  By virtue of those activities, Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the XVV enterprise through the filing of this Complaint.

1093.  A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Klikshteyn, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1094.  Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1095.  Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

1096.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $105,000.00, the exact amount to be determined at trial.

1097.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Klikshteyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## EIGHTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS KLIKSHTEYN AND XVV

### (Common Law Fraud)

1098.  The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1099.  Defendants XVV and Klikshteyn made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1100.  On information and belief, each and every bill and supporting documentation submitted by Defendants XVV and Klikshteyn to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to

defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1101. On information and belief, Defendants XVV and Klikshteyn intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts XVV was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Klikshteyn, through XVV, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Klikshteyn, through XVV, to

manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1102. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant XVV's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1103. Defendants XVV and Klikshteyn knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1104. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants XVV and Klikshteyn.

1105. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant XVV's claims for No-fault insurance benefits submitted in connection therewith.

1106. Furthermore, the far reaching pattern of fraudulent conduct by Defendants XVV and Klikshteyn evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1107. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $105,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS XVV AND KLIKSHTEYN

### (Unjust Enrichment)

1108.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1109.   By reason of their wrongdoing, Defendants XVV and Klikshteyn have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1110.   Plaintiffs are therefore entitled to restitution from Defendants XVV and Klikshteyn in the amount by which they have been unjustly enriched.

1111.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $105,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND
## JOHN DOES 2 THROUGH 20

### (Aiding and Abetting)

1112.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1113.   On information and belief, the Wholesale Defendants (one or more of the ABC

Corporations 1 through 20 and one or more of the John Does 2 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants XVV and Klikshteyn.

1114.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants XVV and Klikshteyn purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants XVV and Klikshteyn could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Klikshteyn , through XVV, to XVV to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through XVV; and (v) knowingly supporting the negotiation and performance of kickback agreements between Klikshteyn through XVV  and the No-fault Clinics.

1115.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants XVV and Klikshteyn to obtain fraudulently inflated payments from

Plaintiffs, among others.

1116.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1117.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through XVV in an amount to be determined at trial, but in no event less than $105,000.00.

1118.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 2 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1119.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

**NINETY-FIRST CLAIM FOR RELIEF**

**AGAINST ALL RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

1120.   The allegations of paragraphs 1 through 275 are hereby repeated and realleged as though fully set forth herein.

1121.   At all relevant times mentioned herein, each and every bill mailed by the Retail

Owners, through their respective Retailers, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

1122.   To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

1123.   At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Claimants.

1124.   In view of the Retail Defendants submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

1125.   As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to No-fault

Claimants and the amounts they were entitled to be reimbursed, which they never supplied to No-fault Claimants, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

1126.   Plaintiffs have no adequate remedy at law.

1127.   The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)   Compensatory damages in an amount in excess of $1,900,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)   Punitive damages in such amount as the Court deems just;

iii)   Treble damages, costs and reasonable attorneys' fees on the First, Fifth, Ninth, Thirteenth, Seventeenth, Twenty-First, Twenty-Fifth, Twenty-Ninth, Thirty-Third, Thirty-Seventh, Forty-First, Forty-Fifth, Fifty-Third, Fifty-Seventh, Sixty-First, Sixty-Second, Sixty-Sixth, Sixty-Seventh, Seventy-First, Seventy-Fifth,  Seventy-Ninth, Eighty-Third, and Eighty-Seventh Claims for Relief, together with prejudgment interest;

iv)      Compensatory and punitive damages on the Second, Sixth, Tenth, eleventh, Fourteenth, Eighteenth, Twenty-Second, Twenty-Sixth, Thirtieth, Thirty-Fourth, Thirty-Eighth, Forty-Second, Forty-Sixth, Fiftieth, fifty-Fourth, Fifty-Eighth, Sixty-Third, Sixty-Eighth, Seventy-Second, Seventy-Sixth, Eightieth, Eighty-Fourth, and Eighty-Eighth Claims for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third, Seventh, Eleventh, Fifteenth, Nineteenth, Twenty-Third, Twenty-Seventh, Thirty-First, Thirty-Fifth, Thirty-Ninth, Forty-Third, Forty-Seventh, Fifty-First, Fifty-Fifth, Fifty-Ninth, Sixty-Forth, Sixty,-Ninth, Seventy-Third, Seventy-Seventh, Eighty-First, Eighty-Fifth, and Eighty-Ninth Claims for Relief, together with prejudgment interest;

vi)      Compensatory and punitive damages on the Fourth, Eighth, Twelfth, Sixteenth, Twentieth, Twenty-Fourth, Twenty Eighth, Thirty-Second, Thirty-Sixth, Fortieth, Forty-Fourth, Forty-Eighth, Fifty-Second, Fifty-Sixth, Sixtieth, Sixty-Fifth, Seventieth, Seventy-Fourth, Seventy-Eighth, Eighty-Second, Eighty-Sixth, and Ninetieth Claims for Relief, together with prejudgment interest;

vii)      Declaratory relief on the Ninety-First Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to

Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Claimants; and

       viii)   Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York,
       July 19, 2017

                       Morrison Mahoney LLP

               By: _____
                   James McKenney (JM-6164)
                   Attorneys for Plaintiffs
                   120 Broadway, Suite 1010
                   New York, New York 10271
                   (212) 825-1212