UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY, *et al.*,

               Plaintiffs,

    -against-

ARTUR AVETISYAN, *et al.*,

               Defendants.

17-CV-4275 (LDH) (RML)

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION PURSUANT TO RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND 28 U.S. CODE § 2283 SEEKING A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION STAYING ALL NO-FAULT COLLECTION PROCEEDINGS CURRENTLY PENDING BETWEEN ADVANCED ORTHOPEDIC SOLUTIONS, INC., ADVANCED PHARMACY, INC., ALMATCARE MEDICAL SUPPLY, INC., AVA CUSTOM SUPPLY, INC., DAILY MEDICAL EQUIPMENT DISTRIBUTION CENTER, INC., LENEX SERVICES INC., LIDA'S MEDICAL SUPPLY INC., LIFE EQUIPMENT INC., TOP Q INC., WELL CARE MEDICAL EQUIPMENT LLC, AND PLAINTIFFS**

MORRISON MAHONEY, LLP
120 BROADWAY, SUITE 1010
NEW YORK, NEW YORK 10271
TELEPHONE: (212) 825-1212

CADWALADER, WICKERSHAM & TAFT LLP
ONE WORLD FINANCIAL CENTER
NEW YORK, NEW YORK 10281
TELEPHONE: (212) 504-6361

ATTORNEYS FOR ALLSTATE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

PROCEDURAL HISTORY AND BACKGROUND .................................................. 1

ARGUMENT ...................................................................................................................... 6

I.     THE HARVEY FAMILY SUMMARY ORDER HAS NO PRECEDENTIAL
EFFECT AND IS FACTUALLY INAPPOSITE ................................................ 6

II.    THE ANTI-INJUNCTION ACT PERMITS  THE RELIEF SOUGHT ............................ 9

    A.    The Injunction Sought Would Aid the Court in Its Jurisdiction and Protect
A Potential Judgment in This Matter. ................................................................ 9

    B.    The Injunction Sought Is Authorized by the RICO Act ........................................11

        1.    The RICO Act Created a Remedy Enforceable in a Federal Court of
Equity. ................................................................................................................12

            a.    The Plain Text of the RICO Act Created a Uniquely Federal
Right to Injunctive Relief ................................................................ 13

            b.    The RICO Act's Legislative History Supports the Plain
Language of the Statute. .................................................................. 15

        2.    The RICO Act Can Only Be Given Its Intended Scope By a Stay of
the State Court Actions. .................................................................................17

            a.    The Injunction Here is Proper In Light of Congress' Intent to
Enforce Federal Statues Through the Limitation of State
Actions. ............................................................................................ 19

            b.    Injunctions Are Particularly Appropriate Applies Where the
State Court Actions Contribute to Ongoing Violations of a
Federal Statute. ................................................................................ 20

    CONCLUSION ....................................................................................................... 22

**Cases**

*Aetna Casualty & Surety Co. v. Liebowitz*, 570 F. Supp. 908, (E.D.N.Y. 1983),
    *aff'd*, 730 F.2d 905 (2d Cir. 1984) .......................................................................... 14

*AHW Inv. P'ship v. Citigroup Inc.*, 806 F.3d 695 (2d Cir. 2015) .................................... 6

*Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013) ..................... 9, 10, 11

*Allstate Ins. Co. v. Harvey Family Chiropractic, Physical Therapy &
    Acupuncture, PLLC*, 677 Fed. App'x. 716 (2d Cir. 2017) .......................... 1, 7, 8, 10

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ................................... 18

*Corley v. United States*, 556 U.S. 303 (2009) .............................................................. 13

*Gov't Employees Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584
    (W.D.N.Y. Oct. 26, 2017) ..................................................................................... 2, 8

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ..................................................... 17

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) ............................................... 13

*Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013) .................................. 13

*In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d
    Cir. 2011) .............................................................................................................. 10

*Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) .................................................. 6, 8

*Milner v. Dep't of the Navy*, 562 U.S. 562 (2011) ...................................................... 15

*Mitchum v. Foster*, 407 U.S. 225 (1972) ............................................................. passim

*Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002) .................. 14, 18

*Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) .................................... 18

*Raila v. United States*, 355 F.3d 118 (2d Cir. 2004) .................................................... 13

*Rotella v. Wood*, 528 U.S. 549 (2000) ................................................................... 17, 18

*Salinas v. United States*, 522 U.S. 52 (1997) .............................................................. 18

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ............................................... 17, 18

*State Farm Mutual Ins. Co. v. Jamaica Wellness Medical, P.C.*, et al., 16-CV-4948
    (FB) (E.D.N.Y. May 18, 2017) ............................................................................. 9, 11

*Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966) ............................................................. 21

*U.S. v. Stratton*, 649 F.2d 1066 (5th Cir. 1981) ......................................................................... 20

*United States v. Brown*, 555 F.2d 407 (5th Cir. 1977) ................................................................ 20

*United States v. Frumento*, 563 F.2d 1083 (3d Cir. 1977) ......................................................... 20

*United States v. Turkette*, 452 U.S. 576 (1981) ............................................................ 15, 18, 19, 20

*Vendo v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) .................................................................... 21

**Statutes**

18 U.S.C. § 1962 ............................................................................................................... 18, 19

18 U.S.C. § 1964 .............................................................................................................. passim

28 U.S.C. § 1651 .................................................................................................................... 10

28 U.S.C. § 2283 ............................................................................................................. 1, 9, 11

42 U.S.C. § 1983 ................................................................................................................ 11, 12

