# 16-1101-cv

## United States Court of Appeals
### for the
## Second Circuit

———— ◆❖◆ ————

ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY
& CASUALTY INSURANCE COMPANY, ALLSTATE FIRE
& CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY
COMPANY, ALLSTATE NORTHBROOK INDEMNITY COMPANY,

*Plaintiffs-Appellants,*

– v. –

HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY
& ACUPUNCTURE, PLLC, RICHARD HARVEY, D.C.,
JIN HWANGBO, L. AC, BERVIN NELSON BRUAL, P.T.,

_____ *Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

STERN & MONTANA LLP
*Attorneys for Plaintiffs-Appellants*
1 World Financial Center, 30th Floor
New York, New York 10028
(212) 532-8100

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellants Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Northbrook Indemnity Company (collectively, "Plaintiff-Appellants" or "Allstate") certify that each is a wholly-owned subsidiary of The Allstate Corporation, a Delaware corporation. The stock of The Allstate Corporation is publicly traded. No publicly held entity owns 10% or more of the stock of The Allstate Corporation. The Allstate Corporation does not own 10% or more of any publicly traded entity.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES ...................................................................... 2

STATEMENT OF CASE ......................................................................... 3

STATEMENT OF RELEVANT FACTS .................................................. 7

    1. The No-fault Law .......................................................................... 7

    2. The Complaint ............................................................................. 10

        A. Harvey FCPTA's Fraudulent Organization .................................... 12

        B. Harvey FCPTA's Examination Under Oath
          and the Civil Court Actions ......................................................... 16

STANDARD OF REVIEW ...................................................................... 19

ARGUMENT ........................................................................................... 20

    I.     THE DISTRICT COURT WAS AUTHORIZED TO ISSUE
          THE PRELIMINARY INJUNCTION REQUESTED BY
          PLAINTIFF-APPELLANTS ............................................................. 20

        A. The District Court Would Have Granted the Preliminary
          Injunction in the Absence of the Perceived Procedural Hurdle .... 20

        B. The "Expressly Authorized" Exception to the
          Anti-Injunction Act ..................................................................... 22

        C. The RICO Act Created a Remedy Enforceable in a Federal Court
          of Equity ...................................................................................... 24

    i.  The Plain Text of the RICO Act Created a Uniquely
       Federal Right to Injunctive Relief………….…………25

    ii.  The RICO Act's Legislative History
       Supports the Plain Language of the Statute...……………28

  D. The RICO Act Can Only Be Given Its Intended
     Scope By a Stay of the State Court Actions.................................31

    i.  The RICO Act is Particularly Appropriate as an Expressly
       Authorized Exception to the Anti-Injunction Act…..........34

    ii.  The Expressly Authorized Exception to the AIA Applies
       Where the State Court Actions Contribute to Ongoing
       Violations of Federal Statute …………………….....35

II.    THE DISTRICT COURT ERRED BY NOT ISSUING THE
    PRELIMINARY INJUNCTION REQUESTED BY PLAINTIFF-
    APPELLANTS ...................................................................39

  A. Plaintiff-Appellants Established Irreparable Harm.......................39

  B. There Are Sufficiently Serious Questions Going to the Merits of
    this Matter to Make Them a Fair Ground For Litigation .............46

  C. The Balance of Hardships Tips Decidedly in Allstate's Favor .....48

CONCLUSION .......................................................................................50

# TABLE OF AUTHORITIES

Page

## Cases

*21st Century Advantage Ins. Co. v. Cabral*,
    35 Misc. 3d 1240(A), 2012 N.Y. Slip Op. 51086(U) (Sup. Ct. 2012) ................45

*Aetna Casualty & Surety Co. v. Liebowitz*,
    570 F. Supp. 908 (E.D.N.Y. 1983), *aff'd*, 730 F.2d 905 (2d Cir. 1984) ..............27

*AIU Ins. Co. v. Deajess Med. Imaging,*
    *P.C.*, 24 Misc. 3d 161 (Sup. Ct. Nassau Cty. 2009)..............................................46

*Allstate Ins. Co. v. Ahmed Halima*,
    No. 06-CV-1316 (DLI) (SMG), 2009 WL 750199 (E.D.N.Y. Mar. 19, 2009).....25

*Allstate Ins. Co. v. Bay Needle Care Acupuncture, P.C.*,
    150613-CV-2013 (Sup. Ct. N.Y. Cty. March 3, 2015) ........................................45

*Allstate Ins. Co. v. Bogoraz*,
    818 F. Supp. 2d 544 (E.D.N.Y. 2011)..................................................................25

*Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199
    (E.D.N.Y. 2013) ............................................................................................. *passim*

*Allstate Ins. Co. v. Howell*,
    No. 09-CV-4660 (RJD) (VVP), 2013 WL 5447152
    (E.D.N.Y. Sept. 30, 2013)....................................................................................25

*Allstate Ins. Co. v. Lyons*,
    843 F. Supp. 2d 358 (E.D.N.Y. 2012)..................................................................25

*Allstate Ins. Co. v. Mirvis*,
    No. 08-CV-4405 SLT VVP, 2015 WL 1539671 (E.D.N.Y. Mar. 31, 2015) ........24

*Allstate Ins. Co. v. P.R. Medical, P.C.*,
    01949-CV-2010 (Sup. Ct. Nassau Cty. Mar. 4 2015)..........................................45

*Allstate Ins. Co. v. Rozenberg*,
   771 F. Supp. 2d 254 (E.D.N.Y. 2011)...................................................................25

*Allstate Ins. Co. v. Smirnov*,
   No. 12-CV-01246 (CBA) (SMG), 2014 WL 4437291
   (E.D.N.Y. Sept. 8, 2014).......................................................................................25

*Allstate Ins. Co. v. Tvildiani,*
   14-CV-07328 (E.D.N.Y. April 14, 2015) ECF No. 28 ...................... 21, 42-43, 50

*Allstate Ins. Co. v. Tvildiani,*
   14-CV-07328 (SJ)(RLM) (E.D.N.Y. March 5, 2015), Doc. No. 12-3………20-21

*Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*,
   No. 05-5934 (DRH) (MLO), 2009 WL 3245388 (E.D.N.Y. Sept. 30, 2009) ......25

*AutoOne Ins. Co. v. Manhattan Heights Med.*, P.C.,
   2009 NY Slip Op 51663U (Sup. Ct. Nassau Cty. 2009) ......................................46

*Bruce v. Martin*,
680 F. Supp. 616 (SDNY
1988)………………………………………………...…………………………47

*Cambridge Med., P.C. v. Allstate Ins. Co.*,
   899 F. Supp. 2d 227 (E.D.N.Y. 2012)..................................................................25

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) .............................................................................................33

*Compass Med., P.C. v. GEICO Ins. Co.*,
   41 Misc. 3d 141(A), 2013 N.Y. Slip Op. 52016(U) (App. Term 2013) ..............45

*Corley v. United States*,
   556 U.S. 303 (2009) .............................................................................................26

*Dandong v. Pinnacle Performance Ltd.*,
   2011 WL 6156743 (S.D.N.Y. Dec. 12. 2011)......................................................49

*GEICO Ins. Co. v. Williams*,
   2011 NY Slip Op 30326U (Sup. Ct. Nassau Cty. 2011)......................................45

*Gov't Employees Ins. Co. v. AMD Chiropractic, P.C.*,
 No. 12-CV-4295 (NG) (JO), 2013 WL 5131057 (E.D.N.Y. Sept. 12, 2013) ......25

*Gov't Employees Ins. Co. v. Badia*,
 No. 13-CV-1720 (CBA) (VMS), 2015 WL 1258218
 (E.D.N.Y. Mar. 18, 2015) ......................................................................................24

*Gov't Employees Ins. Co., et al. v. Damien*, *et al.*,
 Docket No. CV 10-5409 (SLT)(JMA) ...................................................................44

*Gov't Employees Ins. Co. v. Esses*,
 No. 12-CV-4424 (RJD) (VVP), 2013 WL 5972481 (E.D.N.Y. Nov. 5, 2013) .....25

*Gov't Employees Ins. Co. v. Hazel*, No. 11-CV-0410 (CBA) (VMS), 2014 WL
 4628661 (E.D.N.Y. Sept. 15, 2014) .......................................................................24

*Gov't Employees Ins. Co. v. Hollis Med. Care, P.C.*,
 No. 10-CV-4341 (ILG) (RML), 2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011) .....25

*Gov't Employees Ins. Co. v. Scheer*,
 No. 13-CV-4039 (SLT) (SMG), 2014 WL 4966137
 (E.D.N.Y. Sept. 30, 2014) .......................................................................................24

*Gov't Employees Ins. Co. v. Simakovsky*,
 No. 14-CV-3775 (KAM) (SMG), 2015 WL 5821407
 (E.D.N.Y. Oct. 5, 2015) ..........................................................................................24

*Gov't Employees Ins. Co. v. Uptown Health Care Mgmt., Inc.*,
 945 F. Supp. 2d 284 (E.D.N.Y. 2013) ....................................................................25

*Gov't Employees Ins. Co. v. Zemlyansky*,
 No. 13-CV-4966 (MKB) (SMG), 2015 WL 5692899
 (E.D.N.Y. Sept. 27, 2015) .......................................................................................24

*H.J. Inc. v. Nw. Bell Tel. Co.*,
 492 U.S. 229 (1989) ................................................................................................32

*Hamilton Watch Co. v. Benrus Watch Co.*,
 206 F2d. 738 (2d Cir. 1953) ...................................................................................47

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) .......................................................................................26

*Huyer v. Wells Fargo & Co.*,
    295 F.R.D. 332 (S.D. Iowa 2013) ....................................................................26

*In re American Exp. Financial Advisors Secs. Litig.*,
    672 F.3d 113 (2d Cir.2011) .............................................................................43

*Jayaraj v. Scappini*,
    66 F.3d 36 (2d Cir.1995) .................................................................................43

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002) ...................................................................... 39-40

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*
    879 F. Supp. 2d 243 (E.D.N.Y. 2012) ........................................................ 25, 45

*Liberty Ins. Corp. v. Leonid (Lenny) Brenman*,
    No. 14-CV-5892 (CBA) (LB), 2016 WL 880170 (E.D.N.Y. Mar. 1, 2016) .........24

*Med. Soc'y of State of N.Y. v. Serio*,
    100 N.Y.2d 854 (2003) ......................................................................................8

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*,
    868 F. Supp. 532 (S.D.N.Y. 1994) ...................................................................40

*Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*,
    12 CV 3858 KMW JLC, 2012 WL 2065294 (S.D.N.Y. June 7, 2012) ................45

*Milner v. Dep't of the Navy*,
    562 U.S. 562 (2011) ........................................................................................28

*Mitchum v. Foster*,
    407 U.S. 225 (1972) .................................................................................. *passim*

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002) ..............................................................27

*Multiquest P.L.L.C. v. Allstate Ins. Co.*,
  17 Misc. 3d 37, 844 N.Y.S.2d 565 (App. Term 2007)..........................................10

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ........................................................................................33

*Panetti v. Quarterman*,
  551 U.S. 930 (2007) ........................................................................................38

*Raila v. United States*,
  355 F.3d 118 (2d Cir. 2004)..............................................................................26

*RJE Corp. v. Northville Indus. Corp.*,
  329 F.3d 310 (2d Cir. 2003)..............................................................................20

*S.E.C. v. Rosenthal*,
  650 F.3d 156 (2d Cir. 2011)..............................................................................19

*Safelite Grp., Inc. v. Jepsen*,
  764 F.3d 258 (2d Cir. 2014)..............................................................................19

*Safeco Ins. Co. of Ind. v. Morel*,
  2009 NY Slip Op 32187U (Sup. Ct. Nassau Cty. 2009) .....................................46

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ............................................................................ 30-31, 33

*Smith v. Hogan*,
  794 F.3d 249 (2d Cir. 2015)..............................................................................19

*State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*,
  No. CV2007-0051(ENV) (MDG), 2007 WL 2908205
  (E.D.N.Y. Oct. 4, 2007) ...................................................................................25

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*,
  No. 04-CV-5045 (ILG), 2008 WL 4146190, (E.D.N.Y. Sept. 5, 2008) ...............25

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
  655 F. Supp. 2d 212 (E.D.N.Y. 2009)................................................................25

*State Farm Mut. Auto. Ins. Co. v. Rabiner*,
    749 F. Supp. 2d 94, 99 (E.D.N.Y. 2010) .................................................................9

*State Farm Mut. Auto. Ins. Co. v. Robert Mallela*,
    4 N.Y.3d 313 (2005) ............................................................................................24

*Studebaker Corp. v. Gittlin*,
    360 F.2d 692 (2d Cir. 1966)..................................................................................36

*Sykes v. Mel S. Harris and Assocs. LLC*,
    780 F.3d 70, 98 n.7 (2d Cir. 2015)........................................................................26

*U.S. v. Stratton*,
    649 F.2d 1066 (5th Cir. 1981)...............................................................................35

*United States v. Brown*,
    555 F.2d 407 (5th Cir. 1977).................................................................................35

*United States v. Carson*,
    52 F.3d 1173 (2d Cir. 1995)....................................................................................7

*United States v. Frumento*,
    563 F.2d 1083 (3d Cir. 1977)................................................................................35

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    995 F.2d 375 (2d Cir. 1993)....................................................................................7

*United States v. Turkette*,
    452 U.S. 576 (1981) ................................................................................. 29, 33, 35

*Vendo v. Lektro-Vend Corp.*,
    433 U.S. 623 (1977) ..............................................................................................37

**Statutes**

11 N.Y.C.R.R. § 65...................................................................................... 8, 10, 21

11 N.Y.C.R.R. § 65–3.11(a). ...................................................................................8

11 N.Y.C.R.R. § 65 3.9(a) ....................................................................................50

11 N.Y.C.R.R. 65-3.16 (a) (12) ......................................................... 9-10, 24,  36

15 U.S.C. §§ 1-7 ...................................................................................................29

15 U.S.C. §§ 12–27 ..............................................................................................29

18 U.S.C. § 1961 ...........................................................................................1, 3, 11

18 U.S.C. § 1962 ......................................................................................... *passim*

18 U.S.C. § 1964(a) .................................................................................... *passim*

18 U.S.C. § 1964(c) ...................................................................................... 24, 26-27

28 U.S.C. § 1292(a)(1) ..........................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

28 U.S.C. § 2283 ........................................................................................ 2, 4-5, 22

29 U.S.C. §§ 52–53 ...............................................................................................29

42 U.S.C. § 1983 ...................................................................................................23

N.Y. Business Corporation Law §§ 1507, 1508 .................................................9

N.Y. Education Law § 6507(4)(c) .......................................................................9

N.Y. Ins. Law § 5102 ...........................................................................................8

N.Y. Ins. Law § 5103(d) ......................................................................................8

Pub. L. No. 91–452, § 1, 84 Stat. 922 (1970) ....................................................35

Pub. L. No.91-452, § 904(a), 84 Stat. 947(1970)………..…………..………. 28

**Other**

115 CONG. REC. 9567 (1969) ..................................................................29

115 CONG. REC. 9567–68 (1969) ...................................................... 29-30

115 CONG. REC. 9568 (1969) ..................................................................28

116 CONG. REC. 35217 (1970) ................................................................35

All Writs Act, 28 U.S. Code § 1651.........................................................43

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, based upon Plaintiff-Appellants' allegations of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*. The district court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) and principles of pendent jurisdiction. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) based upon the district court's denial of Plaintiff-Appellants' Motion for a Preliminary Injunction.

