UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY, *et al.*,

                              **Plaintiffs,**

-against-

ARTUR AVETISYAN, *et al.*,

                              **Defendants.**

17-CV-4275 (RPK)(RML)

DECLARATION OF JAMES MCKENNEY IN SUPPORT OF PLAINTIFFS' MOTION FOR A DEFAULT JUDGMENT PURSUANT TO FED. R. CIV. P. 55

James A. McKenney declares pursuant to 28 U.S.C. § 1746 that the following is true and correct:

      1.      I am a Partner with the firm of Morrison Mahoney LLP, attorneys for Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and Northbrook Indemnity Company (collectively referred to herein as "Allstate" or "Plaintiffs") in the above-entitled action, and I am fully familiar with all the facts and circumstances in this matter.

      2.      I submit this declaration pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 55(b)(2), and Rule 55.2(a) of the Local Civil Rules of the Southern and Eastern Districts of New York (hereinafter "Local Rules") in support of Plaintiffs' application for the entry of a default judgment against Defendants Artur Avetisyan ("Avetisyan"), Alexandra Matlyuk ("Matlyuk"), and Gregory Miller ("Miller") (collectively "Defaulted Retail Owners"); Almatcare Medical Supply Inc. ("Almatcare Medical Supply"), AVA Custom Supply, Inc. ("AVA Custom Supply"), and Daily Medical Equipment Distribution Center, Inc. ("Daily Medical") (collectively "Defaulted Retailers") (Defaulted Retail Owners and Defaulted Retailers are collectively referred to as "Defaulted Retail Defendants"); and IG & NAT Services, Inc. ("IG&NAT Services" or "Defaulted Wholesaler") (collectively the "Defaulted Defendants") for their failure to answer or otherwise

appear in the above captioned action. A copy of a proposed default judgment is annexed hereto as Exhibit "1."

## BACKGROUND

3. Plaintiffs commenced this action on July 19, 2017, *see* Civil Docket Sheet No. 1 ("Original Complaint"), and subsequently filed their First Amended Complaint on May 9, 2018, alleging, *inter alia,* significant violations of the United States Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c) and 1964(c). *See* Civil Docket Sheet ("ECF") No. 157. A copy of the First Amended Complaint (hereinafter, the "Complaint" or the "Amended Complaint") is annexed hereto as Exhibit "2."

4. As of the date of this filing, Plaintiffs have settled with every Defendant who appeared in this matter, leaving only Plaintiffs' claims for relief against the Defaulted Defendants, who are the subject of this application, left unresolved. *See, e.g.,* Stipulations of Dismissal and related Orders at ECF Nos. 106-108, 120-21, 130-131, 140, 164, 170, 188, 194, 203, 225, 227, 235, and 272.

## FACTUAL BACKGROUND

5. The Complaint alleges, among other things, that the owners of numerous durable medical equipment ("DME") and orthotic device retail supply companies (generally referred to as the "Retail Owners"), including Defaulted Retail Owners Avetisyan, Matlyuk, and Miller, through their retail DME companies (generally referred to as the "Retailers"), including Almatcare Medical Supply, AVA Custom Supply, and Daily Medical, participated in the mechanics and execution of massive parallel schemes to defraud in which the Retail Owners, through the Retailers, mailed hundreds of fraudulent insurance claims for DME and orthotic devices to Plaintiffs for reimbursement pursuant to the Comprehensive Motor Vehicle Insurance Reparations Act of New

York State, N.Y. Ins. Law § 5101 *et seq.* (popularly known as the "No-fault Law"). *See* Exh. "2" at ¶¶ 1-2, 20, 23, 43, 50, 53, 91, 93, 95, 129, 134, 136, 144, 147, 389-391, 463-465, 537-539. The Retail Owners and Retailers are collectively referred to herein as the "Retail Defendants."