**Other Authorities**

115 Cong. Rec. 9567 (1969) ............................................................................................... 15, 16

116 Cong. Rec. 35217 (1970) .................................................................................................. 19

**Rules**

Fed.R.Civ.P. 65 .................................................................................................................... 1, 22

Second Circuit Local Rule 32.1.1 ............................................................................................... 8

## INTRODUCTION

In accordance with the Court's June 21, 2018 Docket Order, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Property and Casualty Insurance Company and Northbrook Indemnity Company (collectively "Plaintiffs" or "Allstate") respectfully submit this Supplemental Memorandum of Law in support of their Motion (the "Motion" (ECF No. 168)) pursuant to Fed.R.Civ.P. 65 and 28 U.S.C. § 2283 seeking a Temporary Restraining Order and Preliminary Injunction enjoining defendants Advanced Orthopedic Solutions Inc., Advanced Pharmacy, Inc., Almatcare Medical Supply Inc., AVA Custom Supply Inc., Daily Medical Equipment Distribution Center, Inc., Lenex Services Inc., Lida's Medical Supply Inc., Life Equipment Inc., Top Q Inc. and Well Care Medical Equipment LLC, (the "Retailers") from: i) proceeding with No-fault collection actions pending in any court or arbitration between the Retailers and Allstate until the resolution of the instant matter; and (ii) filing new arbitration proceedings or civil actions seeking collection of No-fault benefits from Allstate until the resolution of the instant matter.

## PROCEDURAL HISTORY AND BACKGROUND

By Docket Order dated June 6, 2018, Judge Ann M. Donnelly denied Plaintiffs' Motion (ECF No. 168) on the basis that "plaintiffs have not demonstrated the irreparable harm necessary for a TRO or preliminary injunction." In doing so, Judge Donnelly cited to a Summary Order issued by the Second Circuit in *Allstate Insurance Company v. Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC*, 677 Fed. App'x. 716 (2d Cir. 2017) (hereinafter the "Summary Order" or "*Harvey Family*"), and found *Harvey Family* to be "an almost identical case involving the same plaintiffs and plaintiffs' counsel" in which the Second Circuit concluded that

"mere injuries... in terms of money, time and energy necessarily expended absent a stay of ongoing state court and arbitration proceedings are not enough to establish irreparable harm."

On June 20, 2018, Plaintiffs moved for reconsideration of Judge Donnelly's Order on the grounds that (i) in the Second Circuit, summary orders such as *Harvey Family* have no precedential effect, particularly in factually dissimilar matters such as this, and (ii) the Docket Order made no mention as to whether or not the Court evaluated -- separate and apart from the issue of whether the expenditure of money, time and resources could constitute irreparable harm -- whether the threat to the efficacy of Plaintiffs' declaratory judgment sought in the federal action could also constitute irreparable harm. In doing so, Plaintiffs cited to *Gov't Employees Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584, at *7 (W.D.N.Y. Oct. 26, 2017), a similar matter in which plaintiff-insurers sought a preliminary injunction staying No-fault arbitrations pending the determination of a related federal action, and in which the District Judge specifically refused to follow the *Harvey Family* Summary Order's conclusion regarding irreparable harm. Indeed, as will be made clear below, the facts of *Strutsovskiy* are much more aligned with the facts here than those of *Harvey Family,* which are not at all similar.

On June 21, 2018, Judge Donnelly granted Plaintiffs' Motion for Reconsideration (ECF No. 173) and allowed supplemental briefing in connection with two specific issues which she directed the parties to be prepared to address at oral argument: (i) the Second Circuit's order in *Harvey Family,* and (ii) the scope of the Federal Anti-Injunction Act ("AIA"). As set forth herein, neither of those issues present an impediment to the Court granting Plaintiffs the relief sought.

First, in the Second Circuit, summary orders such as the one issued in *Harvey Family* have no precedential effect because such orders do not set forth the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated

case to make the ruling applicable. Underscoring that principle is the fact that in *Harvey Family*, the issue of "irreparable harm" <u>was not as issue raised by the Plaintiffs-Appellants to be decided on appeal</u>. Rather, the only issue put before the Second Circuit for determination was whether or not the District Court had the authority to enjoin state court cases in light of the AIA – an issue that the Court never addressed in light of its finding, *sua sponte*, that a threshold showing of irreparable harm was not met. However, because the Second Circuit made such a finding by summary order in which it provided no context or basis, it cannot be extrapolated to this matter due to its entirely different factual framework.

In particular, in *Harvey Family,* it was alleged that a chiropractor, Richard Harvey, D.C., recruited a licensed acupuncturist and physical therapist to serve as sham owners of Harvey Family Chiropractic, Physical Therapy and Acupuncture ("Harvey FCPTA") in an effort to circumvent New York licensing laws and maximize profits by billing for services that Harvey was otherwise prohibited by law from providing. Accordingly, Plaintiffs sought a declaration that Harvey FCPTA was not properly licensed, and therefore not entitled to No-fault reimbursement. Critically, at the time of the Second Circuit's Summary Order, <u>none</u> of the underlying actions involved the issue of Harvey FCPTA's licensing. Thus, the Second Circuit apparently concluded that any decision rendered on an underlying matter could <u>not</u> possibly interfere with, or be contrary to, the declaratory relief sought by plaintiffs in the federal action, and therefore no irreparable harm could be found.[1] That is certainly <u>not</u> the case here, where decisions in underlying pending actions can directly interfere with the declaratory judgment that Plaintiffs are seeking.