## STATEMENT OF ISSUES

1.     Whether the District Court erred by not finding that Section 1964(a) of the RICO Act, which authorizes the district courts of the United States "to prevent and restrain violations of Section 1962," is an "expressly authorized by Act of Congress" exception to 28 U.S.C § 2283 (the "Anti-Injunction Act").

2.     Whether the District Court was authorized to issue the preliminary injunction requested by Plaintiff-Appellants, which sought a stay of state court cases being used in furtherance of continuing RICO violations, and erred by not doing so.

## STATEMENT OF CASE

On December 16, 2015, Allstate filed the Complaint in the instant matter, alleging that Defendant-Appellee Richard Harvey, D.C. (the "Controller" or "Harvey") presided over an enterprise that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Plaintiff-Appellants, through New York State's No-fault system via the submission of fraudulent claims for chiropractic, acupuncture, and physical therapy services submitted by Harvey Family Chiropractic, Physical Therapy and Acupuncture ("Harvey FCPTA"), an entity formed and operated in violation of Article 12 of the New York State Limited Liability Company Law, Articles 136 and 160 of the Education Law, and the implementing regulations promulgated by the New York State Department of Financial Services concerning the eligibility of health care providers seeking reimbursement under the No-fault law.

In furtherance of the scheme to defraud, it is alleged that Defendant-Appellee Harvey solicited and secured Defendant-Appellees Jin Hwangbo L.Ac. ("Hwangbo") and Bervin Nelson Brual P.T. ("Brual") (collectively, the "Paper Owners" or "Sham Member Providers") to serve as nominal owners of Harvey FCPTA, without actually providing them with any attributes of true ownership. The Complaint alleges that the Defendant-Appellees engaged in substantive violations of 18 U.S.C. § 1961 (the RICO Act), by, among other things, submitting

thousands of fraudulent claim forms seeking payment for chiropractic, acupuncture and/or physical therapy services. By its Complaint, Allstate seeks compensatory damages arising from the Defendant-Appellees' substantive RICO violations, as well as a declaratory judgment that Allstate is not required to pay any No-fault claims from Harvey FCPTA that seek reimbursement for any medical services, due to Harvey FCPTA's fraudulent organization. As alleged in the Complaint, such claims continue to be submitted by and/or in the name of Harvey FCPTA, and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits. There are currently hundreds of claims pending New York City Civil Court and Nassau County District Court actions (the "State Court Actions") seeking reimbursement of No-fault benefits to which Harvey FCPTA is not entitled.

After service of the Complaint, on or about January 24, 2016, Allstate sought a preliminary injunction enjoining Harvey FCPTA from: (i) proceeding with the State Court Actions until the resolution of the instant matter; and (ii) filing new arbitration proceedings or civil actions seeking collection of No-fault benefits from Allstate until the resolution of the instant matter. As relevant to this appeal, Plaintiff-Appellants maintained that the Anti-Injunction Act (the "AIA"), 22 U.S.C. § 2283, does not prohibit the district court from enjoining the State Court Actions, as the AIA provides an exception for such injunctions when "expressly authorized

by [an] Act of Congress." 28 U.S.C. § 2283. In particular, Plaintiff-Appellants argued that since Section 1964(a) of the RICO Act expressly provides that "district courts of the United States shall have jurisdiction to <u>prevent and restrain</u> violations of [the RICO Act] by issuing appropriate orders, including, but not limited to . . . imposing reasonable restrictions on the future activities . . . of any person," 18 U.S.C. § 1964(a) (emphasis added), an order staying the State Court Actions would directly serve and promote Section 1964(a)'s goal of restraining violations of the RICO Act, as each of the State Court Actions seeks reimbursement for No-fault claims that are part of a pattern of racketeering activity in violation of the RICO Act.

Defendant-Appellees filed an Affirmation in Opposition on February 5, 2016, in which they did not oppose Plaintiff-Appellants' AIA arguments. *See* Appendix ("A")-265–82. Plaintiff-Appellants filed a Reply on February 19, 2016. Oral argument on Allstate's application was heard on March 10, 2016. Ruling from the bench, the Honorable Sterling Johnson denied Plaintiff-Appellants' application, stating that in another matter before him in which there was pending litigation in state court, he granted a preliminary injunction of the state court matters and was reversed by the Second Circuit. In addition, Judge Johnson had the record reflect that he had issued preliminary injunctions in the past, but in the context of arbitrations and not civil litigations. A-776.

Importantly, the district court did not take any issue with Plaintiff-Appellants' satisfaction of the substantive elements necessary for the issuance of the injunction sought; rather, the court's concern was its authority to issue such an injunction, presumably based on the Anti-Injunction Act ("AIA"), as the AIA was the only statute brought before the court, pursuant to which Plaintiff-Appellants argued the Court had authority to issue the injunction sought. At the time of the March 10 hearing, the court could not recall the name of the case upon which it relied in denying Plaintiff-Appellants' Motion.

On March 11, 2016, Plaintiff-Appellants filed a letter with the District Court indicating that after an exhaustive search of Second Circuit reported decisions for the case upon which the court relied, Plaintiff-Appellants were unable to find the decision, and thus, respectfully requested that the court provide the case cite, or to the extent unpublished, any identifying information that would allow Plaintiff-Appellants to obtain a copy of that decision. A-779. Plaintiff-Appellants did not receive a response from the District Court.

On March 21, 2016, Plaintiff-Appellants moved the District Court for reconsideration of the March 10, 2016 Order, advising the court that there is was interpretation of existing Second Circuit precedent standing for the proposition that the RICO Act is not an exception to the Anti-Injunction Act, and that the Court overlooked binding precedent in the Second Circuit that the RICO Act grants

courts "broad discretion and latitude in enjoining violators from activities that might lead to future violations," including by issuing injunctions. *U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 995 F.2d 375, 377 (2d Cir. 1993) (affirming district court's issuance of an injunction because Section 1964(a) authorizes courts "to prevent and restrain violations of [RICO] by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in the enterprise [or] imposing reasonable restrictions on the future activities or investments of any person . . . ." (alteration in original) (quoting 18 U.S.C. § 1964(a))); *see also U.S. v. Carson*, 52 F.3d 1173, 1184 (2d Cir. 1995) (same).

On March 23, 2016, the District Court denied Plaintiff-Appellants' Motion for Reconsideration on the basis that they had not established that the court overlooked any controlling law or data, or committed clear error, as is required by Local Rule 6.3. A-790. The instant appeal followed.

## STATEMENT OF RELEVANT FACTS

### 1. The No-fault Law

In 1973, the New York State Legislature enacted the No-fault Law, with the goals of ensuring prompt compensation for losses incurred by accident victims without regard to fault or negligence, reducing the burden on the courts, and providing substantial premium savings to New York motorists. *Med. Soc'y of State*

*of N.Y. v. Serio,* 100 N.Y.2d 854, 860 (2003). In furtherance thereof, pursuant to N.Y. Ins. Law § 5103(d), the Legislature empowered the Superintendent of the New York State Department of Insurance (now known as the New York State Department of Financial Services (the "DFS")) to promulgate regulations implementing the No-fault Law, codified at 11 N.Y.C.R.R. §§ 65 *et seq.* Those regulations, among other things: (i) mandate that No-fault insurers reimburse eligible injured persons up to $50,000 for basic economic loss (including reasonable and necessary medical expenses), *see* Ins. Law § 5102, relating to personal injury suffered as the result of the use or operation of a covered motor vehicle; (ii) state that a health care provider that fails to meet any applicable New York State or local licensing requirement is ineligible to receive reimbursement pursuant to the No-fault Law; and (iii) allow a claimant the right to assign a claim for No-fault benefits to a healthcare provider, which may submit requests for payment directly to insurers pursuant to 11 N.Y.C.R.R. § 65–3.11(a). When an insurer denies and/or withholds payment for billed-for services, a provider may initiate an action against the insurers for breach of contract, either in court or arbitration.

In the seminal case of *State Farm Mutual Automobile Insurance Co. v. Mallela,* 4 N.Y.3d 313 (2005), the New York State Court of Appeals addressed the certified question from this Court of whether a medical corporation that was

fraudulently incorporated under N.Y. Business Corporation Law §§ 1507, 1508, and N.Y. Education Law § 6507(4)(c)[1] was entitled to be reimbursed by insurers pursuant to the No-fault Law, and its implementing regulations, for medical services rendered by licensed medical practitioners. *Mallela*, 4 N.Y.3d at 320. The court analyzed Section 65-3.16(a)(12) and unanimously answered the question in the negative. *Id*. In addition, the *Mallela* court recognized that insurers could maintain a cause of action for fraud or unjust enrichment against fraudulently incorporated providers to recoup payments made after April 4, 2002, the effective date of the amendment to the implementing regulations that required medical providers to be licensed in accordance with applicable state and local law to be eligible for reimbursement of No-fault benefits. *Id*. at 322; *see also State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 99 (E.D.N.Y. 2010) (recognizing *Mallela*'s holding that insurers could maintain actions for fraud or unjust enrichment to recoup payments made to fraudulently incorporated medical providers).

Although *Mallela* concerned fraudulently incorporated medical corporations, the regulation relied upon by the Court of Appeals in that case applies equally to any "provider of health care services," including PLLCs such as Harvey FCPTA.

---

[1] N.Y. Business Corporation Law §§ 1507, 1508 and N.Y. Education Law § 6507(4)(c) provide, in essence, that a certificate of authority to operate as a professional corporation may only be issued to a corporation whose owners are licensed in the profession which the corporation is authorized to practice.

*See Multiquest P.L.L.C. v. Allstate Ins. Co.*, 844 N.Y.S.2d 565, 567 (App. Term 2007) (holding that the "requirements of membership, professional licensing, and filing are substantially the same" for professional service corporations and PLLCs, and concluding that "11 N.Y.C.R.R. [§] 65-3.16 (a)(12) clearly applies" to PLLCs); *see also Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 295–96 (E.D.N.Y. 2013) (holding that *Mallela* made no distinction between health care providers incorporated as business entities pursuant to the business corporation law and health care providers licensed as Article 28 facilities under the public health law.)

**2.**     **The Complaint**

Plaintiff-Appellants underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program. A-20. Harvey FCPTA is ostensibly a healthcare provider that bills for chiropractic, acupuncture and physical therapy services to, among others, individuals covered under the No-fault Law. *Id.* In exchange for its services, Harvey FCPTA accepted assignments of benefits from its patients covered under the No-fault law ("Claimants") and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiff-Appellants, in particular. *Id.* In purported compliance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, Harvey FCPTA submitted proof of its claims to Plaintiff-Appellants. To process and verify claims submitted by Harvey FCPTA, Plaintiff-Appellants required, and Harvey FCPTA submitted, to the extent

applicable, narrative reports and other records relative to the alleged medical treatment rendered to Claimants, for which Harvey FCPTA was seeking payment. A-23. Pursuant to the No-fault law and its implementing regulations, as well as the applicable policies of insurance, Plaintiff-Appellants are generally required to process a PLLC's claims within 30 days of receipt of proof of claim. *Id.* To fulfill its obligation to promptly process claims, Allstate justifiably relied upon the bills and documentation submitted by Harvey FCPTA in support of its claims, and paid Harvey FCPTA based on the representations and information that Harvey FCPTA mailed to Allstate. *Id.* To the extent Plaintiff-Appellants denied Harvey FCPTA's proof of claims, Harvey FCPTA, in many instances, initiated actions in the Civil Courts of New York City and the District Court of Nassau County challenging the denials and seeking reimbursement of the claims.

Against the foregoing backdrop, Plaintiff-Appellants commenced this action alleging, among other things, violations of RICO, 18 U.S.C. §§ 1961 *et seq.*, and New York State common law. The Complaint alleges that Defendant-Appellee Harvey presided over an enterprise that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Plaintiff-Appellants, through New York State's No-fault system via the submission of fraudulent claims for chiropractic, acupuncture, and physical therapy services purportedly rendered by Harvey FCPTA, an entity formed and operated in violation of Article 12 of the

New York State Limited Liability Company Law, Articles 136 and 160 of the Education Law, and the implementing regulations promulgated by the DFS concerning the eligibility of health care providers seeking reimbursement under the No-fault law.  A-8.