6. Under the No-fault Law, Plaintiffs are required to pay for, *inter alia*, necessary health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Claimants") and arise from the use or operation of such motor vehicles in the State of New York. *See* New York State, N.Y. Ins. Law § 5103(a). Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services. *See* 11 NYCRR 65-3.11. As described in the Complaint, the Retail Owners, through the Retailers, exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed, or if provided, were of inferior quality relative to what was represented in the bills submitted to Plaintiffs to have been provided, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices. *See* Exh. "2" at ¶¶ 31, 55, 132, 178, 233, 236, 247.

7. "DME" generally refers to equipment and/or supplies used for a medical purpose by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools. *Id.* at ¶ 2.

8. "Orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items

3

include, but are not limited to, ankle braces, back braces, cervical collars, knee braces, shoulder braces and wrist braces. *Id.*

9.  The New York State Medicaid program has established limits on the maximum permissible charges for, among other things, DME and/or orthotic devices. These limits are listed on the New York State Medicaid DME Services Fee Schedule (hereinafter the "Fee Schedule"). During the relevant time period in the Complaint, "the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances" is "the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided" (hereinafter "Fee Schedule Items"). *See* 12 N.Y.C.R.R. § 442.2.

10.  With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee payable (hereinafter "Non-Fee Schedule Items"), the New York State Workers' Compensation Board regulation provides that the fee payable shall be the lesser of:

> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2(a).

As set forth within the body of the Complaint, as well as in its numerous Exhibits and tables setting forth a representative sample of predicate acts, the Retail Owners, through the Retailers, abused the No-fault Law through various fraudulent billing practices, including routinely submitting bills and supporting documentation to Plaintiffs that misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at

4

the time when, in fact, the Retail Owners, through the Retailers, were utilizing phantom codes for which there was no published fee schedule; (ii) the charges reflected on the Retailers' bills for Non-Fee Schedule items was the lesser of their acquisition costs, plus 50% or the usual and customary price charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in the Retailers' bills corresponded with the equipment purportedly provided. *See* Exh. "2" at ¶¶ 37-40, 45, 182, 187-98, 203, and 207 and Compl. Exhs. 2, 8–16, 20–25, and 27–31.

11.     In addition, the Retail Owners, through the Retailers, also routinely submitted fraudulent bills to Plaintiffs in support of claims for (i) expensive custom-fitted DME and/or orthotic devices, such as lumbar sacral orthoses ("LSOs") as well as knee, wrist, elbow and shoulder braces that were never provided; (ii) expensive DME and/or orthotic devices that required fittings and/or adjustments that were never performed; and (iii) reimbursement of DME and/or orthotic devices in excess of the relevant fee schedule in existence at the time. *See e.g.,* Exh. "2" at ¶¶ 192, 208-237 and Compl. Exhs. 8-9, 21-31, 34–38, 41–45. Each of those bills materially misrepresented the nature, cost and quality of the DME and/or orthotic devices purportedly provided, to the extent the items were provided at all. *Id*. at ¶¶ 22, 43-44, 49, 132, 134, 136, 158, 175, 196-198, 405, 479, 553, 1121, and 1123.

12.     As alleged in the Complaint, the schemes in which the Defaulted Defendants participated are related and similar, stemming from a common blueprint. *Id.* at ¶¶ 20, 22-28, 49, 134 and 148.

13.     In that regard, the Defaulted Defendants devised, and carried out, fundamentally identical schemes to fraudulently bill Plaintiffs in the manner described above for expensive DME and/or orthotic devices that were never provided, or if provided, were inexpensive items of inferior quality that cost a fraction of the amounts that the Retailers materially misrepresented in the

fraudulent insurance claims they submitted to Plaintiffs. *Id*. at ¶¶ 23, 132-34, and 163 and Compl. Exh. 1.

14. As part of the scheme, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, several No-fault Clinics operating in the New York metropolitan area, through their medical doctors and/or chiropractors, who are not named as defendants in the Complaint, provided the Retailers with prescriptions for DME and/or orthotic devices pursuant to a standard protocol or predetermined course of treatment. Exh. "2" at ¶¶ 3, 5, 21, 49, 136, 147, 150-51, and 156-58. At the No-fault Clinics, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics would issue a prescription for a standard battery of DME and/or orthotic devices, irrespective of the Claimant's actual medical needs. *Id*. at ¶¶ 30-31, 147 and 150-51.