At bar, each and every underlying action which Plaintiffs are seeking to have stayed are a component of the larger scheme to defraud alleged in the Complaint, and all of the issues to be

---

[1] It is noted that while Plaintiffs do not agree with the Second Circuit's Summary Order, Plaintiffs recognize that its decision was one that could be viewed as reasonable given the facts before it.

litigated in those underlying matters concern the legitimacy of the Retailers' provision of durable medical equipment ("DME") to claimants; issues which cut to the very heart of the declaration that Plaintiffs seek (that Plaintiffs have no obligation to pay the Retailers' No-fault claims because the Retailers engaged in a scheme to obtain reimbursement far in excess of the maximum permissible amount they are entitled to receive). Thus, while any single claim involved in an underlying matter may, in isolation, appear legitimate, it is only when viewed through the prism of the fraudulent blueprint alleged, where the Retailers' used common paperwork and protocols across many claims, that the claims' fraudulent pattern and nature are given clarity. Thus, without the requested stay, Plaintiffs will be faced with the prospect of litigating hundreds of different underlying actions, some or all of which may result in judgments concerning the legitimacy of the DME provided by the Retailers that may run <u>directly contrary</u> to the declaratory judgment that Plaintiffs will be awarded here should they prevail. In addition, this Court could be faced with the prospect of dozens, or even hundreds of individual court findings that DME was properly provided by the Retailers, notwithstanding that this Court may find that the Retailers engaged in a fraudulent scheme and are not entitled to any reimbursement at all. Thus, the potential for lower Court findings threatening, if not completely undermining, the declaratory relief that Plaintiffs seek here is very real, and epitomizes irreparable harm, which is only underscored by the equitable nature of the relief sought by Plaintiffs that cannot be remedied by monetary damages.

Second, with respect to that portion of the Motion (ECF No. 168) seeking an order enjoining No-fault collection actions pending in New York State courts, Plaintiffs will demonstrate to the Court that while the AIA generally restricts a court of the United States from issuing an injunction which would stay proceedings in a state court, the AIA provides for three exceptions, all of which are implicated here (if the injunction is expressly authorized by Act of Congress; if it

is necessary in aid of its jurisdiction; or if it is necessary to protect or effectuate its judgments). In that regard, while Plaintiffs' Motion (ECF No. 168) sets forth how and why the requested stay is necessary in aid of the Court's jurisdiction and to protect a potential judgment, Plaintiffs will augment that analysis herein and at oral argument, to the extent necessary, to explain how the third exception—that the injunction is expressly authorized by an act of Congress—is implicated as well.

In particular, the RICO Act <u>expressly</u> provides that "district courts of the United States shall have jurisdiction to <u>prevent and restrain</u> violations of…[the RICO Act]…by issuing appropriate orders, including, but not limited to…imposing reasonable restrictions on the future activities...of any person…" *See* 18 U.S.C. 1961(a).  Moreover, even if that language were not explicitly in the statute, the United States Supreme Court has held that in order to qualify for the "expressly authorized by Act of Congress" exception, the statute in question need not even be explicit; rather, the test is simply whether "an Act of Congress, clearly creating a federal right or remedy enforceable in a court of equity, could be given its intended scope only by a stay of the state court proceeding." In this case, the RICO Act, which has the congressional mandate of preventing racketeering activity, could not be given its intended scope if Defendants are permitted to seek and potentially obtain the fruits of their racketeering activity while this matter is pending. Such a result would run directly contrary to the stated purpose of the statute. Thus, for the reasons set forth herein and in Plaintiffs' moving papers, it is respectfully requested that the Motion (ECF No. 168) be granted upon this reconsideration.

<u>**ARGUMENT**</u>

**I.**

**THE HARVEY FAMILY SUMMARY ORDER HAS NO PRECEDENTIAL EFFECT AND IS FACTUALLY INAPPOSITE**

As a threshold matter, because the *Harvey Family* decision was a summary order, it has no precedential effect. *See AHW Inv. P'ship v. Citigroup Inc*., 806 F.3d 695, fn. 5 (2d Cir. 2015)(finding that rulings by summary order do not have precedential effect in the Second Circuit because such orders, being summary, frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case) (internal quotations and citation omitted); *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) (same). In fact, the only issue on appeal to the Second Circuit was whether the District Court had the authority pursuant to the AIA to issue a preliminary injunction enjoining state court actions, and the issue of "irreparable harm" was not raised or briefed by the parties. Indeed, the Second Circuit never addressed the issue of whether the District Court had the authority pursuant to the AIA to issue the requested injunction, and instead determined, *sua sponte*, that a threshold determination of irreparable harm had not been met. However, the Second Circuit did not set forth its reasoning for that decision, nor the facts upon it was based, which is the precise reason why the Summary Order cannot be given precedential effect and that the facts of this case can and should be given full independent consideration.

Moreover, a comparison between the facts and circumstances giving rise to the Summary Order in *Harvey Family*, and the facts and circumstances here, makes clear that the matters are

manifestly different, negating any precedential effect that the Summary Order could have.[2] As noted above, in *Harvey Family,* it was alleged that a chiropractor recruited a licensed and physical therapist to serve as sham owners of Harvey FCPTA in an effort to circumvent New York licensing laws, and the plaintiffs in that case sought a declaration that *Harvey Family* was, in fact, not properly licensed. However, <u>none</u> of the underlying actions at issue there involved Harvey FCPTA's licensing. Accordingly, any decision rendered on an underlying matter could not possibly have interfered with, or be contrary to, the declaratory relief sought by plaintiffs in the federal action. Here, however, the underlying actions which Plaintiffs are seeking to have stayed are each part and parcel of the larger scheme to defraud alleged in the Complaint, and each one involves issues that, if ruled upon, could impact the efficacy of the declaratory relief that Plaintiffs seek. Indeed, the underlying matters all involve issues regarding the legitimacy of DME that the Retailers' provided Claimants, which are issues that are directly related to the declaration that Plaintiffs seek here.