A. **Harvey FCPTA's Fraudulent Organization**

Defendant-Appellee Harvey is a licensed chiropractor, but is not licensed to practice acupuncture or physical therapy in the State of New York. A-24. Prior to the formation of Harvey FCPTA, Defendant-Appellee Harvey was a sole proprietor providing chiropractic, acupuncture, and physical therapy services that sought reimbursement for services through, among others, the No-fault system under the assumed name of "Harvey Family Chiropractic," which maintained its offices at 944 North Broadway, Yonkers, New York 10701. A-29. The Complaint alleges that, in or about March 2011, recognizing that as a licensed chiropractor, not licensed or otherwise certified in acupuncture and/or physical therapy, he was ineligible to seek reimbursement for such services, Defendant-Appellee Harvey recruited a licensed acupuncturist and physical therapist as nominal owners in order to reconstitute Harvey Family Chiropractic as Harvey FCPTA, in an effort to circumvent New York licensing laws and maximize profits by billing for services that he was otherwise prohibited by law from providing. A-30.

The Complaint further alleges that in violation of Article 12 of the LLC Law, at the time Harvey FCPTA was organized in the State of New York, its original nominal paper owners, acupuncturist Paul S. Wong ("Wong") and physical therapist Ricardo S. Sanahon, Jr. ("Sanahon"), who are not named as defendants in this action, were members of Harvey FCPTA in name only; true ownership, management and control was held exclusively by Defendant-Appellee Harvey. A-12. When a purported acupuncturist or physical therapist member/owner ceased their employment relationship with Harvey FCPTA, Defendant-Appellee Harvey replaced them with another acupuncturist and/or physical therapist, who would similarly serve as a member/owner of Harvey FCPTA in name only. Irrespective of which licensed acupuncturist and/or physical therapist was listed on the articles of organization, none of them incurred any costs to establish and/or operate Harvey FCPTA, nor did they invest any money in the practice that they purportedly owned. A-30–31. In order to feign the appearance that a new business entity was being established, Defendant-Appellee Harvey moved the location of Harvey FCPTA from 944 North Broadway, Yonkers, NY, to 984 North Broadway, Yonkers, NY. A-30.

The Complaint goes on to allege that Defendant-Appellee Harvey unilaterally established the manner and means through which Harvey FCPTA was set up and operated, A-31; provided all start-up and operating costs of Harvey

13

FCPTA, *id.*; exercised complete control over all aspects of Harvey FCPTA, including billing, hiring all professional and non-professional staff, collecting on the medical bills submitted to insurance companies, making personnel decisions, retaining attorneys to pursue No-fault collections on behalf of Harvey FCPTA, retaining other professionals such as accountants, establishing relationships with the clinics that referred "patients" to Harvey FCPTA, controlling the bank account(s) of Harvey FCPTA, determining what disbursements would be made from Harvey FCPTA's account(s), determining what agreements would be entered into on behalf and/or in the name of Harvey FCPTA, and controlling and managing all other aspects of the finances of Harvey FCPTA. A-24–25.

Further, the Complaint details how Harvey FCPTA's operating agreement (the "Operating Agreement"), which purported to organize Harvey FCPTA as a PLLC in which the paper owners were listed as owners/members together with Defendant-Appellee Harvey, was nothing more than a device used by Defendant-Appellee Harvey to fraudulently conceal the actual relationship between the purported member owners of Harvey FCPTA , in order to deceive insurers into believing that Harvey FCPTA was a legitimate PLLC legally organized under the laws of the State of New York. A-31–32. In that regard, the Operating Agreement purports to allocate 1000 shares in Harvey FCPTA as follows: 970 shares (or 97%) to Defendant-Appellee Harvey as the PLLC's member chiropractor, 20 shares or

(2%) to the PLLC's member physical therapist, and 10 shares or (1%) to the PLLC's member acupuncturist (though, in reality, no profits were distributed to the member physical therapist or acupuncturist). A-731. In fact, the Operating Agreement vested Defendant-Appellee Harvey with the unilateral right to make any and all decisions on behalf of Harvey FCPTA. A-32–33. Specifically, the Operating Agreement vested Defendant-Appellee Harvey with the exclusive right to call member meetings, approve mergers and sales and dispositions of assets, file bankruptcy and reorganization petitions, amend or its terms, remove a member, appoint managers, approve sales of new shares and the sale/transfer of members' shares, decide when profits are distributed, and dissolve Harvey FCPTA. *Id.*; *see also* A-731–33; A-736; A-738–40. The Complaint further alleges that the Operating Agreement was drafted by an attorney chosen by Defendant-Appellee Harvey without any input from any of the paper owners. A-32.

In furtherance of the scheme to defraud, it is alleged that Defendant-Appellee Harvey solicited and secured Defendant-Appellees Hwangbo and Brual to serve as nominal owners of Harvey FCPTA, without having any attributes of real ownership in Harvey FCPTA. A-28. The Paper Owners did not exercise any control over Harvey FCPTA, nor did they maintain or have access to the books and records, including accounting, financial records, bank statements and reports relating to Harvey FCPTA, all of which were controlled and maintained by

Defendant-Appellee Harvey and/or others acting under his direction and control. A-34. By way of example and not limitation, the Paper Owners did not: (i) control Harvey FCPTA's money or other assets; (ii) contribute any capital to Harvey FCPTA; (iii) negotiate any lease agreements relating to the physical premises and equipment for Harvey FCPTA; (iv) retain the attorney and/or accountant that drafted the incorporation papers and or Operating Agreements for Harvey FCPTA; (v) have access to any corporate books, bank accounts, financial or business ledgers; (vi) receive profits or percentage of profits, revenue or other income from Harvey FCPTA, except for their salary; (vii) receive written daily, weekly, monthly or annual accounting or financial ledger or reports concerning Harvey FCPTA's account receivables or disbursements; (viii) manage the daily operations of Harvey FCPTA's business; (ix) hire any employees, professional or non-professional; (x) retain the accountants that managed Harvey FCPTA's financial affairs; or (xii) purchase, lease, select, order, arrange to maintain, or repair any of the office and/or medical equipment housed at Harvey FCPTA's location. A-34–35.

### B. Harvey FCPTA's Examination Under Oath and the Civil Court Actions

The allegations of the Complaint were confirmed in 2014 through the sworn testimony of Defendant-Appellees Brual and Hwangbo during Examinations Under Oath ("EUOs"). For example, Brual acknowledged that despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he: (i)

considers himself an "employee" of Harvey FCPTA, A-236; (ii) earns a salary of $30.00 per hour, an amount which was set by Defendant-Appellee Harvey, A-224–25; (iii) has never received compensation based upon his purported ownership, A-228; (iv) does not know if any of the other members, including Defendant-Appellee Harvey, receive a salary, A-226; (v) is unaware of any of Harvey FCPTA's employees' salaries, A-232; (vi) did not contribute any capital to buy into Harvey FCPTA, A-227; (vii) is not aware of Harvey FCPTA's overall revenues or net income, A-228; (viii) does not know the amount of Harvey FCPTA's monthly billing to insurance companies for the physical therapy services which Harvey FCPTA, through Brual, purportedly provides, A-237; (ix) does not know Harvey FCPTA's revenue for the physical therapy services that Harvey FCPTA, through Brual, provides, *id.*; (x) is not aware of how Harvey FCPTA's lease is paid, A-228; (xi) is not a signatory on Harvey FCPTA's bank account, A-229; (xii) has never discussed the daily operation of Harvey FCPTA with Defendant-Appellee Harvey, A-228; A-232–33; (xiii) did not interview or hire any Harvey FCPTA employees, including but not limited to its Physical Therapy Assistant, who was interviewed and hired solely by Defendant-Appellee Harvey, A-230–32; (xiv) is not aware of Harvey FCPTA's billing procedure, A-233; (xv) has never seen any of Harvey FCPTA's tax returns, A-234; (xvi) does not know the attorneys that Harvey FCPTA

uses, A-235; and (xvii) does not know who is responsible for Harvey FCPTA's payroll. *Id.*

Further proof that Harvey FCPTA is secretly owned solely by Defendant-Appellee Harvey is demonstrated through the EUO testimony of Defendant-Appellee Hwangbo in the same matter, who acknowledged that, despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he: (i) is paid a salary by Defendant-Appellee Harvey of $35.00 per hour, A-243; (ii) is not a signatory on Harvey FCPTA's bank account, A-246; (iii) has never participated in a meeting of the members of Harvey FCPTA, A-249; (iv) is unaware of any rights he has under the Operating Agreement which bears his signature, A-247–48; A-250; (v) does not possess a key to gain entry to the facility, A-251; (vi) does not have any knowledge concerning Harvey FCPTA's revenue, A-252; (vii) has never received any dividends from Harvey FCPTA, A-244–46; A-252; (viii) is not aware of the amount of Harvey FCPTA's payroll or how it is handled, A-253; A-256; (ix) is not aware of how much revenue Harvey FCPTA generates from acupuncture services he purportedly provides, A-254–55; (x) does not know who prepares Harvey FCPTA's tax returns, A-255; (xi) does not review Harvey FCPTA's tax returns before, or even know if, they are filed, A-255–56; (xii) is unaware of any of the finances of Harvey FCPTA, A-257–58; and (xiii) is not aware of Harvey FCPTA's weekly and/or monthly income. A-258.

Subsequent to the admissions of Brual and Hwangbo in the 2014 EUOs, Harvey FCPTA began filing hundreds of New York City Civil Court and Nassau County District Court actions seeking reimbursement of No-fault benefits to which it is not entitled. For example, in 2015, Harvey FCPTA filed at least 200 such actions; overall there are over 100 Harvey FCPTA actions scheduled for future court appearances. It is these actions that Plaintiff-Appellants seek to enjoin, as they are part of Harvey FCPTA's attempt to collect on the fruits of it ongoing fraudulent activity constituting RICO violations.

## **STANDARD OF REVIEW**

Although this Court reviews "a district court's denial of a motion for a preliminary injunction for abuse of discretion," it reviews "the district court's legal conclusions *de novo*." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014). Because the district court did not take issue with the underlying merits of Plaintiff-Appellants' preliminary injunction motion, this appeal seeks review of only the district court's interpretation of federal statutes underlying its decision. *See S.E.C. v. Rosenthal*, 650 F.3d 156, 158 (2d Cir. 2011) ("We review *de novo* the district court's interpretation of a federal statute.").

In addition, a district court's subsequent denial of a motion for reconsideration is reviewed for abuse of discretion. *See Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015). "A court abuses its discretion when its decision rests on a

legal error or a clearly erroneous factual finding, or when its decision does not fall within the range of permissible decisions." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 316 (2d Cir. 2003).

## ARGUMENT

## I.

### THE DISTRICT COURT WAS AUTHORIZED TO ISSUE THE PRELIMINARY INJUNCTION REQUESTED BY PLAINTIFF-APPELLANTS

### A. The District Court Would Have Granted the Preliminary Injunction in the Absence of the Perceived Procedural Hurdle

As a threshold matter, it is noted that the Judge Johnson did not take issue with any of the substantive elements of Plaintiff-Appellants' injunction request, explicitly indicating that he had previously granted such injunctions with respect to pending *arbitrations*. In fact, in *Allstate Insurance Co. v. Tvildiani*, 14-CV-07328 (SJ) (RLM) (E.D.N.Y. March 5, 2015), Judge Johnson did just that. *Tvildiani* involved substantive facts that are virtually identical to the facts here. In *Tvildiani*, as here, the plaintiffs sought monetary relief and a final declaratory judgment for alleged RICO and related state law violations relating to the alleged fraudulent incorporation of a medical provider that submitted claims for payment to No-fault insurance carriers, including Plaintiffs. Plaintiffs alleged there, as they do here, that they paid the defendant medical provider's No-fault claims in reliance on representations and information mailed to Plaintiffs contending that Defendants

were, among other things, in compliance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq. See* Mem. in Supp. of Amended Mot. for Temporary Restraining Order, *Tvildiani*, 14-CV-07328 (SJ) (RLM) (E.D.N.Y. March 5, 2015), ECF No. 12-3, at 5–6. In *Tvildiani*, as here, the professional service corporation defendants ("Defendant PCs") initiated actions against the plaintiffs in arbitration, challenging the plaintiffs' denials of their claims for payment and seeking reimbursement of the same. *Id.* at 5. The plaintiffs moved for an order preliminarily enjoining the Defendant PCs from filing and proceeding with any No-fault collection actions. *Id.* The district court granted the plaintiffs' motion, finding that "Plaintiffs demonstrated that they face[d] irreparable harm absent the award of a preliminary injunction," there were "sufficiently serious questions going to the merits to make them a fair ground for litigation," and "[t]he balance of hardships tip[ped] in favor of staying arbitration." Order Entering Preliminary Injunction, *Tvildiani*, 14-CV-07328 (E.D.N.Y. April 14, 2015) ECF No. 28.

At bar, after Plaintiff-Appellants set forth their reasons for seeking the preliminary injunctions (which were exactly the same as in *Tvildiani*)*,* Judge Johnson found that:

> This is the case where I have had some experience in other matters in which plaintiff has sought to have a preliminary injunction in a case in which there was a pending litigation in state court. I granted that injunction. It went up on appeal and I was reversed by the Second Circuit, saying I could not do that. So based upon that and my personal experience, I'm going to deny the preliminary injunction.

> I'll let the record reflect that I have issued a preliminary injunction,
> but that was for an arbitration, not for a civil litigation.

A-776. Thus, as is clear from the transcript, Judge Johnson would have granted Plaintiff-Appellants' application for a preliminary injunction of the underlying matters if they were pending in arbitration, but felt that he did not have the authority to do so in the context of state court litigations. For the reasons set forth below, it is respectfully submitted that the District Court does have such authority, and therefore erred by not issuing the preliminary injunction.

## B. The "Expressly Authorized" Exception to the Anti-Injunction Act

The Anti-Injunction Act ("AIA"), codified at 28 U.S.C. § 2283, prohibits federal courts from enjoining state court proceedings except, *inter alia*, "as expressly authorized by Act of Congress." In *Mitchum v. Foster*, 407 U.S. 225 (1972), the United States Supreme Court held that, in order to qualify for this exception, the statute in question need not contain an express reference to the AIA, nor must it explicitly authorize injunctions of state court proceedings. 407 U.S. at 337. Rather, the Court explained that the test is simply whether "an Act of Congress, clearly creating a federal right or remedy enforceable in a court of equity, could be given its intended scope only by a stay of the state court proceeding." *Id.* at 238.