15. Often, the No-fault Clinics directed their associated physicians, chiropractors and/or other providers to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and to ensure that the prescriptions issued for these items were generic and non-descript, meaning that they were to omit any detailed description of the items to be supplied to the No-fault Claimants. *Id*. at ¶¶ 156-58. In addition to prescribing Non-Fee Schedule Items, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, lumbar cushions and thermophores, which the Retailers then used in support of their claims for reimbursement at a higher rate for expensive DME that the Retailers never provided. *Id*. at ¶¶ 158-59. The prescriptions were never given to the No-fault Claimants. Instead, they were given directly to the Retailers to eliminate the

possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices. *Id.* at ¶ 155.

16. In furtherance of the scheme to defraud alleged in the Complaint, in addition to the agreements and/or kickback relationships entered into with the No-fault Clinics, one or more of the Retailers also entered into agreements with one or more owners of DME and orthotic device wholesale supply companies (generally referred to as the "Wholesale Owners") through their respective corporations (generally referred to as "Wholesalers"), including Defaulted Wholesaler IG&NAT Services , whereby these Wholesalers supplied the Retailers with invoices that were used to document inflated and outrageous wholesale costs for the DME and/or orthotic devices the Retailers allegedly purchased, which the Retailers then submitted to Plaintiffs as part of their proof of claim. *Id.* at ¶¶ 10, 15, 136-138, 147, and 166-67, 169.

17. The wholesale invoices provided by the Wholesalers to the Retailers included artificial prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein. *Id.* at ¶¶ 10, 15, 136-38, and 166-67. To the extent the Retailers provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices to be much higher in cost than the actual items received from the Wholesalers. *Id.* at ¶¶ 10, 138, and 166-68.

18. In that regard, the wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, upwards of 10 to 20 times the actual prices that the Retailers paid for the DME and/or orthotic devices that were actually provided to the Claimants. *Id.* at ¶¶ 10 and 169. Further, each of the wholesale invoices provided by the Wholesalers to the Retailers intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was

supposedly provided could not be verified based on the wholesale invoice alone. *Id*. at ¶¶ 10, 137-38, 142, and 170. In other instances, the DME and/or orthotic devices reflected in the wholesale invoices that were purportedly provided by the Wholesalers to the Retailers were, in fact, never provided to the Retailers; rather, the Wholesalers created and provided the wholesale invoices to the Retailers to create the illusion of a sale. *Id*. at ¶¶ 10 and 171.

19. In return for the inflated and/or illusory invoices, the Retailers would issue checks to the Wholesalers for the full amount of the inflated wholesale invoice. *Id*. at ¶¶ 11, 138, 172-73, and 270. The Wholesalers would then convert the checks to cash through check cashing establishments, or by other means, and would return the majority of the money to the Retailers while keeping a portion of the profits of the scheme for themselves. *Id*. at ¶¶ 11, 134, 138, 172-73, and 266-71.

20. With the generic prescriptions and inflated invoices in hand, the Retailers routinely submitted the generic prescriptions and inflated invoices to Plaintiffs in support of their fraudulent insurance claims for reimbursement, along with claim forms and delivery receipts that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices that were purportedly provided to No-fault Claimants. *Id*. at ¶¶ 5, 15, 49, 147, 165-67, 175, 178 and 181.

21. In that regard and for their part in the scheme, the Wholesalers (and No-fault Clinics) provided the means through which the Defendants were able to execute their scheme to defraud. *Id*. at ¶¶ 137-141, and 144. The fraudulent wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers in general, and Plaintiffs in particular, to obtain reimbursement under the No-fault Law in excess of the actual cost of the DME and/or orthotic devices purportedly provided. *Id*. at ¶¶ 137-39, 141-42, 144, and 177-78.