In that regard, while the provision of DME by the Retailers to any single Claimant may appear legitimate in the isolated context of a single underlying matter, it is only through the evaluation of the entire universe of claims, where the Retailers' used common paperwork and protocols, that the full extent of their scheme becomes clear. Thus, without the requested stay, Plaintiffs and the Court could be faced with the prospect of hundreds of different decisions in underlying actions that may result in findings concerning the legitimacy of the provision of DME by the Retailers that are <u>directly contrary</u> to the declaratory judgment that Plaintiffs will be

---

[2] The only purportedly factual detail provided by the Second Circuit in *Harvey Family* was that "the plaintiffs allege that the defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961, *et seq.*, by presiding over an enterprise that received funds from fraudulent claims for chiropractic, acupuncture, and physical therapy services under New York state's No-Fault Law. *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 717 (2d Cir. 2017).

awarded here should they prevail. Accordingly, the potential for lower court decisions threatening and/or undermining the declaratory relief that Plaintiffs seek here is very real and imminent.

The matter of *Gov't Employees Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584, at *7 (W.D.N.Y. Oct. 26, 2017), offers guidance. In *Strutsovskiy*, the plaintiff-insurer commenced an action against a medical doctor and his professional corporation alleging a fraudulent No-fault billing scheme whereby the defendants submitted fraudulent bills for services that were not medically necessary or not performed at all. As here, the plaintiff-insurer brought claims based on RICO, common law fraud and unjust enrichment, as well as a claim for a declaration that it was not required to pay the defendants' outstanding No-fault claims. Pending the disposition of the plaintiff-insurer's declaratory judgment claim, it sought an order staying, *inter alia*, any and all pending No-fault insurance collection arbitrations that had been submitted by or on behalf of the defendants. The defendants argued, as the Docket Order concluded here, that irreparable harm could not be established in light of the *Harvey Family* ruling. However, Judge Vilardo disagreed with the defendants, finding that *Harvey Family* provided an insufficient basis to preclude a preliminary injunction because:

> "[s]ummary orders from the Second Circuit have no precedential effect precisely because they are "summary"—i.e., without enough factual detail for a court to know whether or not the precedent might apply to the facts before it. Rule 32.1.1(a) ("Rulings by summary order do not have precedential effect."); *see Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011 ("[T]he rationale underlying [Rule 32.1.1] is that such orders, being summary, frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case.") Indeed, *Harvey* provides only limited information about the facts in that case, and so this Court cannot meaningfully compare the facts and circumstances giving rise to the summary order with those in the case at bar. *See id.* Therefore the Second Circuit's finding in *Harvey* that the plaintiffs failed to establish the irreparable harm necessary for a preliminary injunction does not color the analysis here. *Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584, at *7.

Accordingly, the *Strutsovskiy* Court appropriately disregarded the holding of *Harvey Family,* and instead relied on the litany of cases (cited by Plaintiffs in the Motion (ECF No. 168)) in which preliminary injunctions had been granted. The result should be no different here, where as in *Strutsovskiy*, the declaratory relief sought in this action is threatened by the hundreds of individual actions that may reach inconsistent conclusions. That prospect was not one that was directly faced in *Harvey Family*, but has been a factor in the similar actions cited in Plaintiffs' Motion (ECF No. 168) in which injunctions were granted, most notably, *State Farm Mutual Ins. Co. v. Jamaica Wellness Medical, P.C.,* et al., 16-CV-4948 (FB) (E.D.N.Y. May 18, 2017). *See also* ECF No. 168-3 at 11-15 (citing cases granting injunctions/stays).

## II.

## THE ANTI-INJUNCTION ACT PERMITS
## THE RELIEF SOUGHT

With respect to that portion of the Motion (ECF No. 168) seeking an order enjoining No-fault collection actions pending in any court,[3] the Anti-Injunction Act (the "AIA"), 28 U.S.C. § 2283 permits this Court to issue such an order. While the AIA generally prevents a court of the United States from granting an injunction which would stay proceedings in a state court, the AIA provides for three exceptions: if the injunction is expressly authorized by Act of Congress; if it is necessary in aid of its jurisdiction; or if it is necessary to protect or effectuate its judgments. *Id.* All three of those exceptions are implicated here.

### A.    The Injunction Sought Would Aid the Court in Its Jurisdiction and Protect A Potential Judgment in This Matter.

There can be no doubt that the temporary freeze of all related pending matters, including

---

[3] The authority of the this Court to enjoin arbitrations is not in doubt (*see, e.g., Elzanaty*, 929 F. Supp. 2d at 219-20), and the issue was not pointed to by Judge Donnelly for further briefing or oral argument.