Specifically, in *Mitchum*, the Supreme Court found that 42 U.S.C. § 1983 (the "Civil Rights Act") qualified as an expressly authorized exception to the Anti-Injunction Act, despite the absence of any explicit provision in the Civil Rights Act for specifically enjoining state court proceedings. The Court noted that by expressly authorizing a "suit in equity" to redress federal civil rights violations, Congress plainly authorized the federal courts to issue injunctions as one of the means of redress. *Id.* at 242. Looking at the overall purpose of the Act, the Court explained that the proponents of the Civil Rights Act "noted that state courts were being used to harass and injure individuals," and that Congress's concern in enacting Section 1983 was that "state instrumentalities could not protect those [federal civil] rights." *Id.* at 240–42. Because of these concerns, the Court found that the Civil Rights Act could not be given its full intended scope absent the ability to stay state court proceedings. Accordingly, the Court ruled that the Civil Rights Act's express authorization of general equitable relief, combined with the Congressional intent to "alter the relationship between the States and the Nation," sufficiently qualified Section 1983 as an exception to the AIA "expressly authorized by Act of Congress," permitting state court injunctions. *Id.*

As set forth below, the same holds true here, where the RICO Act, which clearly created a right of equitable relief in order to restrain violations of its provisions, could only be given its intended scope by a stay of the State Court

Actions, which seek to further the RICO violations, and thus the District Court was mistaken in its belief that it lacked the authority to issue such an injunction.

## C. The RICO Act Created a Remedy Enforceable in a Federal Court of Equity

With respect to the first prong of the *Mitchum* analysis—whether the RICO Act created a federal right or remedy enforceable in a court of equity—Section 1964(a) of the RICO Act explicitly and unambiguously empowers district courts with jurisdiction, and incredibly wide latitude, to issue orders that "prevent and restrain violations of [the RICO Act]." 18 U.S.C. § 1964(a). Moreover, the plain language of that section demonstrates that Congress, in passing the RICO Act, created uniquely federal remedies which are enforceable in federal courts of equity.[2]

---

[2] Moreover, Section 1964(c) unquestionably empowers insurers to enforce RICO by bringing actions in federal court for injuries sustained by violations of the RICO Act, predicated upon health care providers' violations of New York licensing laws—a power which has been exercised frequently. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12); *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313 (2005); *Liberty Ins. Corp. v. Leonid (Lenny) Brenman*, No. 14-CV-5892 (CBA) (LB), 2016 WL 880170 (E.D.N.Y. Mar. 1, 2016); *Gov't Employees Ins. Co. v. Simakovsky*, No. 14-CV-3775 (KAM) (SMG), 2015 WL 5821407 (E.D.N.Y. Oct. 5, 2015); *Gov't Employees Ins. Co. v. Zemlyansky*, No. 13-CV-4966 (MKB) (SMG), 2015 WL 5692899 (E.D.N.Y. Sept. 27, 2015); *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405 SLT VVP, 2015 WL 1539671 (E.D.N.Y. Mar. 31, 2015), *appeal dismissed* (July 20, 2015); *Gov't Employees Ins. Co. v. Badia*, No. 13-CV-1720 (CBA) (VMS), 2015 WL 1258218 (E.D.N.Y. Mar. 18, 2015); *Gov't Employees Ins. Co. v. Scheer*, No. 13-CV-4039 (SLT) (SMG), 2014 WL 4966137 (E.D.N.Y. Sept. 30, 2014); *Gov't Employees Ins. Co. v. Hazel*, No. 11-CV-0410 (CBA) (VMS), 2014 WL 4628661 (E.D.N.Y. Sept. 15, 2014); *Allstate Ins. Co. v. Smirnov*, No. 12-CV-01246 (CBA) (SMG), 2014 WL 4437291 (E.D.N.Y. Sept. 8, 2014); *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013); *Gov't Employees Ins. Co. v. Uptown Health Care Mgmt., Inc.*, 945 F. Supp. 2d 284 (E.D.N.Y. 2013); *Gov't Employees Ins. Co. v. Esses*, No. 12-CV-4424 (RJD)

### i.  The Plain Text of the RICO Act Created a Uniquely Federal Right to Injunctive Relief

Section 1964(a) of the RICO Act reads in full:

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, *but not limited to*: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

18 U.S.C. § 1964(a) (emphasis added). The plain text of the statute, permitting courts to issue orders in order to "prevent and restrain" violations of the RICO Act, explicitly including equitable relief, is unambiguous. In that regard, "statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'" *Raila v. United States*,

---

(VVP), 2013 WL 5972481 (E.D.N.Y. Nov. 5, 2013); *Allstate Ins. Co. v. Howell*, No. 09-CV-4660 (RJD) (VVP), 2013 WL 5447152 (E.D.N.Y. Sept. 30, 2013); *Gov't Employees Ins. Co. v. AMD Chiropractic, P.C.*, No. 12-CV-4295 (NG) (JO), 2013 WL 5131057 (E.D.N.Y. Sept. 12, 2013); *Cambridge Med., P.C. v. Allstate Ins. Co.*, 899 F. Supp. 2d 227 (E.D.N.Y. 2012); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243 (E.D.N.Y. 2012); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358 (E.D.N.Y. 2012); *Allstate Ins. Co. v. Bogoraz*, 818 F. Supp. 2d 544 (E.D.N.Y. 2011); *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254 (E.D.N.Y. 2011); *Gov't Employees Ins. Co. v. Hollis Med. Care, P.C.*, No. 10-CV-4341 (ILG) (RML), 2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011); *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212 (E.D.N.Y. 2009); *Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, No. 05-5934 (DRH) (MLO), 2009 WL 3245388 (E.D.N.Y. Sept. 30, 2009); *Allstate Ins. Co. v. Ahmed Halima*, No. 06-CV-1316 (DLI) (SMG), 2009 WL 750199 (E.D.N.Y. Mar. 19, 2009); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, No. 04-CV-5045 (ILG), 2008 WL 4146190, (E.D.N.Y. Sept. 5, 2008); *State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.*, No. CV2007-0051(ENV) (MDG), 2007 WL 2908205 (E.D.N.Y. Oct. 4, 2007).

355 F.3d 118, 120 (2d Cir. 2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). Importantly, when discerning the meaning of statutory language, the court should construe the statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009). Section 1964(c) of the RICO Act grants private plaintiffs a right of action under the statute. Section 1964(a), in turn, grants district courts broad and general jurisdiction to fashion appropriate equitable relief in civil RICO actions, without any limitations as to who can seek such relief.[3] Thus, a plain reading of the statute, giving due meaning to all its provisions, confirms that the district court is empowered to grant litigants, such as Plaintiff-Appellants, preliminary injunctive relief under RICO by virtue of Section 1964(a).

The precept that a district court may issue a preliminary injunction pursuant to 1964(a) has been acknowledged in the Eastern District of New York for at least

---

[3] Although the question of whether or not Section 1964(a) of the RICO Act provides a mechanism by which a private party may sue for *permanent* injunctive relief remains open in this Circuit (and the majority of the district courts to examine this issue in the past fifteen years have held that it does, s*ee, e.g., Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 344 (S.D. Iowa 2013)), this Court need not determine that issue here. There can be no dispute that a private party may seek *preliminary injunctive relief* pursuant to the Federal Rules of Civil Procedure, and that district courts have the power to grant such relief *pursuant to any power that the Court has jurisdiction to exercise*. *See Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 98 n.7 (2d Cir. 2015). In the instant case, this power arises under Section 1964(a)*.

three decades. In *Aetna Casualty & Surety Co. v. Liebowitz*, 570 F. Supp. 908, (E.D.N.Y. 1983), *aff'd*, 730 F.2d 905 (2d Cir. 1984), the Court found:

> [A]lthough § 1964(c) states only that a private party may sue for treble damages, § 1964(a) gives the court broad jurisdiction to remedy violations of § 1962 by issuing 'appropriate orders.' Nothing in the statute indicates that a preliminary injunction would not be an 'appropriate order' within the meaning of § 1964(a).

Judge Rakoff's decision in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002) is similarly illustrative. In rejecting the argument that private plaintiffs were barred from seeking preliminary injunctions under RICO, Judge Rakoff found that "[i]t would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of utilizing this classic remedial power in private civil actions brought under the act." *Uzan*, 202 F. Supp. 2d at 244 (quoting Pub. L. No.91-452, § 904(a), 84 Stat. 947(1970)). Notably, Judge Rakoff found that such injunctions could be granted under both the general equitable powers conveyed to federal courts by the Judiciary Act of 1789 and "*the specific grant of power given by Congress under Section 1964(a) of [the] RICO [Act]*." *Id.* at 250 (emphasis added).

At bar, despite the District Court having been provided with *Uzan* and other related cases cited herein, it failed to follow their clear import, or the clear import

of the text of Section 1964(a). Accordingly, the court's denial of Plaintiff-Appellants' application for a preliminary injunction of the State Court Actions, premised on the Court's purported lack of authority to issue such an injunction, was contrary to the plain meaning of Section 1964(a) and was in error.

### ii. The RICO Act's Legislative History Supports the Plain Language of the Statute

Because the plain language of the RICO Act is unambiguous, there is no need for the Court to consider its legislative purpose. *See Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011). Even so, the RICO Act's legislative purpose further supports the plain meaning of the statute, which allows for preliminary injunctive relief. The RICO Act was drafted in order to expand the role of the federal courts to issue "injunction and other relief [and] enlarge, strengthen, and vitalize the tools available" to fight racketeering. 115 CONG. REC. 9568 (1969). "The view was that existing law, state and federal, was not adequate to address the problem, which was of national dimensions." *United States v. Turkette*, 452 U.S. 576, 586 (1981). In response to concerns about the rampant spread of racketeering and organized crime in the 1960s, the RICO Act was created to provide a new and uniquely powerful tool to fight the "penetration of organized crime into the fabric of our society." 115 CONG. REC. 9567 (1969). In setting out both criminal and civil repercussions, RICO was intended to be a multi-faceted attack on "criminals us[ing] racketeering methods in legitimate fields of endeavor." *Id.* Because

individuals convicted under then-existing criminal laws could simply "use the same knowhow acquired to start the same business again under a different name," it was crucial to create a statutory scheme that could effectively remove "this cancer … by direct attack, by forceable[sic] removal and *prevention of return*." *Id.* at 9567–68 (emphasis added). It was this need for a new, expansive, and comprehensive remedy to the ongoing issue of racketeering that led to the creation of what later became Section 1964(a).

When RICO was introduced in the Senate in 1969, Senator John McClellan, who oversaw the drafting of the bill, explained:

> I believe it necessary to make several clarifying remarks on the antitrust [style] remedies this bill provides … There is … no intention here of importing the great complexity of antitrust law[4] enforcement into this field … The many references to antitrust cases are necessary because the particular equitable remedies desired have been brought to their greatest development in this field, and in many instances they are the primary precedents for the remedies in this bill. *Nor do I mean to limit the remedies available to those which have already been established*. The ability of our chancery courts to formulate a remedy to fit the wrong is one of the great benefits of our system of justice. This ability is not hindered by the bill. … *Again I emphasize that the remedies are not confined to those listed*.

---

[4] In drafting the RICO Act, Congress modeled it largely on antitrust laws—specifically, the Sherman Act, codified at 15 U.S.C. §§ 1-7, and the Clayton Act, codified at 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53, but designed it to go *beyond* the equitable remedies previously established under antitrust law. As the Supreme Court has recognized, the RICO Act is a "far-reaching civil enforcement scheme," *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 483 (1985), that goes above and beyond any similar pre-existing legislation—and it does so on purpose.

115 CONG. REC. 9567–68 (1969) (emphasis added). The 1969 Senate Committee Report on the proposed bill confirms the congressional intent to create a broad and powerful tool against racketeering:

> What is needed here, the committee believes, are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts.

S. REP. No. 91–617, p. 79 (1969).

As demonstrated by the RICO Act's legislative history, it is evident that Congress created the RICO Act, in general, and Section 1964(a), in particular, in order for Federal Courts to be able to use all available weapons in their arsenal in order to combat racketeering, and specifically, far-reaching equitable remedies. It is for that reason that the Supreme Court has consistently thwarted lower courts' efforts to narrow RICO's scope (*see* Section I.D, *infra*). Consequently, when reading the unambiguous text of section 1964(a) in light of Congress's expressed remedial intent, the only coherent reading of the statute is one that allows plaintiffs to seek preliminary injunctive relief under section 1964(a), to prevent and restrain alleged violations of the RICO Act.

In sum, both the plain meaning of the statutory text and the legislative history of the RICO Act support the conclusion that Section 1964(a) permits the issuance of preliminary injunctions as a uniquely federal remedy enforceable in a

federal court of equity, thus satisfying the first part of the *Mitchum* test. Accordingly, it is respectfully submitted that 1964(a) authorizes the preliminary injunctive relief that Plaintiff-Appellants seek here.

### D. The RICO Act Can Only Be Given Its Intended Scope By a Stay of the State Court Actions_____

With respect to the second prong of the *Mitchum* test—whether the RICO Act could be given its intended scope only by a stay of the state court proceedings—such is clearly the case here. The Supreme Court has time and again emphasized the RICO Act's broad remedial purpose, referencing both Congress's express intent, through legislative history, and its "self-consciously expansive language and overall approach." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985) ("The statute's 'remedial' purposes are nowhere more evident than in the provision of a private action for those injured by racketeering activity. . . . RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime. . . . [I]t is in this spirit that all of the Act's provisions should be read."). This holds true even when RICO is used outside of the context of traditionally conceived "organized crime." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989) ("The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime."). Indeed, as the Supreme Court has

opined, "[t]he object of civil RICO is . . . not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 558 (2000) (internal quotations and citations omitted).