22.   In sum, as alleged in the Complaint, the Retailers' bills routinely sought the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided, or not provided as billed and/or if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity. *Id*. at ¶¶ 43, 54, 132-33, 136, 147, 178, 217, 225, and 236.  The bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices actually provided were inexpensive and of poor quality, to the extent they were provided at all. *Id*. at ¶¶ 15-16, 22, 50, 136, 175, 180, 192, 196, 273, 405, 479, and 553.  With the assistance of the Wholesalers and the No-fault Clinics, the Retail Owners, through the Retailers, were able to submit hundreds of fraudulent insurance claims to Plaintiffs for reimbursement under the No-fault Law; claims that Plaintiffs would not have otherwise paid had they known of their fraudulent nature.  *Id.* at ¶¶ 4-5, 10, 129, 409, 483, and 557.

## **PROCEDURAL HISTORY**

23.   On or about September 15, 2017, pursuant to Fed. R. Civ. P. 4(h), Plaintiffs served the Original Complaint on Defaulted Defendants Almatcare Medical Supply Inc., AVA Custom Supply Inc., Daily Medical, and IG&NAT Services, Inc.  Copies of the affidavits of service (Docket Nos. 12, 14, 16, and 20 respectively) are annexed hereto as Exhibits "3" through "6."

24.   On or about September 29, 2017, pursuant to Fed. R. Civ. P. 4(e), Plaintiffs served the Original Complaint on Defaulted Defendant Matlyuk by delivering a copy to a person of suitable age at her home address, who is a co-tenant, and, on or about October 4, 2017, sending a copy of the same by first class mail to Matlyuk's home address.  A copy of the affidavit of service (Docket No. 33) is annexed hereto as Exhibit "7."

9

25. On or about September 20, 2017, pursuant to Fed. R. Civ. P. 4(e) and N.Y. C.P.L.R. 308(2), Plaintiffs served the Original Complaint on upon Defaulted Defendant Miller by delivering a copy to a person of suitable age at his work address, and, sending a copy of the same by first class mail to Miller's home address.  Pursuant to N.Y. C.P.L.R. 308(2), service was complete 10 days following the filing of proof of service, or on or about October 17, 2017. A copy of the affidavit of service (Docket No. 35) is annexed hereto as Exhibit "8."

26. On or about November 9, 2017, pursuant to Fed. R. Civ. P. 4(e) and N.Y. C.P.L.R. 308(2), Plaintiffs served the Original Complaint on upon Defaulted Defendant Avetisyan by delivering a copy to a person of suitable age at his home address, and, sending a copy of the same by first class mail to Avetisyan's home address.  Pursuant to N.Y. C.P.L.R. 308(2), service was complete 10 days following the filing of proof of service, or on or about November 27, 2017.  A copy of the affidavit of service (Docket No. 111) is annexed hereto as Exhibit "9."

27. Pursuant to Fed. R. Civ. P. 12, the Defaulted Defendants were required to serve an answer or otherwise appear within twenty-one (21) days of service of the Original Complaint.

28. Between November 6, 2017 and January 23, 2018, the Clerk of the United States District Court, Eastern District of New York, certified that Defaulted Defendants Almatcare Medical Supply, AVA Custom Supply, IG&NAT Services, Matlyuk, and Avetisyan and had not filed an answer or otherwise moved with respect to the Original Complaint and noted their default. *See* ECF Nos. 77-79, 103, and 137, respectively.

29. Defendants Miller and Daily Medical Equipment Distribution Center's time to answer the Original Complaint or otherwise appear was extended by orders entered October 30, 2017 and December 6, 2017, to an ultimate deadline of January 19, 2018.

30. On May 9, 2018, Plaintiffs filed their Amended Complaint. Exh. 2. In that regard, the Amended Complaint is identical in every regard to the Original Complaint with respect to allegations and claims stated against Defendants Avetisyan, Matlyuk, Miller, Almatcare Medical Supply, AVA Custom Supply, Daily Medical Equipment Distribution Center, and IG&NAT Services.