those in state court, would significantly aid the jurisdiction of this Court, as well as protect any judgment issued in this case. The analysis engaged in by the Court in *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 220 (E.D.N.Y. 2013) is particularly instructive on this issue. In *Elzanaty*, plaintiff insurers sought to stay pending No-fault arbitrations pending determination of its declaratory and fraud action alleging that defendant No-fault providers were not entitled to reimbursement. In granting the plaintiffs' motion to stay, the *Elzanaty* court specifically addressed its authority to issue the requested stay pursuant to the All Writs Act, 28 U.S.C. § 1651, which allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law" and noted that the Second Circuit's decision in *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011), expressly allows the possibility that, in certain circumstances, the All Writs Act could permit a court to enjoin arbitration. *Elzanaty*, 929 F. Supp at 219-220. *Elzanaty* further found that in the case before the Court, which is factually similar to the matter at bar, "it would severely threaten any judgment of [the] Court to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to [defendant medical providers'] eligibility for reimbursement of No-fault insurance payments…" *Id.* at 220. If "the providers" rights are delayed, rather than effectively terminated, the Court believes that a stay is the most appropriate solution here in order to avoid the large volume of arbitrations and inconsistent judgments that are gradually culminating in a procedural and substantive train wreck…" *Id.* "In the Court's view, this situation presents precisely the kind of circumstance envisioned by the Second Circuit when it left the express exception it did in *In re American Express." Id.* The same threats recognized in *Elzanaty* exist here, and those threats are no different with respect to underlying matters that are pending in courts, rather than arbitration.

In *State Farm Mutual Ins. Co. v. Jamaica Wellness Medical, P.C.,* et al., 16-CV-4948 (FB), a case with allegations virtually identical to those here, including against two of the very same defendants, Judge Block came to the same conclusion as the *Elzanaty* Court, this time in the context of both pending arbitrations and state court ligations. In particular, Judge Block issued the requested stay and ruled that "all of the issues I hear would certainly aid the jurisdiction of court, resolve the matters, avoid fragmentation, avoid multiplicity of litigation which could result in disparate determinations. It would be a mess, perhaps, that could be avoided by dealing with all these issues in this litigation. It seems that is the sensible things to do." It is equally sensible to issue a stay here.

### B.    The Injunction Sought Is Authorized by the RICO Act.

As noted, the AIA, codified at 28 U.S.C. § 2283, prohibits federal courts from enjoining state court proceedings except, *inter alia*, "as expressly authorized by Act of Congress." In *Mitchum v. Foster*, 407 U.S. 225 (1972) , the United States Supreme Court held that, in order to qualify for this exception, the statute in question need not contain an express reference to the AIA, nor must it explicitly authorize injunctions of state court proceedings. 407 U.S. at 337. Rather, the Court explained that the test is simply whether "an Act of Congress, clearly creating a federal right or remedy enforceable in a court of equity, could be given its intended scope only by a stay of the state court proceeding." *Id.* at 238.

Specifically, in *Mitchum*, the Supreme Court found that 42 U.S.C. § 1983  (the "Civil Rights Act") qualified as an expressly authorized exception to the AIA, despite the absence of any explicit provision in the Civil Rights Act for specifically enjoining state court proceedings. The Court noted that by expressly authorizing a "suit in equity" to redress federal civil rights violations, Congress plainly authorized the federal courts to issue injunctions as one of the means of redress.

*Id.* at 242. Looking at the overall purpose of the Act, the Court explained that the proponents of the Civil Rights Act "noted that state courts were being used to harass and injure individuals," and that Congress's concern in enacting Section 1983 was that "state instrumentalities could not protect those [federal civil] rights." *Id.* at 240–42. Because of these concerns, the Court found that the Civil Rights Act could not be given its full intended scope absent the ability to stay state court proceedings. Accordingly, the Court ruled that the Civil Rights Act's express authorization of general equitable relief, combined with the Congressional intent to "alter the relationship between the States and the Nation," sufficiently qualified Section 1983 as an exception to the AIA "expressly authorized by Act of Congress," permitting state court injunctions. *Id.* As set forth below, the same holds true here, where the RICO Act, which clearly created a right of equitable relief in order to restrain violations of its provisions, could only be given its intended scope by a stay of the State Court Actions, which seek to further the RICO violations, and thus the District Court was mistaken in its belief that it lacked the authority to issue such an injunction.

1.  **The RICO Act Created a Remedy Enforceable in a Federal Court of Equity.**

With respect to the first prong of the *Mitchum* analysis—whether the RICO Act created a federal right or remedy enforceable in a court of equity—Section 1964(a) of the RICO Act explicitly and unambiguously empowers district courts with jurisdiction, and incredibly wide latitude, to issue orders that "prevent and restrain violations of [the RICO Act]." Moreover, the plain language of that section demonstrates that Congress, in passing the RICO Act, created uniquely federal remedies which are enforceable in federal courts of equity.

### a. The Plain Text of the RICO Act Created a Uniquely Federal Right to Injunctive Relief.

Section 1964(a) of the RICO Act reads in full:

The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, *but not limited to*: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964(a) (emphasis added). The plain text of the statute, permitting courts to issue orders in order to "prevent and restrain" violations of the RICO Act, explicitly including equitable relief, is unambiguous. In that regard, "statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'" *Raila v. United States*, 355 F.3d 118, 120 (2d Cir. 2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Importantly, when discerning the meaning of statutory language, the court should construe the statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009), Section 1964(c) of the RICO Act grants private plaintiffs a right of action under the statute. Section 1964(a), in turn, grants district courts broad and general jurisdiction to fashion appropriate equitable relief in civil RICO actions, without any limitations as to who can seek such relief.[4] Thus, a plain reading of the statute, giving due meaning to all its provisions, confirms that the district

---

[4] Although the question of whether or not Section 1964(a) of the RICO Act provides a mechanism by which a private party may sue for *permanent* injunctive relief remains open in this Circuit (and the majority of the district courts to examine this issue in the past fifteen years have held that it does, s*ee, e.g., Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 344 (S.D. Iowa 2013), this Court need not determine that issue here. There can be no dispute that a private party may seek *preliminary injunctive relief* pursuant to the Federal Rules of Civil Procedure, and that district courts have the power to grant such relief *pursuant to any power that the Court has jurisdiction to exercise. See Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 98 n.7 (2d Cir. 2015). In the instant case, this power arises under Section 1964(a).

court is empowered to grant litigants, such as Plaintiff-Appellants, preliminary injunctive relief under RICO by virtue of Section 1964(a).