To that end, Congress specifically instructed that the RICO Act "be liberally construed to effectuate its remedial purposes." *Id.* n.3. Interpreting the RICO Act to allow private plaintiffs to seek preliminary equitable relief, in order to prevent and restrain RICO violations, clearly promotes that objective. A contrary reading would risk stripping federal courts of their power to issue effective relief in cases involving an ongoing racketeering scheme, which would undermine the RICO Act's purpose and severely undercut its intended scope. Indeed, consistent with Congress's stated purpose of enacting RICO as a broad and powerful piece of legislation, the Supreme Court has repeatedly rebuked lower courts' efforts to narrow RICO's scope. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) (declining to hold that an individual cannot be a separate entity from his wholly owned corporation for purposes of distinguishing RICO defendant from RICO enterprise); *Salinas v. United States*, 522 U.S. 52, 63 (1997) (declining to apply overt act requirement to RICO conspiracy provision); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994) (declining to find economic motive requirement for RICO "enterprise"); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479

(1985) (declining to require criminal conviction prior to allowing civil RICO action and declining to require injury from "racketeering" separate from the predicate acts); *United States v. Turkette*, 452 U.S. 576 (1981) (declining to limit §1962 to "legitimate" enterprises).

In sum, given the express congressional intent to empower the federal courts, via Section 1964(a), to employ an expansive set of tools, both traditional and new, to "prevent and restrain" violations of the RICO Act, the intended scope of the RICO Act plainly encompasses the power of district courts to issue preliminary injunctive relief. *See Uzan*, 202 F. Supp. 2d at 244. In the instant case, Plaintiff-Appellants asked the District Court to exercise its uniquely federal powers in order to prevent and restrain further violations of 18 U.S.C. § 1962, by placing a temporary hold on Defendant-Appellees' State Court Actions, which directly seek the fruits of their racketeering activity. In light of the incredibly wide latitude given to district courts in shaping equitable relief in RICO actions, and the congressional and judicial guidance consistently reaffirming RICO's broad scope, it is clear that the provisional remedy sought by Plaintiff-Appellants here—a temporary stay of the State Court Actions in order to preserve the status quo and prevent and restrain further violations of Section 1962—is certainly within the breadth of the RICO Act, and in fact, is necessary in order to give the RICO Act its intended extensive remedial purpose and scope. As such, in accordance with the

Supreme Court's guidance in *Mitchum*, the RICO Act qualifies as an exception to the AIA, expressly authorized by Act of Congress.

### i. The RICO Act is Particularly Appropriate as an Expressly Authorized Exception to the Anti-Injunction Act

The Supreme Court has found the "expressly authorized" exception to the Anti-Injunction Act particularly applicable when it is "evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). This is precisely the case with the RICO Act. As the Supreme Court has acknowledged:

> Congress was well aware that it was entering a *new domain of federal involvement* through the enactment of this measure. . . . Congress was well aware of the fear that RICO would move large substantive areas formerly totally within the police power of the State into the Federal realm. . . . In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing that it would alter somewhat the role of the Federal Government in the war against organized crime . . . .

*United States v. Turkette*, 452 U.S. 576, 586–87 (1981) (citing 116 CONG. REC. 35217 (1970)) (emphasis added). The Supreme Court, in *Turkette,* refused to place certain limitations on RICO with full knowledge that doing so would "substantially alter the balance between federal and state enforcement of criminal law." *Id.* Indeed, Congress quite intentionally altered the balance between federal and state courts via the RICO Act, because the fear of wide-spread corruption that motivated

RICO's passing was not limited to private business, but extended to "the entire democratic process itself"—including the judicial process. *United States v. Brown*, 555 F.2d 407, 416 (5th Cir. 1977) (quoting Pub. L. No. 91–452, § 1, 84 Stat. 922 (1970)). Consequently, even state courts are not immune from RICO's reach. *See, e.g., United States v. Frumento*, 563 F.2d 1083, 1090-91 (3d Cir. 1977) (declining to carve out a governmental entity exception to RICO, because "Congress did not confine its scrutiny to special areas of economic activity"); *U.S. v. Stratton*, 649 F.2d 1066, 1074 (5th Cir. 1981) (finding that state courts may be part of a RICO enterprise).

Reading the RICO Act as a whole, from the broad remedial powers it bestows upon the district courts, to the breadth of its applicability even to state judiciaries, the Act clearly contemplates a comprehensive enforcement scheme by which the federal courts are expressly empowered to address violations of the RICO Act's provisions in any form—including state court actions.

### ii. The Expressly Authorized Exception to the AIA Applies Where the State Court Action Contribute to Ongoing Violations of a Federal Statute

As this Court has acknowledged, where a federal statute empowers the district courts to restrain violations of its provisions, and "the state court action is predicated . . . [on a] contravention of the federal statute," injunction of such action

is appropriate under the "expressly authorized" exception to the AIA. *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966). This is precisely the situation at bar, where the State Court Actions are an attempt by Defendant-Appellees to collect on the fruits of their RICO enterprise. Because of Harvey FCPTA's fraudulent incorporation and illegal corporate structure, it is not eligible for reimbursement under the No-fault law. 11 N.Y.C.R.R. § 65-3.16 (a)(12). Yet, Harvey FCPTA is currently pursuing hundreds of state court actions to attempt exactly what it is prohibited by law from doing, in furtherance of the RICO enterprise. Thus, under the narrow factual circumstances present at bar, the RICO Act qualifies as an "expressly authorized" exception to the AIA, under which the district court may grant the preliminary injunction requested by Plaintiffs in order to prevent further violations of the statute.

The United States Supreme Court has approved the proposition that an Act of Congress may provide an exception to the AIA when the underlying state court actions sought to be enjoined are part of the very activities prohibited by the statute. In *Vendo v. Lektro-Vend Corp.*, 433 U.S. 623 (1977), the Supreme Court held that the equitable relief provisions in the antitrust laws—from which section 1964(a) of the RICO Act was derived—are an exception to the AIA in the narrow circumstances where the state court proceedings were being used as part of an antitrust violation.

Specifically, in *Vendo,* the Supreme Court considered whether the AIA barred an injunction enjoining state court proceedings under section 16 of the Clayton Act. *Id.* at 629. Similar to RICO's grant of jurisdiction to "prevent and restrain" RICO violations, 18 U.S.C. § 1964(a), section 16 of the Clayton Act authorizes courts to grant injunctive relief "against threatened loss or damage by violation of the antitrust laws." *Id.* at 631. While the justices were divided in their rationales (three in plurality; two in concurrence; and four in dissent), a majority of the justices agreed that such injunctive relief under the Clayton Act was, under the right circumstances, an expressly authorized exception to the AIA. *Id.* at 643–58 (concurrence and dissent).[5] Writing the controlling opinion, Justice Blackmun found that an injunction under the Clayton Act would not run afoul of the AIA if three prerequisites were met: (1) the state court proceedings were themselves part of the antitrust violation; (2) the traditional equitable factors warranted an injunction; and (3) "the only way to give the antitrust laws their intended scope is by staying the state proceedings" (essentially, the *Mitchum* test). *Id.* at 644 (Blackmun, J., concurring).

At bar, there can be no dispute that Plaintiff-Appellants have satisfied the prerequisites set forth in Justice Blackmun's controlling concurrence in *Vendo*.

---

[5] Because there was no majority decision for the court, Justice Blackmun's concurrence, joined by Chief Justice Burger, as the narrowest of the three opinions, is controlling. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("When there is no majority opinion, the narrower holding controls.").

First, the Defendant-Appellees here, through the affairs of the RICO enterprise, are perversely using state courts as tools for their ongoing RICO violation. As alleged in the Complaint and demonstrated through the evidence submitted to the District Court, Harvey FCPTA is an enterprise through which the Defendants have engaged in a pattern of racketeering, namely submitting fraudulent insurance claims and pursuing collections on those claims. In that regard, Harvey FCPTA now has hundreds of state court actions pending against Plaintiff-Appellants, all of which seek to collect the proceeds from the fraud that forms the very basis of the RICO violation. Second, as discussed in Section I.A, *supra*, and Section II, *infra*, Judge Johnson took no issue with Plaintiff-Appellants' satisfaction of the preliminary injunction factors, as Plaintiff-Appellants have well satisfied that standard. Third, as discussed in Section I.D *supra*, the RICO Act fully passes the *Mitchum* test, as the only way to give RICO its intended scope in the instant case is to stay the State Court Actions. Thus, in light of the broad intended scope of the RICO Act, and the pronouncements of this Court and the United States Supreme Court, the district court *must* be able to use the broad jurisdiction granted to it under section 1964(a) to temporarily enjoin state court proceedings that subvert the judicial process by furthering the underlying RICO violation, such as those at bar.

## II.

### THE DISTRICT COURT ERRED BY NOT ISSUING THE PRELIMINARY INJUNCTION REQUESTED BY PLAINTIFF-APPELLANTS

"A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). As noted in Section I.A, *supra*, Judge Johnson would have granted Plaintiff-Appellants' application for a preliminary injunction but for his incorrect belief that he was precluded from doing so. The reason for that is clear: Plaintiff-Appellants' moving papers and oral argument overwhelmingly established their right to such relief.

### A.      Plaintiff-Appellants Established Irreparable Harm

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm, which cannot be adequately redressed by final relief on the merits and for which monetary damages cannot provide adequate compensation." *Kamerling*, 295 F.3d at 214 (internal quotations and citations omitted). In addition, irreparable harm must be shown to be actual and imminent, and not remote or speculative. *Id.* Here, there is no doubt that Plaintiff-Appellants will suffer irreparable harm in the absence of the requested preliminary injunction and accompanying stay.

In the instant case, Plaintiff-Appellants are seeking, among other things, a final declaratory judgment that they are not required to pay any No-fault claims from Harvey FCPTA that seek reimbursement for medical services, due to Harvey FCPTA's fraudulent organization. That relief, by its very nature, is equitable and therefore cannot be redressed by monetary damages. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*, 868 F. Supp. 532, 535 (S.D.N.Y. 1994). Indeed, if the requested injunction is not granted and the State Court Actions are allowed to proceed, any such actions resulting in rulings with regard to Harvey FCPTA's eligibility for reimbursement of No-fault insurance payment that are inconsistent with this Court's ruling on the same issue would severely threaten any judgment of this Court. *See Allstate Ins. Co. v. Elzanaty*, 929 F. Supp.2d 199, 220 (E.D.N.Y. 2013) (granting a stay of pending No-fault actions because allowing them to proceed "would severely threaten any judgment of [the] Court to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to [defendant medical providers'] eligibility for reimbursement of No-Fault insurance payments . . . ."). That threat, which could ultimately strip Plaintiff-Appellants of their right to seek and be awarded a declaratory judgment by this Court, clearly meets the threshold for irreparable harm. Moreover, with no stay in place, Plaintiff-Appellants are required to litigate the related actions while the instant declaratory judgment action is pending, expending resources in litigating matters

relating to insurance proceeds that Defendant-Appellees are not entitled to in the first place due to their fraudulent activity.

Putting aside that it is impractical for a New York City Civil Court Judge to adequately consider the substantive Federal questions raised in the Complaint, any such litigations in state court are and will be presented to many different judges, and will undoubtedly result in a gallimaufry of independent and potentially contradictory conclusions. Further, if the district court were to ultimately grant declaratory judgment in Plaintiff-Appellants' favor, and find that Harvey FCPTA is not properly licensed and therefore ineligible for reimbursement, to the extent that state court decisions resulted in contrary conclusions, Allstate would be forced into a position where it must either pay a judgment for a claim this Court has determined is void, or appeal the state court judgment, unnecessarily drawing out the litigation. Indeed, if the State Court Actions are not stayed, Plaintiff-Appellants will be forced to make repetitious arguments in myriad litigations and/or arbitrations, resulting in inconsistent decisions, which may ultimately be unenforceable in any case, or which may be enforced by the state courts contemporaneously with a contrary decision in this Court, causing harm to Plaintiff-Appellants from which they could not recover.

It is for precisely this reason that the Court in *Elzanaty*, 929 F. Supp. 2d 199

(relied upon by the District Court in *Tvildiani,* 14-CV-07328), granted a similar

motion to the one at bar, finding:

> [i]f this Court were to grant a declaratory judgment finding [defendant
> medical professional corporations] ineligible for reimbursement, it
> may be that an award won by the Defendants in arbitration would
> conflict with this Court's ruling and may not be enforceable. With this
> in mind, it cannot be said that the only injuries at stake here are
> "money, time and energy necessarily expended in the absence of a
> stay", which are not considered "irreparable." . . . *[T]here is a
> concern here with wasting time and resources in an arbitration with
> awards that might eventually be, at best, inconsistent with this Court's
> ruling, and at worst, essentially ineffective.* The Court need not
> address now the precise effect of an inconsistent declaratory judgment
> from this Court on certain arbitration awards. It is sufficient to
> recognize the large realm of potential problems this may cause on the
> validity of those awards, especially in light of their multitude and
> internal inconsistency with each other.

*Elzanaty*, 929 F. Supp. 2d at 221–22 (quoting *Jayaraj v. Scappini,* 66 F.3d 36, 39

(2d Cir.1995)) (emphasis added).[6] Accordingly, the court found that "allowing a

---

[6] The *Elzanaty* Court also addressed its authority to issue the requested stay pursuant to the All
Writs Act, 28 U.S.C. § 1651, which allows federal courts to "issue all writs necessary or
appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of
law," and noted that the Second Circuit's decision in *In re American Exp. Financial Advisors
Secs. Litig.,* 672 F.3d 113 (2d Cir.2011) expressly allows the possibility that, in certain
circumstances, the All Writs Act could permit a court to enjoin arbitration. *Elzanaty*, 929 F. Supp
at 219-220. *Elzanaty* further found that in the case before the Court, which is identical to the
matter at bar, since a stay merely means that the providers' "rights are delayed, rather than
effectively terminated . . . a stay is the most appropriate solution here in order to avoid the large
volume of arbitrations and inconsistent judgments that are gradually culminating in a procedural
and substantive train wreck. . . . In the Court's view, this situation presents precisely the kind of
circumstance envisioned by the Second Circuit when it left the express exception it did in *In re
American Express*." *Elzanaty*, 929 F. Supp. 2d at 220.

large number of proceedings to be heard by a mix of arbitrators, each of whom will likely come to their own independent and potentially contradictory conclusions, will result in harm to Allstate from which it cannot recover." *Id.* at 222. The reasoning used in *Elzanaty* and *Tvildiani* is applicable here, where a stay would be the most economic result and guide the outcome of pending and future litigations. Indeed, if the district court finds Harvey FCPTA to be ineligible for reimbursement due to its illegal corporate structure, then all pending and future No-Fault matters become moot. If however, the district court finds that Harvey FCPTA is not structured illegally, then any defense on that ground in the related litigations similarly becomes moot. Accordingly, the district court's decision in this matter will very likely dispose of the main controversies in the related litigations and thus, a stay of the State Court Actions until a disposition is reached in the district court is manifestly appropriate.