31. Pursuant to Federal Rule of Civil Procedure 5(a)(2), because Defendants Avetisyan, Matlyuk, Miller, Almatcare Medical Supply, AVA Custom Supply, Daily Medical, and IG&NAT Services had failed to appear in the above action and the Amended Complaint did not assert new claims against Defendants Avetisyan, Matlyuk, Miller, Almatcare Medical Supply, AVA Custom Supply, Daily Medical, and IG&NAT Services, Defendants Avetisyan, Matlyuk, Miller, Almatcare Medical Supply, AVA Custom Supply, Daily Medical Equipment Distribution Center, and IG&NAT Services were not served with the Amended Complaint.[1]

32. At the time of this motion, the Defaulted Defendants have failed to answer or otherwise move with respect to the Complaint and have failed to appear or otherwise defend against the action.

33. On or about June 26, 2018, the Clerk of the United States District Court, Eastern District of New York, certified that Defaulted Defendants Daily Medical and Gregory Miller had not filed an answer or otherwise moved with respect to the Amended Complaint and noted their default. Copies of the Clerk's Certificates of Default (Docket Nos. 176-77), relating to each of these respective Defaulted Defendants, are annexed hereto as Exhibits "10" and "11."

---

[1] Defendants Daily Medical and Gregory Miller never filed a responsive pleading in this action, and no attorney filed a notice of appearance on their behalf. However, to the extent that Mark Furman of the law firm Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf, & Carone, LLP appeared on behalf of Daily Medical and Gregory Miller by virtue of his filling an application for an extension in time to answer on their behalf on December 6, 2017 (ECF No. 122), and is listed among the attorneys receiving ECF filing emails, Plaintiffs achieved effective service of the Amended Complaint on Daily Medical and Gregory Miller when the Amended Complaint was filed pursuant to Fed. R. Civ. P. 5(a)(1)(B) and Local Civil Rule 5.2(a).

11

34. On or about November 6, 2018, the Clerk of the United States District Court, Eastern District of New York, certified that Defaulted Defendants Almatcare Medical Supply and Alexandra Matlyuk had not filed an answer or otherwise moved with respect to the Amended Complaint and noted their default. Copies of the Clerk's Certificates of Default (Docket Nos. 212-13), relating to each of these respective Defaulted Defendants, are annexed hereto as Exhibits "12" and "13."

35. On or about December 3, 2018, the Clerk of the United States District Court, Eastern District of New York, certified that Defaulted Defendants Artur Avetisyan, AVA Custom Supply and IG&NAT Services had not filed answers or otherwise moved with respect to the Amended Complaint and noted their default. Copies of the Clerk's Certificates of Default (Docket Nos. 220-22), relating to each of these respective Defaulted Defendants, are annexed hereto as Exhibits "14," "15," and "16."

36. By failing to answer the Complaint or otherwise defend against the action, the Defaulted Defendants have conceded the allegations relating to Plaintiffs' claims. Thus, there are no material questions of fact at issue and, coupled with the proper service in this action, a default judgment is appropriate. *See Briarpatch, Ltd., L.P. v. Geisler Roberdeau, Inc.*, 513 F. Supp. 2d 1, 3 (S.D.N.Y. 2007). Further, as noted in the accompanying memorandum of law, in light of the default, all of the allegations in the Complaint are accepted as true. *See Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009), *United States v. Williams,* 11-CV-3593 (NGG)(RLM), 2012 WL 170106 (E.D.N.Y. Jan. 19, 2012); *Finkel v. Robco Elec. Corp.,* 11-CV-2353 (NGG)(RLM), 2011 WL 3204603 (E.D.N.Y. July 27, 2011); *Phillip Morris USA, Inc. v. A & V Minimarket, Inc.,* 592 F. Supp. 2d 569, 672 (S.D.N.Y. 2009) (*citing Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993)). Therefore, accepting Plaintiffs' allegations as true, it is respectfully submitted that this Court must

grant Plaintiffs' application for default judgment against the Defaulted Defendants in the amounts specified below.