The precept that a district court may issue a preliminary injunction pursuant to 1964(a) has been acknowledged in the Eastern District of New York for at least three decades. In *Aetna Casualty & Surety Co. v. Liebowitz*, 570 F. Supp. 908 (E.D.N.Y. 1983), *aff'd*, 730 F.2d 905 (2d Cir. 1984), the Court found:

> [A]lthough § 1964(c) states only that a private party may sue for treble damages, § 1964(a) gives the court broad jurisdiction to remedy violations of § 1962 by issuing 'appropriate orders.' Nothing in the statute indicates that a preliminary injunction would not be an 'appropriate order' within the meaning of § 1964(a).

570 F. Supp. at 910.

Judge Rakoff's decision in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), is similarly illustrative. In rejecting the argument that private plaintiffs were barred from seeking preliminary injunctions under RICO, Judge Rakoff found that "[i]t would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of utilizing this classic remedial power in private civil actions brought under the act." *Uzan*, 202 F. Supp. 2d at 244 (quoting Pub. L. No.91-452, § 904(a), 84 Stat. 947(1970). Notably, Judge Rakoff found that such injunctions could be granted under both the general equitable powers conveyed to federal courts by the Judiciary Act of 1789 and "*the specific grant of power given by Congress under Section 1964(a) of [the] RICO [Act]*." *Id.* at 250  (emphasis added). Judge Rakoff's reasoning is sound, and should be applied here.

**b.**     **The RICO Act's Legislative History Supports the Plain Language of the Statute.**

Because the plain language of the RICO Act is unambiguous, there is no need for the Court to further mine for legislative intent. *See Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011). Even so, the RICO Act's legislative history further supports the plain meaning of the statute, which allows for preliminary injunctive relief. The RICO Act was drafted in order to expand the role of the federal courts to issue "injunction and other relief [and] enlarge, strengthen, and vitalize the tools available" to fight racketeering. 115 CONG. REC. 9568 (1969). "The view was that existing law, state and federal, was not adequate to address the problem, which was of national dimensions." *United States v. Turkette*, 452 U.S. 576, 586 (1981). In response to concerns about the rampant spread of racketeering and organized crime in the 1960s, the RICO Act was created to provide a new and uniquely powerful tool to fight the "penetration of organized crime into the fabric of our society." 115 CONG. REC. 9567 (1969). In setting out both criminal and civil repercussions, RICO was intended to be a multi-faceted attack on "criminals us[ing] racketeering methods in legitimate fields of endeavor." *Id.* Because individuals convicted under then-existing criminal laws could simply "use the same knowhow acquired to start the same business again under a different name," it was crucial to create a statutory scheme that could effectively remove "this cancer … by direct attack, by forceable[sic] removal and *prevention of return*." *Id.* at 9567–68 (emphasis added) . It was this need for a new, expansive, and comprehensive remedy to the ongoing issue of racketeering that led to the creation of what later became Section 1964(a).

When RICO was introduced in the Senate in 1969, Senator John McClellan, who oversaw the drafting of the bill, explained:

> I believe it necessary to make several clarifying remarks on the antitrust [style] remedies this bill provides … There is … no intention here of importing the great

complexity of antitrust law[5] enforcement into this field … The many references to antitrust cases are necessary because the particular equitable remedies desired have been brought to their greatest development in this field, and in many instances they are the primary precedents for the remedies in this bill. *Nor do I mean to limit the remedies available to those which have already been established*. The ability of our chancery courts to formulate a remedy to fit the wrong is one of the great benefits of our system of justice. This ability is not hindered by the bill. … *Again I emphasize that the remedies are not confined to those listed.*

115 CONG. REC. 9567–68 (1969) (emphasis added). The 1969 Senate Committee Report on the proposed bill confirms the congressional intent to create a broad and powerful tool against racketeering:

What is needed here, the committee believes, are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts.

S. REP. No. 91–617, p. 79 (1969).

As demonstrated by the RICO Act's legislative history, it is evident that Congress created the RICO Act, in general, and Section 1964(a), in particular, in order for Federal Courts to be able to use all available weapons in their arsenal in order to combat racketeering, and specifically, far-reaching equitable remedies. It is for that reason that the Supreme Court has consistently thwarted lower courts' efforts to narrow RICO's scope. Consequently, when reading the unambiguous text of section 1964(a) in light of Congress's expressed remedial intent, the only coherent reading of the statute is one that allows plaintiffs to seek preliminary injunctive relief under section 1964(a), to prevent and restrain alleged violations of the RICO Act.

---

[5] In drafting the RICO Act, Congress modeled it largely on antitrust laws—specifically, the Sherman Act, codified at 15 U.S.C. §§ 1-7, and the Clayton Act, codified at 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53, but designed it to go *beyond* the equitable remedies previously established under antitrust law. As the Supreme Court has recognized, the RICO Act is a "far-reaching civil enforcement scheme," *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 483 (1985) , that goes above and beyond any similar pre-existing legislation—and it does so on purpose.