Judge Spatt's decision in *Elzanaty*, and Judge Johnson's decision in *Tvildiani*, are not aberrations, but are in accord with a long line of federal and state court cases which have stayed both state court proceedings and arbitrations pending the determination of a related No-fault declaratory judgment action. For example, in *Government Employees Insurance Co. v. Damien*, a matter which also involved an alleged scheme by defendants to fraudulently obtain No-fault payments from plaintiff-insurers through medical professional corporations, Judge

Townes granted plaintiff-insurers' request for a stay and ordered the defendant

medical professional corporations:

> [E]njoined from commencing *and/or* prosecuting, or causing to be
> commenced or prosecuted, any future collection proceeding against
> [plaintiffs] seeking payment for No-fault benefits . . . either through
> state court proceedings or arbitration, except as counterclaims to this
> action, and . . . from prosecuting any collection proceedings currently
> pending in arbitration before the American Arbitration Association
> between [plaintiffs] and [defendant medical professional
> corporations], or any of them, and all such arbitrations are hereby
> stayed pending resolution of this action.

Order for Injunctive Relief, *Damien*, 10-CV-5409 (SLT) (JMA) (E.D.N.Y

Jan. 4, 2011), ECF No. 63 (emphasis added). Similarly, in *Liberty Mutual*

*Insurance Co. v. Excel Imaging, P.C.*, Judge Weinstein also stayed pending No-

fault arbitrations, finding that "[p]ermitting these individual claims to proceed to

arbitration while [a related] claim for a declaratory judgment remains pending in

this court puts the plaintiffs at significant risk of multiple judgments that may be

inconsistent with the ultimate decision in this case." 879 F Supp. 2d 243, 264

(E.D.N.Y. 2012); *accord Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*,

12-CV-3858 (KMW) (JLC), 2012 WL 2065294 (S.D.N.Y. June 7, 2012) (staying a

parallel court action filed by defendant because allowing it to go forward would

create the impermissible risk of irreparable harm in the form of potentially inconsistent decisions).[7]

As these Federal and State Court cases demonstrate, the potential harm to Allstate from moving forward with hundreds of related litigations while a declaratory judgment action is pending in federal court is actual, imminent and real, and thus the requested stay will have the dual effect of protecting Allstate

---

[7] New York State Courts are also in agreement, specifically regarding actions wherein an insurer seeks a declaration that a defendant medical providers is not entitled to recover No-fault benefits due to fraud. *See, e.g.*, *Allstate Ins. Co. v. P.R. Medical, P.C.*, 01949-CV-2010 (Sup. Ct. Mar. 4 2015) (staying all pending No-fault arbitrations and lawsuits pending the outcome of the declaratory judgment to avoid repetitive litigation of the same issues); *Allstate Ins. Co. v. Bay Needle Care Acupuncture, P.C.*, 150613-CV-2013 (Sup. Ct. March 3, 2015) (staying all pending No-Fault proceedings commenced by defendants pending the outcome declaratory judgment to avoid risking "inconsistent decisions in a multiplicity of suits and arbitration proceedings"); *Compass Med., P.C. v. GEICO Ins. Co.*, 41 Misc. 3d 141(A), 2013 N.Y. Slip Op. 52016(U) (App. Term 2013) (staying New York City Civil Court PIP action pending outcome of insurer's Supreme Court action for declaratory judgment and fraud); *21st Century Advantage Ins. Co. v. Cabral*, 35 Misc. 3d 1240(A), 2012 N.Y. Slip Op. 51086(U) (Sup. Ct. 2012) (enjoining PIP litigation in lower courts pending outcome of declaratory judgment and fraud claims in Supreme Court); *GEICO Ins. Co. v. Williams*, 2011 NY Slip Op. 30326U at * 10 - * 11 (Sup. Ct. 2011) (staying all pending No-fault arbitrations pending the outcome of the declaratory judgment due to the possibility of 19 significantly varying outcomes if the plaintiff-insurer was required to litigate each allegedly fraudulent claim separately); *AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc. 3d 161, 165 (Sup. Ct. 2009) (staying state court actions and arbitrations, and consolidating them with the declaratory judgment action, noting the large number of actions and arbitrations involving the common question of the defendants' eligibility for No-fault reimbursement.); *Safeco Ins. Co. of Ind. v. Morel*, 2009 NY Slip Op 32187U at *3- *4 (Sup. Ct. 2009) (staying the defendants' pending arbitrations noting that a single, declaratory judgment action was the most efficient means to resolve the dispute amongst the parties); *AutoOne Ins. Co. v. Manhattan Heights Med.*, P.C., 2009 NY Slip Op. 51663U at *3-*4 (Sup. Ct. 2009) (staying No-fault collection matters to prevent repetitive litigation and arbitration where the Supreme Court declaratory judgment action would universally determine whether the professional corporations were fraudulently incorporated); *St. Paul Travelers Ins. Co. v Nandi*, 15 Misc. 3d 1145(A), 2007 N.Y. Slip Op. 51154(U) (Sup. Ct. 2007) (enjoining PIP actions in lower courts pending outcome of declaratory judgment and fraud claims in Supreme Court "in view of the multiplicity of lawsuits and the possible inconsistent outcomes in the absence of an injunction").

from that harm and protecting the issues in dispute before the district court from dozens of potentially contradictory conclusions which would only serve to confuse those issues.

### B.   There Are Sufficiently Serious Questions Going to the Merits of this Matter to Make Them a Fair Ground For Litigation

In addition to a showing of irreparable harm, a party seeking a preliminary injunction must demonstrate either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor. In cases such as the one at bar, where the Complaint outlines, in great detail, complex schemes to defraud which require extensive discovery and further investigation of matters within the peculiar knowledge of the Defendant-Appellees, it would be premature for the court to determine the likelihood of Plaintiff-Appellants' success on the merits. *See e.g.*, *Bruce v. Martin*, 680 F. Supp. 616, 622 (S.D.N.Y. 1988) ("[I]t would be premature at this stage of the proceedings to offer any opinion on whether the plaintiffs have shown a likelihood of success on the merits. It suffices to say that the pleadings of the plaintiffs have shown sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in their favor."); *see also Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) ("To justify a temporary injunction, it is not necessary that the plaintiff's right to a final decision, after a

trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation"). In the instant case, Plaintiff-Appellants easily demonstrated to the district court sufficiently serious questions going to the merits, as well as a balance of hardships tipping in Plaintiff-Appellants' favor.[8]

As in *Tvildiani*, the Complaint in this action clearly sets forth sufficiently serious questions going to the merits to make them fair grounds for litigation. As noted above, the Complaint raises serious questions regarding the ownership of Harvey FCPTA, which operated a well-organized illegal enterprise that engaged in systematic and fraudulent practices, and schemed to defraud, and did defraud, Allstate of hundreds of thousands of dollars. Indeed, the Complaint details how the nominal paper owners of Harvey FCPTA were divested of any and all attributes of ownership and control, which was diverted to Defendant-Appellee Harvey. Plaintiff-Appellants have particularized the fraudulent statements made by Defendant-Appellees within the body of the Complaint, as well as in numerous Exhibits and Predicate Act tables, which are annexed thereto and identify, among

---

[8] It is noted that, while the threshold showing of sufficiently serious questions going to the merits is easily made out here, Plaintiff-Appellants can also easily show a likelihood of success on the merits based upon the sworn EUO testimony of Defendants Hwangbo and Brual, in which they acknowledged that they were not owners of Harvey FCPTA.

other things, representative fraudulent mailings to each of the Plaintiff-Appellants by or on behalf of Harvey FCPTA, including claim numbers, claimant initials and dates of service. Moreover, the EUO transcripts of Defendant-Appellees Hwangbo and Brual, and the Harvey FCPTA Operating Agreement, support Plaintiff-Appellants' claims that Defendant-Appellee Harvey exclusively owned, operated, controlled and managed Harvey FCPTA, in contravention of No-fault law. *See* Statement of Relevant Facts, Section 2, *supra*. To the extent that Harvey FCPTA represented to Plaintiff-Appellants, through the submission of claims, that it is properly licensed, and to the extent Harvey FCPTA disputes the well-pled allegations of the Complaint, there is no doubt that Plaintiff-Appellants have raised sufficiently serious questions to make them fair grounds for litigation. *See e.g.*, *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 6156743 (S.D.N.Y. Dec. 12. 2011) ("The Second Circuit has held that conflicting stories between parties can establish a sufficiently serious question going to the merits for the purposes of justifying a preliminary injunction." (quotations and citations omitted)).

### C.  The Balance of Hardships Tips Decidedly in Allstate's Favor

As noted in Section II.A, *supra*, if the requested relief is not granted, Plaintiff-Appellants will be required, in the context of civil court litigations, to undertake significant time and expense to litigate hundreds of related matters while the instant declaratory judgment is pending. Allstate will be made to make

repetitious arguments in these matters, which could ultimately result in unenforceable and likely inconsistent decisions. In addition, the results of these proceedings, which will be occurring on an ongoing basis throughout the pendency of this action, will undoubtedly be brought before the district court by the prevailing parties in those matters, which will do little more than dilute the issues before the court regarding the complex allegations in the Complaint, rather than sharpen them. It is respectfully submitted that the requested TRO and stay is the only way to avoid the large volume of litigations and inconsistent judgments that could culminate "in a procedural and substantive train wreck." *See Elzanaty*, 929 F. Supp. 2d at 220; *Tvildiani*, 14-CV-7328 (April 14, 2015) ("Justice would be better administered with the fewest number of fora hearing the issues….").

In addition, it would be fundamentally unfair to Plaintiff-Appellants to allow Harvey FCPTA to seek No-fault payments from Plaintiff-Appellants in other proceedings, when the fundamental issue concerning their eligibility to be paid in the first place is at issue in this matter. This is especially true in light of Harvey FCPTA's unwavering effort to file and litigate as many matters as possible as soon as possible. This unfairness can be easily avoided by temporarily staying the current matters and enjoining any future matters until the conclusion of the federal litigation.

Moreover, if Defendant-Appellees prevail in this litigation, and ultimately prevail on the State Court Actions, they will benefit from the language of 11 N.Y.C.R.R. § 65 3.9(a), which mandates the award of interest of two percent (2%) *every month* No-fault payments are overdue. Accordingly, in the extremely unlikely event that Defendant-Appellees prevail in this matter (and subsequently in the related litigations), they will be well compensated for the delay with a *twenty-four percent* (24%) yearly return on the outstanding principle of their successful claims. When weighed against the time and expense that Plaintiff-Appellants would need to expend in litigating each of the individual claims, and the substantial prejudice to Allstate if it were subject to a state court judgment that was later determined to be void by a ruling of the district court, the balance of equities tips decidedly and overwhelmingly in favor of Plaintiff-Appellants.

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully submitted that: (1) the District Court erred in holding that the Anti-Injunction Act precluded it from issuing the preliminary relief requested by Plaintiff-Appellants in their Motion for Preliminary Injunction; (2) the District Court erred in failing to issue the requested injunction; (3) the District Court abused its discretion in failing to identify the Second Circuit case upon which it purportedly relied in denying Plaintiff-Appellants' Motion for a Preliminary Injunction; and (4) the District Court erred in failing to reconsider its

denial of Plaintiff-Appellants' Motion for Preliminary Injunction.

Therefore, Plaintiff-Appellants respectfully pray this Court reverse the District Court's denial of Plaintiff-Appellants' Motion for Reconsideration, and reverse the District Court's denial of Plaintiff-Appellants' Motion for Preliminary Injunction.

STERN & MONTANA LLP

By: _____ /s/Daniel Marvin

Robert A. Stern, Esq. (RAS-1282)
Daniel S. Marvin, Esq.(DM-7106)
Attorneys for Plaintiffs
Office and Post Office Address:
One World Financial Center
30th Floor
New York, New York  10281
Telephone No.:  (212) 532-8100

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,365 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman font with footnotes in 12 point Times New Roman font.

By:     /s/Daniel Marvin

# SPECIAL APPENDIX

i

# Special Appendix Table of Contents

**Page**

Minute Order of the Honorable Sterling Johnson, Denying
  Motion for Temporary Restraining Order and Preliminary
  Injunction, Dated March 10, 2016, Appealed From ............... SPA-1

Transcript of Oral Argument Held before the Honorable
  Sterling Johnson, Dated March 10, 2016 ................................ SPA-5

Order of the Honorable Sterling Johnson, Denying Motion
  for Reconsideration, Dated March 23, 2016, Appealed From .... SPA-25

CM/ECF ?