37. In addition to the foregoing, on February 18, 2020, in *United States of America* v *Miller,* 20-cv-134, in the Southern District of New York, Defendant Miller pleaded guilty to one count of conspiring to commit health care fraud, wherein he owned and operated at least two DME supply companies which fraudulently billed No-fault Insurers upwards of $9,000,000. Similar to Plaintiffs' allegations in the Complaint, the bills submitted by Miller's DME supply companies were fraudulent because, "(a) the bills were for DME that was never provided to patients; (b) the bills were for DME that was medically unnecessary; and (c) the bills were for expensive DME purportedly provided to patients when the DME in fact provided to patients was inexpensive DME." *See* Information, *United States of America* v *Miller,* 20-cv-134, S.D.N.Y. (ECF No. 2).

38. A review of New York City Department of Consumer affairs records reveals that the only DME supply company that Miller owns is Daily Medical.

## **RELIEF SOUGHT**

39. As noted above, Plaintiffs have settled with or have discontinued their claims against all Defendants, except the Defaulted Defendants.

40. All of Plaintiffs' claims against the Defaulted Defendants are identified in the table attached hereto as Exhibit "17." Specifically, Plaintiffs are seeking an entry of judgment against certain Defaulted Defendants on their RICO Claims for Relief, which allege violations under 18 U.S.C. §1962(c), and which are identified in the table attached hereto as Exhibit "18." Plaintiffs are also seeking an entry of judgment against certain Defaulted Defendants on common law claims sounding in fraud and unjust enrichment, which are identified in the table attached hereto as Exhibit "19." Finally, Plaintiffs seek a judgment declaring that Plaintiffs have no obligation to pay

13

any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claim submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Claimants.

41. As set forth in the accompanying Declaration of Michael Bruno, the total damages Plaintiffs have incurred in connection with the fraudulent insurance claims underlying this action that pertain to each Defaulted Defendant are contained in spreadsheets prepared by counsel containing information extracted from summaries of payments made on claims for reimbursement under the No-Fault law, maintained in the ordinary course of business, which are included as exhibits to this declaration. In that regard, the damages for Plaintiffs' RICO counts are calculated based on the payments made to the applicable Retailer enterprise in which the each Defaulted Defendants participated. Similarly, the damages for Plaintiffs' common law claims are calculated based on the amounts paid to the Defaulted Retailers Defendant(s). Thus, attached hereto as Exhibits "20" through "23" are the aforementioned spreadsheets, prepared by counsel based on information maintained by Allstate in its ordinary course of business, itemizing each payment made by Plaintiffs to the relevant Retailer enterprise in which the Defaulted Defendants are alleged to have participated. As set forth in the accompanying Declaration of Michael Bruno, Mr. Bruno

compared the spreadsheets in Exhibits "20" through "23" to the payment summaries maintained by Allstate and confirmed that the information is true and correct. The amounts reflected therein form the basis of the judgments sought against the Defaulted Defendants.

42. As explained in the accompanying memorandum of law, Plaintiffs are entitled to treble damages on their RICO claims and the Defaulted Defendants named in all claims for relief are jointly and severally liable for the amounts set forth therein.

43. In addition, Plaintiffs are also seeking pre-judgment interest on their claims. As set forth in Plaintiffs' memorandum of law, interest is calculated from the first day of the year following the date of Plaintiffs' payments to the relevant Retailer enterprise. Calculating interest in this manner produces an interest amount that is less than the total amount of interest Plaintiffs may seek under New York State law, but has been adopted by several courts within this district in similar cases. *See Govt. Employees Ins. Co. v Infinity Health Products, Ltd.*, 10-CV-5611 (JG)(JMA), 2012 WL 1427796, at *10-12 (E.D.N.Y. Apr. 6, 2012) *report and recommendation adopted,* 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012); *Gov't Employees Ins. Co. v. Li-Elle Serv., Inc.*, 12-CV-2157 (KAM)(VMS), 2013 WL 829302 (E.D.N.Y. Feb. 11, 2013) *report and recommendation adopted as modified*, 2013 WL 829274 (E.D.N.Y. Mar. 6, 2013); *Gov't Employees Ins. Co. v. IAV Med. Supply, Inc.*, 11-CV-4261 (ARR)(RER), 2013 WL 764735, at * 8-10 (E.D.N.Y. Feb. 8, 2013) *report and recommendation adopted*, 2013 WL 765190 (E.D.N.Y. Feb. 28, 2013).