In sum, both the plain meaning of the statutory text and the legislative history of the RICO Act support the conclusion that Section 1964(a) permits the issuance of preliminary injunctions as a uniquely federal remedy enforceable in a federal court of equity, thus satisfying the first part of the *Mitchum* test. Accordingly, it is respectfully submitted that 1964(a) authorizes the preliminary injunctive relief that Plaintiff-Appellants seek here.

**2.** **The RICO Act Can Only Be Given Its Intended Scope By a Stay of the State Court Actions.**

With respect to the second prong of the *Mitchum* test—whether the RICO Act could be given its intended scope only by a stay of the state court proceedings—such is clearly the case here. The Supreme Court has time and again emphasized the RICO Act's broad remedial purpose, referencing both Congress's express intent, through legislative history, and its "self-consciously expansive language and overall approach." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) ("The statute's 'remedial' purposes are nowhere more evident than in the provision of a private action for those injured by racketeering activity. . . . RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime. . . . [I]t is in this spirit that all of the Act's provisions should be read."). This holds true even when RICO is used outside of the context of traditionally conceived "organized crime." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989) ("The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime."). Indeed, as the Supreme Court has opined, "[t]he object of civil RICO is . . . not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 558 (2000) (internal quotations and citations omitted).

To that end, Congress specifically instructed that the RICO Act "be liberally construed to effectuate its remedial purposes." *Id.* at 557, n.3. Interpreting the RICO Act to allow private plaintiffs to seek preliminary equitable relief, in order to prevent and restrain RICO violations, clearly promotes that objective. A contrary reading would risk stripping federal courts of their power to issue effective relief in cases involving an ongoing racketeering scheme, which would undermine the RICO Act's purpose and severely undercut its intended scope. Indeed, consistent with Congress's stated purpose of enacting RICO as a broad and powerful piece of legislation, the Supreme Court has repeatedly rebuked lower courts' efforts to narrow RICO's scope. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) (declining to hold that an individual cannot be a separate entity from his wholly owned corporation for purposes of distinguishing RICO defendant from RICO enterprise); *Salinas v. United States*, 522 U.S. 52, 63 (1997) (declining to apply overt act requirement to RICO conspiracy provision); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994) (declining to find economic motive requirement for RICO "enterprise"); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985) (declining to require criminal conviction prior to allowing civil RICO action and declining to require injury from "racketeering" separate from the predicate acts); *United States v. Turkette*, 452 U.S. 576 (1981) (declining to limit §1962 to "legitimate" enterprises).

In sum, given the express congressional intent to empower the federal courts, via Section 1964(a), to employ an expansive set of tools, both traditional and new, to "prevent and restrain" violations of the RICO Act, the intended scope of the RICO Act plainly encompasses the power of district courts to issue preliminary injunctive relief. *See Uzan*, 202 F. Supp. 2d at 244. In the instant case, Plaintiff-Appellants asked the District Court to exercise its uniquely federal powers in order to prevent and restrain further violations of 18 U.S.C. § 1962, by placing a

temporary hold on Defendant-Appellees' State Court Actions, which directly seek the fruits of their racketeering activity. In light of the incredibly wide latitude given to district courts in shaping equitable relief in RICO actions, and the congressional and judicial guidance consistently reaffirming RICO's broad scope, it is clear that the provisional remedy sought by Plaintiff-Appellants here—a temporary stay of the State Court Actions in order to preserve the status quo and prevent and restrain further violations of Section 1962—is certainly within the breadth of the RICO Act, and in fact, is necessary in order to give the RICO Act its intended extensive remedial purpose and scope. As such, in accordance with the Supreme Court's guidance in *Mitchum*, the RICO Act qualifies as an exception to the AIA, expressly authorized by Act of Congress.

     **a.**     **The Injunction Here is Proper In Light of Congress' Intent to Enforce Federal Statues Through the Limitation of State Actions.**

Underscoring the fact that the RICO Act could not be given its intended purpose without an injunction requested here is the fact that the Supreme Court has found the "expressly authorized" exception to the AIA particularly applicable when it is "evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). This is precisely the case with the RICO Act. As the Supreme Court has acknowledged:

> Congress was well aware that it was entering a *new domain of federal involvement* through the enactment of this measure. . . . Congress was well aware of the fear that RICO would move large substantive areas formerly totally within the police power of the State into the Federal realm. . . . In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing that it would alter somewhat the role of the Federal Government in the war against organized crime . . . .

*United States v. Turkette*, 452 U.S. 576, 586–87 (1981) (citing 116 CONG. REC. 35217 (1970)) (emphasis added). The Supreme Court, in *Turkette,* refused to place certain limitations on RICO with full knowledge that doing so would "substantially alter the balance between federal and state

enforcement of criminal law." *Id.* Indeed, Congress quite intentionally altered the balance between federal and state courts via the RICO Act, because the fear of wide-spread corruption that motivated RICO's passing was not limited to private business, but extended to "the entire democratic process itself"—including the judicial process. *United States v. Brown*, 555 F.2d 407, 416 (5th Cir. 1977) (quoting Pub. L. No. 91–452, § 1, 84 Stat. 922 (1970). Consequently, even state courts are not immune from RICO's reach. *See, e.g., United States v. Frumento*, 563 F.2d 1083, 1090-91 (3d Cir. 1977) (declining to carve out a governmental entity exception to RICO, because "Congress did not confine its scrutiny to special areas of economic activity"); *U.S. v. Stratton*, 649 F.2d 1066, 1074 (5th Cir. 1981) (finding that state courts may be part of a RICO enterprise). Accordingly, it is clear that Congress intended to alter the balance between federal and state rights towards ensuring that federal statutes, such as the RICO Act, be allowed to fulfill their intended scope, and such shift permits the injunction requested here. Reading the RICO Act as a whole, from the broad remedial powers it bestows upon the district courts, to the breadth of its applicability even to state judiciaries, the Act clearly contemplates a comprehensive enforcement scheme by which the federal courts are expressly empowered to address violations of the RICO Act's provisions in any form—including state court actions.