- Query
- Reports
- Utilities
- Logout

ACO

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:15-cv-07149-SJ-CLP

Allstate Insurance Company et al v. Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC et al
Assigned to: Judge Sterling Johnson, Jr
Referred to: Magistrate Judge Cheryl L. Pollak
Demand: $425,000
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 12/16/2015
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt Organization
Jurisdiction: Federal Question

**Plaintiff**

**Allstate Insurance Company**
        represented by  **Daniel Scott Marvin**
Stern & Montana, LLP
One World Financial Center, 30th Flr.
New York, NY 10281
212-532-8100
Fax: 212-532-7271
Email: d.marvin@stern-montana.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
Stern & Montana, LLP
One World Financial Center
30th floor
New York, NY 10281
(212)532-8100
Fax: (212)532-7271
Email: bob@stern-montana.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
Stern & Montana, LLP
One World Financial Center
30th floor
New York, NY 10281
212-532-8100
Fax: 212-532-7271
Email: s.burgos@stern-montana.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
Stern & Montana LLP
One World Financial Center, 30th Floor
New York, NY 10281
(212) 532-8100
Fax: (212) 532-7271
Email: j.mulvaney@stern-montana.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Property & Casualty Insurance Company**      represented by   **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Fire & Casualty Insurance Company**      represented by   **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Indemnity Company**      represented by   **Daniel Scott Marvin**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Northbrook Indemnity Company**          represented by   **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC**          represented by   **Louis Frank Chisari**
Marcote & Associates, P.C.
403 Merrick Avenue
2nd Floor
East Meadow, NY 11554
(516)280-2281
Fax: (516)280-2283
Email: lchisari@marcotelaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Richard Harvey, D.C.**          represented by   **Louis Frank Chisari**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jin Hwangbo, L.Ac**      represented by **Louis Frank Chisari**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bervin Nelson Brual, P.T.**      represented by **Louis Frank Chisari**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2016 | 21 | Letter *Requesting Case Information* by Allstate Insurance Company (Marvin, Daniel) (Entered: 03/10/2016) |
| 03/10/2016 | | Minute Order. for proceedings held before Judge Sterling Johnson, Jr: Case called. Parties present. Motion Hearing held on 3/10/2016 re 10 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Allstate Insurance Company. Oral argument heard. The Motion is DENIED for reasons stated on the record. The parties are instructed to proceed before Magistrate Judge Pollak. (Court Reporter Lisa Schmid.) (Rodriguez, Ana) (Entered: 03/10/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/11/2016 11:24:08 | | |
| **PACER Login:** | Bobstern:2857122:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-07149-SJ-CLP Start date: 3/10/2016 End date: 3/10/2016 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------------x
     ALLSTATE INSURANCE COMPANY, ET AL,
 3
                     PLAINTIFFS,
 4
          versus                          15 CV 07149(SJ)(CLP)
 5
     HARVEY FAMILY CHIROPRACTIC,
 6   PHYSICAL THERAPY & ACUPUNCTURE,       U. S. Courthouse
     PLLC, ET AL,                          225 Cadman Plaza Esat
 7                                         Brooklyn, New York
                     DEFENDANTS.          March 10th, 2016
 8                                         11:00 a. m.
     -------------------------------------x
 9
                     CIVIL CAUSE FOR ORAL ARGUMENT
10          BEFORE THE HONORABLE STERLING JOHNSON
                   UNITED STATES DISTRICT JUDGE
11
                          APPEARANCES
12
     Attorneys for Plaintiffs:
13   STERN & MONTANA, LLP
     One World Financial Center
14   30th Floor
     New York, New York 10281
15   BY:  SANDRA BURGOS, ESQ.
          ROBERT STERN, ESQ.
16        DANIEL MARVIN, ESQ.

17   Attorneys for Defendant:
     MARCOTE & ASSOCIATES
18   108 New South Road
     Hicksville, New York 11801
19   BY:  LOUIS CHISARI, ESQ.
          JANNINE GORDINEER, ESQ.
20

21   Court Reporter:
     LISA SCHMID, CCR, RMR
22   Official Court Reporter
     225 Cadman Plaza East
23   Brooklyn, New York 11201
     Phone:  718-613-2644 Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1            THE CLERK:  Allstate Insurance Company versus Harvey
 2   Family Chiropractic.
 3            Counsel, note your appearance.
 4            MS. BURGOS:  Good morning, Your Honor.  Sandra
 5   Burgos, along with Robert Stern and Daniel Marvin for the
 6   plaintiffs.
 7            THE COURT:  Step up.
 8            MR. CHISARI:  For the defendants, Marcote and
 9   Associates by Louis Chisari and Jannine Gordineer.  Good
10   morning, Your Honor.
11            THE COURT:  Good morning.
12            MS. GORDINEER:  Good morning, Your Honor.
13            THE COURT:  This is a TRO?
14            MS. BURGOS:  It's a Motion for Preliminary
15   Injunction, Your Honor.  It did contain a request for a TRO,
16   but Your Honor denied that part of it and set a briefing
17   schedule followed by argument on the Motion for Preliminary
18   Injunction.
19            THE COURT:  Now, this is a Preliminary Injunction to
20   stay a I guess you would call it a parallel action in state
21   court?
22            MS. BURGOS:  Yes, Your Honor.  It's a Preliminary
23   Injunction to enjoin any proceedings filed by the defendants
24   for No-Fault collection.  All of these cases are pending in
25   the civil courts of New York and/or the district courts of
```

1    Nassau County. So those No-Fault PIP actions are actions

2    through which the defendants have sued our clients, the

3    insurers, seeking reimbursement for services that they

4    purportedly rendered through what we allege is a

5    fraudulently-organized --

6           THE COURT: I understand that.

7           MS. BURGOS: -- entity.

8           THE COURT: What authority do you say I have to

9    do -- to stay that?

10          MS. BURGOS: Well, Your Honor, we believe that Your

11   Honor is authorized, even under the Anti-Injunction Act, to

12   grant the relief that we're seeking. The AIA normally does

13   not -- the AIA does not prohibit this Court from issuing an

14   injunction, while the AIA generally prohibits a federal court

15   from enjoining a state proceeding.

16          There are three exceptions. The first is when --

17   except as expressly authorized by an Act of Congress. The

18   second is where necessary, in aid of its jurisdiction. The

19   third is to protect or effectuate its judgments.

20          And as we have laid forth in our papers, the

21   plaintiff's position is the AIA makes an exception, as is true

22   in this case, where the complaint is premised on substantive

23   violations of 18 USC 1961, the RICO Act.

24          1961 -- Section 1964(a) of the RICO Act expressly

25   provides that, "District courts of the United States shall

1   have jurisdiction to prevent and restrain violations of the

2   RICO Act by issuing appropriate orders including but not

3   limited to imposing reasonable restrictions on the future

4   activities of any person."

5          Here, an order staying the underlying actions in the

6   civil courts would directly serve and promote the goal of

7   Section 1964(a) of restraining violations of the RICO Act,

8   since each of these underlying actions seem reimbursement for

9   No-Fault claims which are part and parcel of the pattern of

10  racketeering activity, in violation of the RICO Act.  The

11  ultimate goal of the RICO enterprise, as we have alleged in

12  the complaint, is to collect reimbursement on those fraudulent

13  No-Fault claims.

14         And so, we respectfully submit to the Court that

15  injunctive relief requested in this case is entirely aligned

16  with the statutory mandate under Section 18 USC 1964(a) to

17  prevent and restrain RICO violations.  And therefore,

18  preventing the defendants from using the state courts to

19  further the affairs of the Harvey FCPTA enterprise does not

20  run afoul of the AIA.

21         And Your Honor, we respectfully submit, as cited in

22  our case, that the provisions of the RICO Act could not be

23  afforded their intended scope if the courts such as this were

24  deprived of its right to issue injunctions restraining

25  violations thereof.

```
 1              Judge Kaplan, in a case that we've cited in our
 2    papers, Chevron Corp. v. Donzigar, 974 F. Supp. 2d 362, 569,
 3    in the Southern District of New York, in a decision rendered
 4    in 2014, held that allowing courts to issue injunctions
 5    pursuant to the RICO Act is consistent with Congress's
 6    intent -- and I'll quote -- not merely to compensate victims
 7    but to turn them into prosecutors, private attorney generals,
 8    dedicated to eliminating racketeering activity.  And the judge
 9    also found the Supreme Court repeatedly has rejected efforts
10    to curtail the scope of civil RICO actions where courts ignore
11    Congress's insistence that the statute be liberally construed
12    to effectuate its remedial purposes.
13              Ultimately, Judge Kaplan's decision in that case was
14    that, "It would be extraordinary indeed if Congress, in
15    enacting a statute that expressly specified was to be
16    liberally construed to effectuate its remedial purposes
17    intended without expressly so stating to deprive the district
18    courts of utilizing the classic remedial power of injunctions
19    in private civil actions brought under the Act."
20              Given the curtailing effect that that
21    Anti-Injunction Act would have on the RICO Act, the liberal
22    interpretation which Congress intended that it be afforded,
23    and since the RICO Act could not be given its intended scope
24    of preventing and restraining RICO violations unless
25    injunctions such as the one requested here were permitted, the
```

1    requested relief would not run afoul of the AIA.

2           Now, Your Honor, I posit an additional argument.

3    All of these cases, at least the underlying ones that we're

4    aware of, are in the civil courts. And respectfully, for the

5    reasons I've just indicated, I respectfully submit that the

6    AIA does give the Court the jurisdiction.

7           I note just for clarification purposes that the

8    underlying actions are not parallel actions to the extent they

9    do not seek the same relief. In the civil court or district

10    court actions, the defendant, Harvey FCPTA, is suing the

11    insurer, seeking reimbursement for services.

12           In the action before Your Honor, among other things,

13    the insurer is seeking a declaration that Harvey FCPTA is not

14    eligible to seek any reimbursement because it is fraudulently

15    organized. And so -- and in addition to that, there are

16    violations of the RICO Act, unjust enrichment and fraud.

17           To the extent that in their papers, the defendants

18    argued that the plaintiffs have not made out or established

19    their entitlement to the preliminary injunction, I would

20    respectfully disagree. I think that the -- as laid out in our

21    papers, plaintiffs have shown that we are dealing with a

22    declaratory judgment action, number one. It is the fourth

23    claim in the complaint. By its very nature, it is seeking

24    equitable relief and as such, there is no adequate remedy at

25    law.

1      I respectfully submit to the Court that if a stay or

2 a preliminary injunction is not granted, there is a very real

3 danger that the ultimate relief that plaintiffs are seeking in

4 this case before the Court, including a declaration that the

5 defendants are ineligible to receive reimbursement under the

6 No-Fault law will be defeated by allowing the PIP or the

7 reimbursement cases to proceed in litigation.

8      Additionally, it's unfair and inequitable to have to

9 litigate in the civil and district courts the very claims that

10 the plaintiffs are seeking to litigate in their declaratory

11 judgment claim before this court.  The possibility of

12 inconsistent rulings or judgments in those cases in the

13 defendant's favor would be inconsistent or has a possibility

14 of being inconsistent with the ultimate relief that the

15 plaintiffs are seeking here, which would all be rendered moot.

16 And in that regard, there is no amount of money, Your Honor,

17 that can compensate Allstate if the suits were to proceed

18 without a stay and would interfere with the plaintiff's

19 declaratory judgment claim.

20      In addition, there are some practical issues, as

21 well, Your Honor, and that is, that the plaintiffs will be

22 required to litigate and arbitrate hundreds of these cases.

23 Since we were here before the Court on February 26th through

24 yesterday, there were 82 of these cases in the civil courts

25 and district courts.  From today through the end of this

LISA SCHMID, CCR, RMR  OFFICIAL COURT REPORTER

1   month, there are another 68.  So in this month alone, there

2   are 150 of these cases that are being funneled through the

3   civil court and the district court of Nassau County.

4            And those suits are likely presented to dozens of

5   different judges.  They have the potential of resulting in

6   potentially different independent and contradictory

7   conclusions, and the defendants have argued that, you know,

8   there is no harm in actually letting those cases go forward,

9   having decisions in those cases and ultimately seeking to

10  recoup them as part of the compensatory claims that we have

11  pending before Your Honor.  And I respectfully submit that

12  that is not a possibility because the defendants may use any

13  of the judgments that they receive in their favor to argue

14  that that money is not recoverable through affirmative

15  litigation because it's rendered pursuant to a judgment.  They

16  may argue collateral estoppel.  They may argue res judicata.

17           And so for those reasons, Your Honor, I respectfully

18  submit that the plaintiffs have sufficiently established that

19  in the absence of a preliminary injunction or stay, that they

20  would be irreparably harmed.

21           Having done that, we'll move on to the second

22  element, which contrary to the defendant's position, the

23  plaintiffs have sufficiently established, as well.

24           Now, while the defendants argue that we have been

25  unable or unsuccessful in establishing the likelihood of

1   success, that is only one alternative of the second element.

2   It's clear that the second element is likelihood of success or

3   sufficiently serious questions going to the merits to make

4   them a fair ground for litigation.

5        Now, in the plaintiff's complaint, we have made a

6   number of allegations that go to the organization and

7   entitlement and eligibility of the defendant to seek

8   reimbursement under the No-Fault Law.  Among those, we've

9   raised serious questions regarding Harvey FCTPA's ownership.

10  The complaint itself details how the paper owners of Harvey

11  FCPTA were divested of any and all attributes of ownership and

12  control.  We have particularized fraudulent statements made by

13  the defendants within the body of the complaint and in

14  numerous exhibits and predicate acts, and we've included

15  excerpts of statements made under oath by Defendants Brual and

16  Hwangbo, who are the record or paper owners or members of

17  Harvey FCPTA, where they acknowledge that they are not owners,

18  that they are employees, that they receive a salary, that they

19  have no significant role in the ownership operation or control

20  of that entity.

21       Having raised that issue in their opposition papers

22  and even in the answer that they filed last night, to the

23  extent that they dispute the allegations in the complaint, to

24  the extent that they offer a conflicting version or stand by

25  their belief that because they have filed documents with the

1    state that on their face represent that they are properly

2    owned and/or organized, that in and of itself creates a

3    conflict, which the Court in *Dandong versus Pinnacle*

4    *Performance, Limited*, 2011 Westlaw cite, 615-6743 the Second

5    Circuit held that, "Conflicting stories between parties can

6    establish a sufficiently serious question going to the merits

7    for the purpose of justifying a preliminary injunction."  Now,

8    I respectfully submit to the Court that in this case, the

9    plaintiffs have sufficiently done that.

10        Moving on to the third and final element, a

11   balancing of the hardships tip decidedly in the plaintiff's

12   favor in this matter.  Number one, Allstate will be made to

13   make repetitious arguments in these matters, which could

14   ultimately result in unenforceable and likely inconsistent

15   decisions.

16        The results -- and this, I think, is probably one of

17   the more important ones, the results of these proceedings will

18   be occurring on an ongoing basis throughout the pendency of

19   this action, and they'll be undoubtedly brought before the

20   Court by the prevailing parties in those underlying actions,

21   and that will do little more than dilute the issues rather

22   than sharpen them.

23        Request to stay and Preliminary Injunction is the

24   only way to avoid the large volume of litigations and

25   inconsistent judgments that could culminate in what Judge

1    Spatt in *Elzanaty* indicated would be procedural and

2    substantive train wreck.

3          Setting aside that, it is fundamentally unfair to

4    allow Harvey FCPTA to seek No-Fault payments from Allstate in

5    other proceedings when the fundamental issue concerning their

6    eligibility to be paid in the first place is at issue here.

7    In addition, Your Honor, if Allstate prevails in this case,

8    then all of the underlying matters will be rendered moot.

9          If the defendant prevails, however, and they prevail

10   on the related matters, they will benefit from the No-Fault

11   regulations which mandate that they will be awarded interest

12   in the amount of 2 percent every month that payments are

13   overdue.  So they stand to gain 24 percent of interest per

14   annum, which is more than any financial institution will grant

15   them if a stay is ultimately granted in this matter.

16         And when it's -- when those elements are weighed

17   against the time and expense that Allstate would need to

18   expend in litigating the individual claims in the civil and

19   district courts, I respectfully submit to the Court that the

20   balance of equity tips decidedly and overwhelmingly in the

21   plaintiff's favor.

22         There's one other argument -- two other things I

23   would like to say, Your Honor.  The first is that this type of

24   relief has been consistently granted by a number of different

25   courts.  On a similar matter in April of last year, *Allstate*

1   *versus Tvildiani*, Your Honor granted a preliminary injunction

2   and stay of underlying arbitration proceedings.

3           There was Judge Spatt in the *Elzanaty* case, Judge

4   Weinstein in the *Excel Radiology* case and we've included Judge

5   Townes in the Allstate versus *Damien* case -- oh, sorry.

6   *Government Employees Insurance Company versus Damien*.  And

7   there are a number of different state court decisions that

8   have similarly held that where there is a determination as to

9   eligibility, that a stay of the PIP matters or the

10  reimbursement matters is appropriate.

11          The other argument that the defendants have raised

12  is that the Federal Arbitration Act prohibits the Court from

13  granting the relief that plaintiffs are seeking, and I

14  respectfully submit that that is incorrect.

15          The first reason is that the matters that are at

16  issue at least that we're aware of right now are in the civil

17  and district courts.  There aren't any matters that are in

18  arbitration, rendering that part of their argument moot.

19          Secondly, with respect to the FAA, this Court, as

20  have numerous other courts relying on the decision in *In Re:*

21  *American Express* and the All Writs Act have recognized that

22  there are circumstances where a Court can enjoin arbitration

23  proceedings, and I respectfully submit that not unlike the

24  *Tvildiani* case, where this Court granted that relief, if there

25  were arbitrations, this would similarly be an appropriate case

1     to grant that relief, given the satisfaction of the elements

2     that the plaintiffs have set before the Court.

3          And so, Your Honor, before I conclude, I

4     respectfully want to let the Court know that the FAA is

5     unequivocal and not an impediment to the Court granting the

6     relief.  The Court is authorized and has jurisdiction to grant

7     the relief under the exception to the Anti-Injunction Act, and

8     the plaintiffs have satisfied the three elements to support a

9     granting of the relief that's being sought.  Thank you.

10          THE COURT:  Counsel?

11          MR. CHISARI:  Your Honor, this will come in two

12    aspects.  I'm going to address the factual basis and Ms.

13    Gordineer will address the legal arguments.

14          As far as -- let's first address the district court

15    matters that are currently pending before the district court

16    in Nassau County.  First, it's only pending before three

17    particular judges that have these cases.

18          What has been left out by plaintiffs is that their

19    firm represents Allstate on 152 of those.  And of those 152,

20    they have only raised this civil RICO on about 30 of them.  In

21    fact, the rest are failure to provide either an EUO or some

22    type of verification.

23          And in fact, in all of these cases, we, as the

24    plaintiffs in those actions, have had to move -- now we're

25    getting ready to move a second time for the failure to provide

1   discovery in all of those actions.  So in other words, they're

2   alleging this RICO, refused to give us any discovery on it.

3   We made a motion.  The judge decided they were supposed to --

4   required to give us discovery.  They gave us discovery that

5   were nonresponsive.  We're required to file a second set of

6   motions to now strike their answers for failure to provide

7   discovery.

8          So Mr. Stern's moving because they're basically, you

9   know, trying to prevent our client from recovering their

10  rights -- and again, they're the only firm that's raised this

11  issue.  Allstate is represented by many.  It's never been

12  raised before, except in that group of about 30 cases where

13  it's raised.  It's never been raised anywhere else, and in

14  fact, Allstate refuses to give us any discovery on that, at

15  that point.

16         With that said, let's talk about Harvey's Family

17  Chiro, as in the transcripts from all of it, *State Farm versus*

18  *Malone*, which is heavily relied on by the plaintiffs, says

19  beyond financial, it's also medical.  And who's controlling

20  the medical part aspect of the practice?

21         And if you read the transcripts -- and they are at

22  length -- in fact, Dr. Harvey says, yes, I may control the

23  financial aspect of it, who gets paid, how we do insurance,

24  but as far as medical goes, I know nothing about the physical

25  therapy as far as the practicing medicine and how patients are

LISA SCHMID, CCR, RMR   OFFICIAL COURT REPORTER