44. Plaintiffs also respectfully reserve their right to seek attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

45. Accordingly, the damages demanded from each of the Defaulted Defendants is calculated and set forth in the following exhibits to this Declaration: (a) Exhibit "24," which sets

forth the calculations for prejudgment interest on all damages pursuant to the RICO and common law claims that are the subject of this application and (b) Exhibit "25," which sets forth the damages sought against each Defaulted Defendant, trebled where appropriate on Plaintiffs' RICO claims, the prejudgment interest, and the total judgment sought against each Defaulted Defendant. In instances where the Defaulted Defendant is liable to Plaintiffs for damages pursuant to the RICO and common law claims for relief, the judgment amount listed in Exhibit "25" against that defendant is the RICO damage amount inclusive of any interest to which Plaintiffs are entitled, as this amount is higher than the common law claim damage amount inclusive of any interest. By way of example, Defaulted Defendant Matlyuk is liable to Plaintiffs on the Thirteenth Claim for Relief sounding in RICO and the Fourteenth and Fifteenth Claims for Relief sounding in fraud and unjust enrichment, but the judgment amount sought against Defaulted Defendant Matlyuk is $101,427.61, which consists of the damages on the RICO claim plus prejudgment interest.

46. Finally, because the Defaulted Retailers, Almatcare Medical Supply, AVA Custom Supply, and Daily Medical, are deemed to have admitted the allegations in the Complaint, Plaintiffs are entitled to a declaration that they are not obligated to pay pending and/or unpaid No-fault claims submitted by the Defaulted Retail Defendants.

47. As further set forth in the Declaration of Michael Bruno, upon review of the billing and payment summaries maintained by Allstate in the ordinary course of business, Mr. Bruno determined that there are in excess of $720,000.00 in unpaid claims that remains in dispute.

48. Moreover, as set forth in the Declaration of Michael Bruno, a sampling of the unpaid fraudulent insurance claims underlying this action that pertain to each Defaulted Retail Defendant are contained in spreadsheets prepared by counsel containing information extracted from summaries of claims for reimbursement under the No-fault law and maintained by Allstate

in the ordinary course of business. These spreadsheets, attached hereto as Exhibits "27" through "29," are based on information maintained by Allstate in its ordinary course of business, itemizing each unpaid claim for reimbursement for DME made by the relevant Default Retail Defendant to Plaintiffs." As set forth in the accompanying Declaration of Michael Bruno, Mr. Bruno compared the spreadsheets in Exhibits "27" through "29" to the claim summaries maintained by Allstate and confirmed that the information is true and correct.

49. In that regard, the Defaulted Retailers continue to file and pursue collections proceedings in the civil courts of the State of New York and the American Arbitrations Association with 177 suits and arbitrations currently pending in which the Default Retailers seek payments from Allstate for the very same DME and/or orthotic devices that Plaintiffs' Complaint alleges has been fraudulently billed. At least 20 of these pending matters have appearances, filing dates, and/or hearings within the next ten months. A spreadsheet listing each collection action is annexed hereto as Exhibit "26."

50. Additionally, in the past six months, the Defaulted Retailers have obtained judgments and/or arbitration awards in at least the following eight collections actions that were pending during the course of the instant RICO action:

- *Almatcare Medical Supply Inc. a/a/o Tamara Nelson v. Allstate Ins. Co.,* CV-701054-18/RI (Richmond Cty. Civ. Ct., Jan. 16, 2020)

- *Almatcare Medical Supply Inc. a/a/o Natasha Cupidore. Allstate Fire and Cas. Ins. Co.,* CV-700562-18/RI (Richmond Cty. Civ. Ct., Jan. 27, 2020)

- *Almatcare Medical Supply Inc. a/a/o Savior Davis, Allstate Fire and Cas. Ins. Co.,* CV-700563-18/RI (Richmond Cty. Civ. Ct., Feb. 10, 2020)

- *In the Matter of AVA Custom Supply, Inc. and Allstate Ins. Co.,* regarding claim no 0456050871, AAA Case No. 17-18-1087-3832 (Dec. 22, 2019)

- *In the Matter of AVA Custom Supply, Inc. and Allstate Ins. Co.,* regarding claim no 0456050871, AAA Case No. 17-19-1118-9452 (Dec. 27, 2019)

17

- *In the Matter of AVA Custom Supply, Inc. and Allstate Fire and Cas. Ins. Co.,* regarding claim no 0433164233, AAA Case No. 17-18-1089-8494 (Jan 29, 2020)

- *Daily Medical Equipment Distribution Center, Inc. a/a/o Jose Guzman v. Allstate Ins. Co.,* CV-062515-15/KI (Kings Cty Civ. Ct., Feb. 20, 2020)

- *Daily Medical Equipment Distribution Center, Inc. a/a/o Rhina Rodriguez v. Allstate Ins. Co.,* CV-062516-15/KI (Kings Cty Civ. Ct., Feb. 20, 2020)

True and correct copies of the awards and docket entries indicating judgments in favor of the Defaulted Retailers are annexed hereto as Exhibit "30."

51.     Furthermore, in the past six months, Plaintiffs have issued payments on eight claims exceeding $29,000.00. A spreadsheet of these payments is annexed hereto to as Exhibit "31." As set forth in the accompanying Declaration of Michael Bruno, Mr. Bruno compared the spreadsheet in Exhibits "31" to the payment summaries maintained by Allstate and confirmed that the information is true and correct. In light of the Defaulted Retailers ongoing and active collection efforts, Plaintiffs respectfully submit their request for declaratory relief should be granted.

## PURSUANT TO LOCAL CIVIL RULE 55.2(c)

52. Pursuant to the Local Rules of the United States District Courts for the Southern and Eastern District of New York, Rule 55.2(c), I hereby certify that a copy of all papers submitted with Plaintiffs' application for default judgment have been mailed to the Defaulted Defendants at the following addresses:

| | |
|---|---|
| Almatcare Medical Supply, Inc. 2900 Ocean Ave. Apt. 2H Brooklyn, NY 11235 | Alexandra Matlyuk 2900 Ocean Ave. Apt. 2H Brooklyn, NY 11210 |
| AVA Custom Supply, Inc. 3426 Guider Avenue, 1st Fl. Brooklyn, NY 11235 | Artur Avetisyan 3426 Guider Avenue, 1st Fl. Brooklyn, NY 11235 |
| Daily Medical Equipment Distribution Center, Inc. 2660 Gerritsen Ave. Brooklyn, NY 11229 | Gregory Miller 2175 East 29th Street Brooklyn, New York 11229 |
| IG&NAT Services, Inc 1970 East 18th Street, Apt. B10 Brooklyn, New York 11229 | |

these being the last known residences of the Defaulted Retail Owners and the last known business addresses of the Defaulted Retailers.

53. Since the entry of their default, I have also investigated Defendants Matlyuk's, Avetisyan's, and Miller's, respective military status pursuant to 50 U.S.C. § 521(b)(1). Annexed hereto as Exhibit "32," are the Department of Defense Manpower Data Center Status Reports, for Defendants Matlyuk, Avetisyan, and Miller which confirm that each Defendant is not in the military service.

**WHEREFORE**, Plaintiffs respectfully move this Court to enter a judgment by default against the Defaulted Defendants in the amounts set forth herein. Further, I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and

belief; that the amount claimed is justly due and owing to Plaintiffs; and that the disbursements sought to be taxed have been made in this action or will necessarily be made or included in the action.

Dated: New York, New York
　　　　July 1, 2020

　　　　　　　　　　　　　　　　　　　　　　　　　　　 \s\ James A. McKenney
　　　　　　　　　　　　　　　　　　　　　　　　　　　James A. McKenney, Esq.