      **b.**        **Injunctions Are Particularly Appropriate Applies Where the State Court Actions Contribute to Ongoing Violations of a Federal Statute.**

Similarly, the RICO Act could not be afforded its intended scope if the ability of federal courts to reign in and restrain state court actions which are contributing to and furthering RICO violations, were limited. As this Court has acknowledged, where a federal statute empowers the district courts to restrain violations of its provisions, and "the state court action is predicated . . . [on a] contravention of the federal statute," injunction of such action is appropriate

under the "expressly authorized" exception to the AIA. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966). This is precisely the situation at bar, where the Underlying Actions are attempts by Retailers to collect on the fruits of their RICO enterprise. Thus, under the narrow factual circumstances present at bar, the RICO Act qualifies as an "expressly authorized" exception to the AIA, under which the district court may grant the preliminary injunction requested by Plaintiffs in order to prevent further violations of the statute.

The United States Supreme Court has approved the proposition that an Act of Congress may provide an exception to the AIA when the underlying state court actions sought to be enjoined are part of the very activities prohibited by the statute. In *Vendo v. Lektro-Vend Corp.*, 433 U.S. 623 (1977), the Supreme Court held that the equitable relief provisions in the antitrust laws—from which section 1964(a) of the RICO Act was derived—are an exception to the AIA in the narrow circumstances where the state court proceedings were being used as part of an antitrust violation.

Specifically, in *Vendo,* the Supreme Court considered whether the AIA barred an injunction enjoining state court proceedings under section 16 of the Clayton Act. *Id.* at 629. Similar to RICO's grant of jurisdiction to "prevent and restrain" RICO violations, 18 U.S.C. § 1964(a), section 16 of the Clayton Act authorizes courts to grant injunctive relief "against threatened loss or damage by violation of the antitrust laws." *Id.* at 631. While the justices were divided in their rationales (three in plurality; two in concurrence; and four in dissent), a majority of the justices agreed that such injunctive relief under the Clayton Act was, under the right circumstances, an expressly authorized exception to the AIA. *Id.* at 643–58 (concurrence and dissent).[6] Writing the controlling opinion, Justice Blackmun found that an injunction under the Clayton Act would not

---

[6] Because there was no majority decision for the court, Justice Blackmun's concurrence, joined by Chief Justice Burger, as the narrowest of the three opinions, is controlling. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("When there is no majority opinion, the narrower holding controls.").

run afoul of the AIA if three prerequisites were met: (1) the state court proceedings were themselves part of the antitrust violation; (2) the traditional equitable factors warranted an injunction; and (3) "the only way to give the antitrust laws their intended scope is by staying the state proceedings" (essentially, the *Mitchum* test). *Id.* at 644 (Blackmun, J., concurring).

At bar, there can be no dispute that Plaintiff-Appellants have satisfied the prerequisites set forth in Justice Blackmun's controlling concurrence in *Vendo*. First, the Retailers here, through the affairs of the RICO enterprise, are perversely using state courts as tools for their ongoing RICO violation. As alleged in the Complaint, the Retailers are enterprises through which the Defendants have engaged in a pattern of racketeering, namely submitting fraudulent insurance claims and pursuing collections on those claims. In that regard, the Retailers now have hundreds of state court actions pending against Plaintiff, all of which seek to collect the proceeds from the fraud that forms the very basis of their RICO violations. Thus, in light of the broad intended scope of the RICO Act, and the pronouncements of this Court and the United States Supreme Court, the district court *must* be able to use the broad jurisdiction granted to it under section 1964(a) to temporarily enjoin state court proceedings that subvert the judicial process by furthering the underlying RICO violation, such as those at bar.

## CONCLUSION

For the reasons set forth herein, and in Plaintiffs' initial Motion (ECF No. 168), pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs respectfully submit that, upon reconsideration, Plaintiffs' Motion should be granted and that the Court should issue a Temporary Restraining Order and preliminary injunction staying all No-fault collection proceedings currently pending between Plaintiffs and the Retailers.

Dated: New York, New York
      June 29, 2018

            MORRISON MAHONEY, LLP

            By:    /s/ Daniel S. Marvin
                  Daniel S. Marvin, Esq.
                  120 Broadway, Suite 1010
                  New York, New York 10271
                  (212) 825-1212

            CADWALADER, WICKERSHAM & TAFT, LLP

            By:      /s/ William Natbony
                  William J. Natbony, Esq.
                  One World Financial Center
                  New York, New York 10281
                  (212) 504-6531

                  *Allstate Insurance Company,*
                  *Allstate Fire and Casualty*
                  *Insurance Company, Allstate*
                  *Indemnity Company, Allstate*
                  *New Jersey Insurance Company,*
                  *Allstate New Jersey Property*
                  *and Casualty Insurance*
                  *Company, Allstate Property and*
                  *Casualty Insurance Company,*
                  *and Northbrook Indemnity*
                  *Company*