```
 1   treated.  That's to my partner, Brual.  As far as acupuncture,
 2   I don't anything to do with the acupuncture as far as the
 3   treatment of the patients.  That goes to Hwangbo.  He treats
 4   the patients.  And in fact, they testified to that effect,
 5   also.  They also testified that they signed all the documents
 6   necessary to be partners, and they made a contribution to that
 7   partnership.
 8           To draw an analogy to that be a law practice, mine,
 9   in particular.  We're not equal -- there are three partners.
10   We are not equal partners.  But as far as the partnership
11   goes, I personally deal with all the financial, insurance and
12   any matter that comes up in the office.
13           My partners, if you brought them in here right now
14   and asked them, by the way, what bank do you guys use?  They
15   would say we have no idea.  Our partner, Louis, who they
16   trust -- and rightly so, I hope -- deals with all that.  We
17   trust him.  Well, in their argument, that's a
18   fraudulently-incorporated law office because my partners know
19   nothing about who provides their health insurance, their
20   disability insurance and their medical insurance and their
21   bank.
22           That's enough with the organization.  I think Your
23   Honor has a handle on that and can read in the transcripts.
24   As far as the legal arguments, I'll turn that over to Ms.
25   Gordineer.
```

1    MS. GORDINEER:  Plaintiff argues that this Court has

2    jurisdiction to stay all pending matters in Supreme Court,

3    arbitrations; however, in plaintiff's moving papers, they

4    cannot cite to one case that shows that this Court actually

5    does have the power and authority to stay all pending claims

6    in the underlying matters.  In fact, they rely on cases that

7    particularly relate to arbitrations.  In their rely papers,

8    they actually tried to shame us for distinguishing the cases

9    based on arbitration, but because that's all that was relied

10   on in the moving papers, defendants have to reply to that.

11   Basically, they -- plaintiffs argue irreparable

12   harm is immediate; however the cases have been going on for

13   three years.  If there was such immediate harm, why wait

14   three, four years later to move forward with this so-called

15   RICO action?  The index numbers are from 2013, and it is now

16   2016.

17   Although plaintiff argues that the relief is

18   equitable and cannot be redressed by monetary damages,

19   plaintiff simply argues that they're going to be forced to

20   expend money in litigation.  That is not enough for

21   irreparable harm to warrant a stay in any of the underlying

22   cases.

23   Further, the sole case they rely on is *Elzanaty*, yet

24   they ignore that the judge -- although in that case, the judge

25   did grant a temporary stay of arbitration claims, if I may

```
 1   quote the Court -- the Court states, "It is no doubt unwise
 2   for a Court to simply step in and stay a
 3   contractually-deserved arbitration" --
 4           THE COURT:  What case are you reading from?
 5           MS. GORDINEER:  Allstate Insurance Company versus
 6   Elzanaty, 929 F. Supp. 2d 199, EDNY, 2013.  The Court
 7   specifically states, "It is no doubt unwise for a Court to
 8   simply step in and stay a contractually-deserved arbitration
 9   merely because the Court sees a potentially more efficient use
10   of time and resources by litigants, arbitrators and judges.
11   There is undeniable a slippery slope."
12           Now, to apply a case where the judge in that case is
13   saying, hey, let's take a step back.  This is a slippery slope
14   and I'm just deciding this on arbitration.  To apply a case
15   where it's just pending with arbitration claims to a state
16   court action is a very detrimental and slippery slope,
17   especially when plaintiffs cannot cite to a single case that
18   says this Court has jurisdiction to stay any underlying
19   matters in state court.
20           Again, I'm just going to conclude by saying the
21   plaintiffs have not -- they have failed to establish
22   irreparable harm, a likelihood of success on the merits, and
23   that the balance of the equity sits in their favor.
24           Although plaintiff simply alleges Mallela
25   violations, there is nothing to suggest --
```

```
 1            THE COURT:  Don't go so fast.  You have a court
 2    reporter.
 3            MS. GORDINEER:  Sorry.  Although plaintiff's
 4    complaint alleges *Mallela* violations, there is nothing to
 5    suggest that there is not a bonafide medical facility made up
 6    of different partners to manage different areas of medicine.
 7    Plaintiffs (sic) have filed all required documents with the
 8    state of New York.  They have complied with every single
 9    obligation that they are legally under obligation to do.
10            In this case, it is clear that basically plaintiffs
11    are trying to throw everything at the wall just to see what
12    sticks.
13            MS. BURGOS:  May I rely briefly?
14            THE COURT:  No, I've heard enough.
15            This is the case where I have had some experience in
16    other matters in which plaintiff has sought to have a
17    preliminary injunction in a case in which there was a pending
18    litigation in state court.  I granted that injunction.  It
19    went up on appeal and I was reversed by the Second Circuit,
20    saying I could not do that.  So based upon that and my
21    personal experience, I'm going to deny the preliminary
22    injunction.
23            I'll let the record reflect that I have issued a
24    preliminary injunction, but that was for an arbitration, not
25    for a civil litigation.  That's it.
```

LISA SCHMID, CCR, RMR  OFFICIAL COURT REPORTER

```
1              What's next on this?

2              MR. CHISARI:  Your Honor, answer was filed.  I would

3    imagine we would get then a scheduling order from the

4    magistrate for discovery.

5              THE COURT:  Who is the magistrate on this?

6              MR. CHISARI:  Judge Pollak, I think.

7              THE COURT:  You go back to Judge Pollak, and she

8    will supervise the discovery and give you some dates.

9              MR. CHISARI:  Thank you, Your Honor.  I would assume

10   get that order through the ECF or would you like us to go

11   there now?

12             THE COURT:  Ana, put it on ECF, a minute entry.

13             THE CLERK:  The order you just issued?

14             THE COURT:  Yes.

15             THE CLERK:  I will, Judge.

16             MR. CHISARI:  So then we would get just get a notice

17   from judge --

18             THE CLERK:  Correct.

19             THE COURT:  And you go to Judge Pollak to continue

20   discovery.

21             (Discussion off the record.)

22             MS. BURGOS:  Your Honor, before we concluded, would

23   you by any chance have the cite to the case that you

24   referenced on the record?

25             THE COURT:  I do not recall the case, but I know
```

1    that I was reversed by the Second Circuit.  I guess you could

2    find it on Lexis or Westlaw.

3              MS. BURGOS:  Thank you, Your Honor.

4              THE COURT:  Among the many reverses I've had.

5              (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6/22/2016                    Eastern District of New York - LIVE Database V6.1.1

CM/ECF

- <u>Query</u>
- <u>Reports</u>
- <u>Utilities</u>
- <u>Logout</u>

ACO

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:15-cv-07149-SJ-CLP

Allstate Insurance Company et al v. Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC et al
Assigned to: Judge Sterling Johnson, Jr
Referred to: Magistrate Judge Cheryl L. Pollak
Demand: $425,000
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 12/16/2015
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt Organization
Jurisdiction: Federal Question

**Plaintiff**

**Allstate Insurance Company**                    represented by **Daniel Scott Marvin**
Stern & Montana, LLP
One World Financial Center, 30th Flr.
New York, NY 10281
212-532-8100
Fax: 212-532-7271
Email: d.marvin@stern-montana.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
Stern & Montana, LLP
One World Financial Center
30th floor
New York, NY 10281
(212)532-8100
Fax: (212)532-7271
Email: bob@stern-montana.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
Stern & Montana, LLP
One World Financial Center
30th floor
New York, NY 10281
212-532-8100
Fax: 212-532-7271
Email: s.burgos@stern-montana.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
Stern & Montana LLP
One World Financial Center, 30th Floor
New York, NY 10281
(212) 532-8100
Fax: (212) 532-7271
Email: j.mulvaney@stern-montana.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Property & Casualty Insurance Company**                represented by **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Fire & Casualty Insurance Company**                represented by **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Indemnity Company**                represented by **Daniel Scott Marvin**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allstate Northbrook Indemnity Company**

represented by **Daniel Scott Marvin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Allan Stern**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandra Patricia Burgos**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Mulvaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC**

represented by **Louis Frank Chisari**
Marcote & Associates, P.C.
403 Merrick Avenue
2nd Floor
East Meadow, NY 11554
(516)280-2281
Fax: (516)280-2283
Email: lchisari@marcotelaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Richard Harvey, D.C.**

represented by **Louis Frank Chisari**

**SPA528**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jin Hwangbo, L.Ac**               represented by   **Louis Frank Chisari**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Bervin Nelson Brual, P.T.**        represented by   **Louis Frank Chisari**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/23/2016 | | ORDER denying 23 Motion for Reconsideration. Plaintiff has not established that the Court overlooked any controlling law or data, or committed clear error, as is required by Local Rule 6.3. Ordered by Judge Sterling Johnson, Jr. on 3/23/2016. (Pownall, Samantha) (Entered: 03/23/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/28/2016 14:24:56 | | |
| **PACER Login:** | Bobstern:2857122:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-07149-SJ-CLP Start date: 3/23/2016 End date: 3/25/2016 |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |