UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ALLSTATE INSURANCE COMPANY, *et al.*,

                Plaintiffs,                        REPORT AND
    -against-                               RECOMMENDATION

ARTUR AVETISYAN, *et al.*,                   17 CV 4275 (RPK)(RML)

                Defendants.
--------------------------------------------------------X
LEVY, United States Magistrate Judge:

        By order dated July 6, 2020, the Honorable Rachel P. Kovner, United States

District Judge, referred plaintiffs' motion for a default judgment against defendants Artur

Avetisyan, Alexandra Matlyuk, Gregory Miller, Almatcare Medical Supply Inc. ("Almatcare"),

AVA Custom Supply, Inc. ("AVA"), Daily Medical Equipment Distribution Center, Inc. ("Daily

Medical"), and IG&NAT Services, Inc. ("IG&NAT") to me for report and recommendation.  For

the reasons stated below, I respectfully recommend that plaintiffs' motion be granted and that

plaintiffs be awarded damages as set out in detail below.

**BACKGROUND AND FACTS**

        Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, Allstate Indemnity Company, Allstate New Jersey Insurance Company, Allstate New

Jersey Property and Casualty Insurance Company, Allstate Property and Casualty Insurance

Company, and Northbrook Indemnity Company ("plaintiffs") commenced this insurance fraud

action on July 19, 2017 against more than fifty defendants, alleging violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* and New York

common law.  (See Complaint, dated July 19, 2017, Dkt. No. 1.)  Defendants Avetisyan,

Matlyuk, Miller, Almatcare, AVA, Daily Medical, and IG&NAT (the "defaulting defendants")

have failed to answer or appear in this action, despite being properly served, and plaintiffs have obtained Clerk's Certificates of Default with respect to them.  (See Affidavits of Service, sworn to Sept. 18, 2017, Sept. 20, 2017, Oct. 4, 2017, and Nov. 16, 2017, Dkt. Nos. 12, 14, 16, 20, 33, 35, and 111; Clerk's Certificates of Default, dated Nov. 6, 2017, Nov. 13, 2017, Jan. 23, 2019, June 26, 2018, and Dec. 3, 2018, Dkt. Nos. 77, 78, 79, 103, 137, 176, 177, 212, 213, 220, 221, and 222.)

According to the Amended Complaint,[1] the owners of various durable medical equipment ("DME")[2] and orthotic device[3] retail supply companies—including defendants Avetisyan, Matlyuk and Miller (the "Retail Owners")—through their retail DME companies, including defendants Almatcare, AVA, and Daily Medical (the "Retailers"), participated in a scheme to defraud plaintiffs by making hundreds of fraudulent automobile insurance claims pursuant to New York's no-fault law, N.Y. Ins. Law § 5101, *et seq.*  (See Amended Complaint, dated May 9, 2018 ("Am. Compl."), Dkt. No. 157, ¶¶ 1-2, 20, 23, 43, 50, 53, 91, 93, 95, 129, 134, 136, 144, 147, 389-91, 463-65, and 537-39.)  Plaintiffs allege that defendants billed them for DME and orthotic devices that were never provided, not provided as

---

[1]  Plaintiffs amended their complaint to correct an error in the causes of action concerning defendants Gala Trading, Inc. and Igal Blantz, who were inadvertently omitted from the 45th and 48th causes of action.  No part of the amendment concerned any of the allegations against the defaulting defendants.  (Plaintiffs' Memorandum of Law in Support of Default Judgment, dated July 1, 2020, Dkt. No. 274-1, at 1 n.1.)

[2]  DME generally refers to equipment and supplies used for a medical purpose by individuals in their homes, including cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, and whirlpools.  (See Amended Complaint, dated May 9, 2018 ("Am. Compl."), Dkt. No. 157, ¶ 2.)

[3]  Orthotic devices are items that are used to support a weak or injured body part or to restrict or eliminate movement for medical purposes. Such items include ankle braces, back braces, cervical collars, knee braces, shoulder braces, and wrist braces.  (Am. Compl. ¶ 2.)

2

billed, if provided were of inferior quality to what was represented in the bills submitted to plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a pre-determined course of treatment in which virtually all claimants received substantially similar DME or orthotic devices.  (See id.  ¶¶ 31, 55, 132, 178, 233, 236, 247.)  Plaintiffs claim that each of the bills at issue in this case materially misrepresented the nature, cost, and quality of the DME or orthotic device purportedly provided, to the extent the items were provided at all.  (Id. ¶¶ 22, 43-44, 49, 132, 134, 136, 158, 175, 196-198, 405, 479, 553, 1121, and 1123.)

Plaintiffs also allege that, in furtherance of the scheme, the Retailers entered into agreements with Wholesalers, including defendant IG&NAT (the "Wholesalers"), to supply the invoices that the Retailers used to document the inflated wholesale costs for the DME and orthotic devices, for which they submitted bills to, and received payment from, plaintiffs.  (Id. ¶¶ 10-11, 15, 113, 136-38, 147, 166-67, 169, 798, 825.)  The fraudulent wholesale invoices were allegedly provided with the knowledge that they would be submitted to insurers to obtain reimbursement under the no-fault law in excess of the actual cost of the DME or orthotic devices purportedly provided.  (Id. ¶¶ 137-41, 144.)  The scheme generally operated as follows: medical clinics would prescribe patients with large amounts of unnecessary medical equipment, which the Retailers would provide to patients.  (Id. ¶ 5.)  The Retailers, through the Retail Owners, would contact the Wholesalers, who would issue invoices for medical equipment they never actually provided, or sell Retailers inexpensive equipment and provide them with invoices grossly inflating the prices.  (Id. ¶ 6.)  The Retailers would then issue checks to the Wholesalers according to the inflated invoice amount, and the Wholesalers would cash the checks and return a portion of the money to the Retailers, who would then give a portion to the medical clinics as a

kickback.  (Id. ¶¶ 7-8.)  The Retailers would ultimately bill plaintiffs according to the inflated

invoices.  (Id. ¶ 9; see also id. ¶¶ 3, 5, 21, 49, 136, 147, 150-51, and 156-158.)

The defaulting defendants are the only remaining defendants in this case.

Plaintiffs seek treble damages for the RICO violations, as well as compensatory damages under

their common law causes of action.  (Id. ¶ 53; Plaintiffs' Memorandum of Law in Support of

Default Judgment, dated July 1, 2020 ("Pls.' Mem."), Dkt. No. 274-1, at 36-38.)  The Amended

Complaint also seeks a declaratory judgment under 28 U.S.C. § 2201 against the Retailers and

Retail Owners relieving plaintiffs of the "obligation to pay the pending, previously-denied and/or

submitted unpaid claims . . . regardless of the purported dates of service."  (Am. Compl. ¶ 1629;

see also id. ¶¶ 1622-1628.)

**DISCUSSION**

A.  Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for

obtaining a default judgment.  First, "[w]hen a party against whom a judgment for affirmative

relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or

otherwise, the clerk must enter the party's default."  FED. R. CIV. P. 55(a).  Second, after default

has been entered, and the defendant fails to appear or move to set aside the default under Rule

55(c), the court may, on plaintiff's motion, enter a default judgment against that defendant.  FED.

R. CIV. P. 55(b)(2).  Plaintiffs took all of the required steps and the Clerk of the Court's entries

of default against these defendants were proper.

However, an entry of default alone is insufficient to establish liability, "since a

party in default does not admit mere conclusions of law."  Trs. of the Plumbers Local Union No.

1 Welfare Fund v. Philip Gen. Constr., No. 05 CV 1665, 2007 WL 3124612, at *3 (E.D.N.Y.

Oct. 23, 2007) (citation omitted).  Therefore, the court must determine whether the allegations in the complaint establish liability as a matter of law.  See Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009).  A defendant's default is considered an admission of all well-pleaded allegations of liability.  Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).  In deciding a motion for default judgment, the court "is required to accept all of the [plaintiffs'] factual allegations as true and draw all reasonable inferences in [their] favor." Finkel, 577 F.3d at 84.  However, plaintiffs bear the burden of demonstrating that the unchallenged facts and all reasonable inferences drawn from the evidence establish each defendant's liability on each asserted cause of action.  See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Plaintiffs seek a default judgment on their RICO, common law fraud, and unjust enrichment claims.  (See Pls.' Mem.)  I will address each claim in turn.

1.  RICO

Plaintiffs assert RICO claims against defendants Matlyuk, Avetisyan, Miller, and IG&NAT (the "RICO defendants"), for participation in four RICO enterprises.  (See Dkt. No. 274-21 (setting out RICO causes of action)).  To state a RICO claim a plaintiff must allege: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of section 1962.  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (quotations and citation omitted).  Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).

5

Thus, in addition to injury and causation, in order to assert a viable claim that a defendant has violated the provisions of § 1962, a plaintiff must allege (1) participation in conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Sedima v. Imrex Co., 473 U.S. 479, 496 (1985); see also Reich v. Lopez, 858 F.3d 55, 59 (2d Cir. 2017) (citation omitted) ("RICO imposes liability on individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'")  "[A]n enterprise includes any union or group of individuals associated in fact . . . for a common purpose of engaging in a course of conduct" and "is proved by . . . evidence that the various associates function as a continuing unit."  Boyle v. United States, 556 U.S. 938, 944-45 (2009).  "The enterprise must also exist 'separate and apart from the pattern of activity in which it engages.'"  D. Penguin Bros. v. City Nat'l Bank, 587 F. App'x 663, 667-68 (2d Cir. 2014) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)); see also Allstate Ins. Co. v. Yehudian, No. 14 CV 4826, 2018 WL 1767873, at *8 (E.D.N.Y. Feb. 15, 2018) ("The alleged enterprise through which a pattern of racketeering activity is conducted must be distinct from those persons or entities who stand accused of conducting that racketeering activity.") (quotations and alteration omitted) (collecting cases), report and recommendation adopted, 2018 WL 1686106 (E.D.N.Y. Mar. 31, 2018).  This requirement is met by demonstrating that a "formal legal distinction" exists between the individual defendants and the RICO enterprise.  Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 165 (2001).  Where the alleged enterprises are corporations and the individual defendants are natural persons, the person-enterprise distinction is met.  See, e.g., Palatkevich v. Choupak, No. 12 CV 1682, 2014 WL 1509236, at *15 (S.D.N.Y. Jan. 24, 2014) ("[A] natural person named as the defendant 'person' is inherently distinct from a corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met.").

To plead a "pattern" of racketeering activity, a plaintiff must allege at least two predicate acts of racketeering activity occurring within a ten-year period. 18 U.S.C. § 1961(5). "Racketeering activity" is defined to include a variety of federal and state crimes, including murder, kidnapping, gambling, arson, robbery, bribery, extortion, wire fraud, mail fraud, and money laundering. See 18 U.S.C. § 1961(1). Plaintiff alleges that defendants engaged in the predicate acts of mail and wire fraud and money laundering  (Am. Compl. ¶¶ 388-391, 396, 462-466, 471, 492, 536-539, 541-546, 796-805, 825.)  "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000) (citation omitted). "As to the first element, a plaintiff must demonstrate (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 310 (S.D.N.Y. 2009) (citing Autuori, 212 F.3d at 115). "[W]hen fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) (citations omitted), aff'd, 2 F. App'x 109 (2d Cir. 2001); see also DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). To state a claim for money laundering, a plaintiff must show that a "defendant (1) engaged in a financial transaction that in fact involved the proceeds of a specified unlawful activity, (2) knew that the transaction involved such proceeds, and (3) either intended to promote the carrying on of a specified unlawful activity or knew the transaction was designed to conceal

or disguise the nature, location, source, ownership, or control of the proceeds." Allstate Ins. Co. v. Afanasyev, No. 12 CV 2423, 2016 WL 1156769, at *9 (E.D.N.Y. Feb. 11, 2016) (quoting Tymoshenko v. Firtash, No. 11 CV 2794, 2015 WL 5505841, at *6 (S.D.N.Y. Sept. 18, 2015) (internal quotations and citations omitted), report and recommendation adopted, 2016 WL 1189284 (E.D.N.Y. Mar. 22, 2016)).

In order to demonstrate a pattern of racketeering, plaintiff's complaint must demonstrate that "the defendants (1) committed at least two predicate acts of racketeering within ten years of one another . . . ; (2) that these racketeering predicates are interrelated; and (3) that they reveal continued, or the threat of continued, racketeering activity." Leung v. Law, 387 F. Supp. 2d 105, 123 (E.D.N.Y. 2005) (citing United States v. Diaz, 176 F.3d 52, 93 (2d Cir. 1999)). "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 240 (1989) (emphasis in original). This continuity requirement may be satisfied by either an open-ended or closed-ended pattern of racketeering activities. Id. at 241.

Open-ended continuity describes "past conduct that by its nature projects into the future with a threat of repetition." Id. The Second Circuit has directed district courts to look first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed in assessing whether a threat of continuity was presented by an open-ended series of predicate acts. See, e.g., GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995); United States v. Aulicino, 44 F.3d 1102, 1111 (2d Cir. 1995); United States v. Kaplan, 886 F.2d 536, 542 (2d Cir. 1989). "[A]n inherently unlawful act performed on behalf of an enterprise whose business is racketeering activity would automatically

give rise to the requisite threat of continuity." GICC Capital, 67 F.3d at 466 (citing Aulicino, 44

F.3d at 1111). Similarly, where the defendants have engaged in acts that are "inherently

unlawful," the threat of continuity is also deemed to be present. Aulicino, 44 F.3d at 1111, 1113.

Where the nature of the conduct or the enterprise does not by itself suggest that the racketeering

acts will continue, courts must look to other factors, such as the number of victims, the breadth

of the scheme, and the defendants' "continuing intent and ability to participate in various ways in

the corruption of the enterprise" in determining whether the defendants' activities posed a threat

of continuity.[4] Kaplan, 886 F.2d at 542-43.

Finally, to demonstrate "participation" in the racketeering activity, "a plaintiff

need only demonstrate that defendant played some part in the operation of the enterprise, even if

not the predominant one." Afanasyev, 2016 WL 1156769, at *8 (quoting Reeves v. Ernst &

Young, 507 U.S. 170, 179 (1993)). "[T]he word 'participate' makes clear that RICO liability is

not limited to those with primary responsibility for the enterprise's affairs, just as the phrase

'directly or indirectly' makes clear that RICO liability is not limited to those with a formal

position in the enterprise, but some part in directing the enterprise's affairs is required." Reeves,

507 U.S. at 179 (footnote omitted).

Having carefully reviewed the Amended Complaint, I find that the well-pleaded

allegations establish defendants' RICO liability. Plaintiffs allege that the RICO defendants

---

[4] A plaintiff can also satisfy the continuity element of the RICO statute's pattern requirement by
alleging that the defendants were engaged in a closed-ended pattern of racketeering activities.
Closed-ended continuity describes a finite, pre-litigation period of repeated conduct over a time
period of substantial duration. H.J., Inc., 492 U.S. at 242; see also GICC, 67 F.3d at 467
(collecting cases and observing that a period of less than two years rarely will satisfy the
substantial duration requirement); Spool v. World Child Int'l Adoption Agency, 520 F.3d 178,
184 (2d Cir. 2008) ("Since the Supreme Court decided H.J. Inc., we have never held a period of
less than two years to constitute a substantial period of time." (quotations and citation omitted).)

engaged in a pattern of racketeering activity by committing continuous and numerous acts of mail and/or wire fraud and money laundering beginning from as early as 2008 to the present. (Am. Compl. ¶ 145; Pls.' Mem. at 19-25.)  Plaintiffs have described, in detail, a scheme in which the RICO defendants each played a part—one that involved the mailing of hundreds of fraudulent insurance claims over a period of years.  (E.g., Am. Compl. ¶¶ 396, 470, 544, 803.) The Amended Complaint explains how the Retailers, through the Retail Owners, would contact the Wholesalers, who would issue invoices for medical equipment they never actually provided, or sell the Retailers inexpensive equipment and provide them with invoices grossly inflating the prices.  (Id. ¶¶ 2-29.)  The Retailers would engage in fraudulent transactions by issuing checks to the Wholesalers according to the inflated invoice amounts, knowing that the Wholesalers would cash the checks and return a portion of the money to the Retailers, who would give a portion to the medical clinics as a kickback and then bill plaintiffs according to the inflated invoices.  (Id. ¶¶ 21-23.)  Each of the RICO defendants was either a Retail Owner or a Wholesaler, and each therefore played some part in the predicate acts of racketeering.  There were also more than two such acts, carried out on a continued basis, attributable to each defendant.  (E.g., Am. Compl. ¶¶ 393, 396 ("The racketeering acts set forth herein were carried out on a continued basis for more than a one-and-a-half year period" during which Matlyuk, through the Almatcare enterprise, "submitted hundreds of fraudulent claim forms"); ¶¶ 467, 470 ("The racketeering acts set forth herein were carried out on a continued basis for more than a one year period" during which Avetisyan, through the AVA enterprise, "submitted hundreds of fraudulent claim forms"); ¶¶ 541, 544 ("The racketeering acts set forth herein were carried out on a continued basis for more than a six year period" during which Miller, through the Daily Medical enterprise, "submitted hundreds of fraudulent claim forms."); ¶¶ 800, 803 ("The racketeering acts set forth herein were

10

carried out on a continued basis for more than an eight-and-a-half year period" during which defendant Zinovy Azyenberg, "with the knowledge and intent of IG&NAT . . . submitted hundreds of fraudulent claim forms[.]").)

These well-pleaded allegations, accepted as true on default, constitute mail and wire fraud as well as financial transactions "done to conceal the true nature of the transactions and to present the illusion of legality" in violation of money laundering statutes.  See, e.g., Allstate Ins. Co. v. Aminov, No. 11 CV 2391, 2014 WL 527834, at *6 (E.D.N.Y. Feb. 7, 2014) (adopting report and recommendation).  Numerous courts in this circuit have found that similar facts, taken as true on default, sufficiently establish violations of both mail and wire fraud and money laundering statutes.  See, e.g., Allstate Ins. Co. v. Abutova, No. 13 CV 3494, 2017 WL 1185222, at *6 (E.D.N.Y. Feb. 15, 2017) (finding that Allstate's allegations clearly established violations of mail and wire fraud as well as money laundering) (collecting cases), report and recommendation adopted, 2017 WL 1184107 (E.D.N.Y. Mar. 29, 2017); Yehudian, 2018 WL 1767873, at *9 (same).  Because plaintiffs allege that each of the defendants engaged in two or more such acts through a distinct RICO enterprise, the Amended Complaint sufficiently alleges, and establishes on default, a pattern of racketeering activity and satisfies elements two through five of a RICO claim.  See id.; Abutova, 2017 WL 1185222, at *6.

In addition, each of the Retail Owners and Wholesalers is alleged to have engaged in a pattern of racketeering activity through a separate and distinct entity, namely one of the Retailers.  (E.g., id. ¶ 134 ("[T]he Retail Owners created and controlled the Retailers, which were part of separate, but substantially similar well-organized illegal enterprises that engaged in fundamentally similar, systematic and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices.  The components of each enterprise

followed practices that were part of a racketeering scheme dictated by the Retail Owners[.]").)
Plaintiffs have sufficiently alleged the existence of illegal enterprises by describing how the
Retailers constituted ongoing organizations through which individuals and corporations would
perpetuate fraud against plaintiffs.  (See id. ¶¶ 388, 390 ("Almatcare Medical Supply was an
'enterprise'" which Matlyuk "exerted control over and directed the operations of . . . to conduct
the pattern of racketeering activities that consisted of creating, submitting and/or causing to be
submitted the fraudulent bills[.]"); ¶¶ 462-463 ("AVA Custom Supply was an 'enterprise'"
which Avetisyan "knowingly conducted and participated in the affairs of . . . through a pattern of
racketeering activity, including the numerous acts of mail fraud."); ¶¶ 536, 538 ("Daily Medical
was an 'enterprise'" through which Miller conducted "the pattern of racketeering activities that
consisted of creating, submitting and/or causing to be submitted the fraudulent bills and
supporting documents to Plaintiffs."); ¶¶ 800-804 (describing IG&NAT's role in the Med
Equipments Service enterprise)).  Further, plaintiffs have identified the connections between
these RICO enterprises and the RICO defendants by describing the process by which the
Retailers, the Retail Owners, and the Wholesalers participated in the racketeering activity.  (See
id. ¶136 (providing examples for how "[t]he members of each enterprise alleged herein played
well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs
of the enterprises.").)  There is, in other words, a corresponding RICO enterprise identified for
each of the Retailers and Wholesalers.  These allegations are sufficient to satisfy the distinctness
requirement for RICO claims, as well as elements one and six of a RICO claim.  See, e.g.,
Yehudian, 2018 WL 1767873, at *8; Abutova, 2017 WL 1185222, at *4; Allstate Ins. Co. v.
Afayansyev, No. 12 CV 2423, 2016 WL 1156769, at *8 (E.D.N.Y. Feb. 11, 2016), report and
recommendation adopted, 2016 WL 1189284 (E.D.N.Y. Mar. 22, 2016); Aminov, 2014 WL

527834, at *5.  I therefore find that plaintiffs have established RICO liability for each of the RICO defendants.

### 2.  Common Law Fraud

Plaintiffs also allege that several of the defaulting defendants, namely the Retail Owners and the Retailers (the "Fraud defendants"), are liable for common law fraud.  (Am. Compl. ¶¶ 402-411; 476-485; 550-559; Pls.' Mem. at 27 n.10; Dkt. No. 274-22 (setting out the common law causes of action)).  A plaintiff asserting a claim of common law fraud under New York law must allege: "(1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) [that] such reliance caused damage to the plaintiff."  Soley v. Wasserman, 823 F. Supp. 2d 221, 235 (S.D.N.Y. 2011) (quotations and citation omitted); accord Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997).  In federal court, fraud must be pleaded with particularity in accordance with Federal Rule 9(b).  AIU Ins. Co. v. Olmecs Med. Supply, Inc., No. 04 CV 2934, 2005 WL 3710370, at *14 (E.D.N.Y. Feb. 22, 2005).  Thus, in making out the first element for fraud—a material representation or omission of fact—a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. at *10 (quoting Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)); see also Gov't Emps. Ins. Co. v. Badia, No. 13 CV 1720, 2015 WL 1258218, at *14 (E.D.N.Y. Mar. 18, 2015) (adopting report and recommendation).

Here, plaintiffs have alleged that the Fraud defendants, through false and misleading statements, created and engaged in a fraudulent scheme that billed plaintiffs for reimbursements for which they were not eligible.  (See Am. Compl. ¶¶ 403-411, 477-485, 551-

Case 1:17-cv-04275-RPK-RML    Document 276    Filed 03/05/21    Page 14 of 26 PageID #: 8173

559.)  Plaintiffs attach as exhibits charts that list the bills that these parties submitted to plaintiffs, along with claim numbers and when the claim was received (the "Claims Charts").  (McKenney Decl., Exs. 20-23.)  The Amended Complaint alleges that each of these claims was fraudulent, *i.e.* it was either for services not rendered or for costs not actually incurred, or both.  (Am. Compl. ¶¶ 404-405, 478-479, 552-553.)  A claim for fraud must satisfy Rule 9(b), that is, the claim must identify with particularity the statement alleged to be fraudulent, the speaker, and when the statement was made.  FED. R. CIV. P. 9(b).  The Claims Charts—which contain statements or claims made by each of the Fraud defendants and when those claims were made— are sufficient to meet this standard.  See, e.g., Badia, 2015 WL 1258218, at *15 ("Plaintiffs' very detailed chart identifies Baneur as the speaker of the fraudulent statements and states when and where each statement was made by listing Baneur's claim submission dates, claim numbers and claim-demand amounts."); Gov't Emps. Ins. Co. v. Alrof, Inc., No. 11 CV 4028, 2013 WL 9600668, at *5 (E.D.N.Y. July 19, 2013) ("Plaintiffs set forth examples and described in detail how the Retail Defendants submitted charges for items more expensive than those actually dispensed, if dispensed at all.  Plaintiffs have also supplied a schedule detailing when the Retail Defendants' claims were paid.  Accordingly, Plaintiffs have pled the fraud with sufficient particularity[.]") (citations omitted), report and recommendation adopted sub nom., Gov't Emps. Ins. Co. v. Park Slope Med. & Surgical Supply, Inc., 2013 WL 5209415 (E.D.N.Y Sept. 13, 2013); Allstate Ins. Co. v. Lyons ("Lyons I"), 843 F. Supp. 2d 358, 373 (E.D.N.Y. 2012) ("Allstate attaches to its Complaint a series of charts that include each of the charges submitted by the defendants that it believes were fraudulent. The charts detail the entity that submitted each claim, as well as the corresponding claim number, the year Allstate paid the claim, and the amount paid by Allstate. Such information clearly directs defendants to the specific

14

misrepresentations Allstate is alleging. Under the circumstances, the specificity requirement of 9(b) requires no more[.]" (citations omitted)).

Additionally, plaintiffs have alleged that the Fraud defendants knew that the claims submitted were false claims. (Am. Compl. ¶¶ 9, 407, 481, 555.) The Amended Complaint also alleges that the Fraud defendants had both motive and opportunity for the fraud: they each had strong motive to receive monetary reimbursements to which they were not entitled, and they had the opportunity and ability to receive those reimbursements by submitting fraudulent claims to plaintiffs. (Id. ¶¶ 406, 480, 554); see also Gov't Emps. Ins. Co. v. Erlikh, No. 16 CV 7120, 2019 WL 1487576, at *6 (E.D.N.Y. Feb. 28, 2019) (defendants "intentionally made . . . false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges"), report and recommendation adopted, 2019 U.S. Dist. LEXIS 57885 (E.D.N.Y. Mar. 31, 2019). Such motive and opportunity are sufficient to infer that a party acted with an intent to defraud. See, e.g., Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC, No. 14 CV 5277, 2016 WL 11395017, at *3 (E.D.N.Y. Feb. 17, 2016) ("This [intent] requirement may be satisfied by alleging facts that show that defendants had both motive and opportunity to commit fraud." (quotations omitted)), report and recommendation adopted sub nom., Gov't Emps. Ins. Co. v. Premier Prof'l Servs., LLC, 2016 WL 1071099 (E.D.N.Y. Mar. 18, 2016); see also Allstate Ins. Co. v. Lyons ("Lyons II"), No. 11 CV 2190, 2015 WL 13735435, at *4 (E.D.N.Y. Mar. 10, 2015) ("Since the purpose of submitting these false claims was to obtain funds the defendants were not entitled to obtain, there was an unmistakable intent to have the plaintiffs rely on the false claims."), report and recommendation adopted, Order dated Mar. 31, 2015; Gov't Emps. Ins. Co. v. Li-Elle Serv., Inc., No. 12 CV 2157, 2013 WL 829302, at *7 (E.D.N.Y. Feb. 11, 2013) ("Plaintiffs allege that Defendants not only knew that

they were submitting fraudulent claims to Allstate, but that they did so intentionally in a scheme for profit. This gives rise to a strong inference of fraudulent intent and is sufficient to establish the scienter requirement." (citation omitted)), report and recommendation adopted as modified, 2013 WL 829274 (E.D.N.Y. Mar. 6, 2013).

Finally, plaintiffs allege that they relied on the facially valid bills that defendants submitted, and as a consequence, paid them for claims otherwise not reimbursable under the no-fault law.  (Am. Compl. ¶ 129.)  These allegations, taken as true on default, satisfy the fourth and fifth elements of common law fraud by showing a reasonable reliance on defendants' misrepresentations, which caused injury to plaintiffs.  See, e.g., Erlikh, 2019 WL 1487576, at *7 ("Given the lengths the Defaulting Defendants took to conceal the fraudulent bills . . . and the facially valid bills, it was reasonable for GEICO to rely on the bills containing the purported misstatements and pay the Defaulting Defendants."); Spectrum Neurology, 2016 WL 11395017, at *4 (plaintiffs adequately alleged reasonable reliance "by explaining that statutory and contractual requirements obligate plaintiffs to respond promptly to facially valid claims submitted under New York's no-fault statutory scheme, and thus limit plaintiffs' opportunity to scrutinize and investigate the propriety of apparently legitimate claims for reimbursement."); cf. State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., No. 04 CV 5045, 2008 WL 4146190, at *13 (E.D.N.Y. Sept. 5, 2008) (finding in the RICO context that "[t]he harm here is directly quantifiable—State Farm has alleged that it was harmed when defendants mailed or caused to be mailed fraudulent claims, and State Farm paid those claims relying on the misrepresentations contained therein").  Plaintiffs have therefore sufficiently alleged each of the elements for a claim of common law fraud against the Fraud defendants.

3.  Unjust Enrichment

Plaintiffs also seek a default judgment for unjust enrichment against the Fraud

defendants.  While plaintiffs explain that the Amended Complaint meets the elements of an

unjust enrichment claim (see Pls.' Mem. at 36), they do not address the viability of such a claim

when other tort liability already exists.  Properly understood, a claim for unjust enrichment

protects a plaintiff only in those circumstances where it has no other recourse in tort or contract.

As the New York Court of Appeals has explained:

> unjust enrichment is not a catchall cause of action to be
> used when others fail. It is available only in unusual
> situations when, though the defendant has not breached
> a contract nor committed a recognized tort,
> circumstances create an equitable obligation running
> from the defendant to the plaintiff. Typical cases are
> those in which the defendant, though guilty of no
> wrongdoing, has received money to which he or she is
> not entitled.  An unjust enrichment claim is not
> available where it simply duplicates, or replaces, a
> conventional contract or tort claim.

Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790, 967 N.E.2d 1177 (N.Y. 2012)

(citations omitted).

Plaintiffs' unjust enrichment claims are based on the same transactions as their

claims for common law fraud, and thus these claims duplicate the fraud claims.  As a result,

plaintiffs are not entitled to a judgment on their claims for unjust enrichment.  See Hughes v.

Ester C Co., 330 F. Supp. 3d 862, 877 (E.D.N.Y. 2018) ("Unjust enrichment claims should be

dismissed where the violative conduct alleged is conterminous with a conventional tort or

contract claim, regardless of whether the tort or contract claim is dismissed." (quotations

omitted)); see also Spinnato v. Unity of Omaha Life Ins. Co., 322 F. Supp. 3d 377, 404

(E.D.N.Y. 2018) ("The instant case is not representative of the 'unusual' circumstances which

provide for an unjust enrichment claim. The Plaintiffs' unjust enrichment claim rehashes and improperly duplicates their fraud claims. . . . As this claim is based on the same set of facts as the fraud claim, the Plaintiffs' thirteenth (unjust enrichment) claim is dismissed[.]"); Allstate Ins. Co. v. Nazarov, No. 11 CV 6187, 2015 WL 5774459, at *16 (E.D.N.Y. Sept. 30, 2015) (denying liability in default judgment motion reasoning that "as Plaintiffs have established the Danilovich Defendants' liability for common law fraud, Plaintiffs have not adequately pled a claim for unjust enrichment because that claim would rely on duplicative facts."). I therefore respectfully recommend that plaintiffs' request for a default judgment on their unjust enrichment claims be denied.

B. Damages

"[A]lthough the default establishes a defendant's liability, unless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." Griffiths v. Francillon, No. 10 CV 3101, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (citations and quotations omitted). "The court must conduct an inquiry to ascertain the amount of damages with reasonable certainty." Joe Hand Promotions, Inc. v. El Norteno Rest. Corp., No. 06 CV 1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (2d Cir. 1992)). Under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing" to determine the amount of damages, "as long as it ensured that there was a basis for the damages specified in the default judgment." Fustok v. ContiCommodity Servs., Inc., 873 F. 2d 38, 40 (2d Cir. 1989). A court may make a damages determination upon a review of detailed affidavits and documentary evidence. Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991); Fustok, 873 F.2d at 40.

Plaintiffs have submitted declarations from attorney James A. McKenney and Michael Bruno, an analyst in Allstate's Special Investigations Unit, as well as other supporting documents to demonstrate their damages. (Declaration of James A. McKenney, Esq., dated July 1, 2020 ("McKenney Decl."), Dkt. No. 274-3, Exs. 20-23; Declaration of Michael Bruno, dated June 5, 2020 ("Bruno Decl."), Dkt. No. 274-2.)  I will address each category of damages in turn.

1.  RICO Damages

Plaintiffs have submitted Claims Charts itemizing each payment they made on account of the fraudulent billings, along with a declaration detailing how the damages were calculated based on payment records plaintiffs maintained in the ordinary course of business. (See McKenney Decl., Exs. 20-23; Bruno Decl. ¶¶ 3-4.)  These Claims Charts list the claim numbers submitted, the billing codes used, the dates of payment, and the amounts paid.  (See McKenney Decl., Exs. 20-23.)  Plaintiffs seek RICO damages based upon the itemized payments and request treble damages for each RICO claim asserted against defendants.  (Am. Compl. ¶ 53.)

Pursuant to 18 U.S.C. § 1964(c), an injured party is automatically entitled to recover "threefold the damages" it sustains for a RICO violation.  "Courts have found that an award of treble damages is appropriate in no-fault billing cases involving RICO fraud claims, even in the context of a default." Afanasyev, 2016 WL 1156769, at *12 (collecting cases). "These damages may be recovered independently of any enterprise liability." Id. (citing 4 K& D Corp. v. Concierge Auditions, LLC, 2 F. Supp. 3d 525, 536 n.4 (S.D.N.Y. 2014)).

Plaintiffs' damages calculations are sufficient evidence to support an award of RICO damages.  E.g., Nazarov, 2015 WL 5774459, *17 (noting that "[i]n similar cases, courts have found such documentation [an affidavit from Allstate's Michael Bruno and copies of payment summaries] sufficient to support a damages award[.]" (collecting cases)). Therefore, I respectfully recommend that plaintiffs be awarded treble damages against defendants in the following amounts:

| Defendant | Enterprise | RICO Damages | Treble Damages |
|-----------|------------|--------------|----------------|
| Avetisyan | AVA | $5,952.68 | $17,858.04 |
| Matlyuk | Almatcare | $32,112.00 | $96,336.00 |
| Miller | Daily Medical | $794,690.34 | $2,384,071.02 |
| IG&NAT | Med Equipments | $112,281.24 | $336,843.72 |

(See McKenney Decl., Ex. 25, Dkt. No. 274-28.)

2. Set-offs

Plaintiffs have included in their final calculations certain set-offs based on settlements reached with other defendants who were also involved in the same RICO enterprises as defendants.  (See Total Damages Chart, McKenney Decl., Ex. 25.)  "In RICO cases, when a plaintiff settles with one defendant, the non-settling defendants are entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the non-settling defendants as long as both the settlement and judgment represent common damages.  The set-off is not an affirmative defense." Allstate Ins. Co. v. Polack, No. 08 CV 565, 2012 WL 4489282, at *7 (E.D.N.Y. Sept. 12, 2012) (quotations and citations omitted), report and recommendation adopted, 2012 WL 4490775 (E.D.N.Y. Sept. 28, 2012).  Plaintiffs state that, because the settlement amounts are part of confidential settlement agreements and therefore cannot be

disclosed, the amounts deducted from the final judgment are not specifically identified.  (Pls.'
Mem. at 39.)  However, the judgment amounts plaintiffs seek in the Total Damages Chart reflect
the treble damages that plaintiffs are entitled to receive, minus any amounts received as part of
confidential settlements.  (Id.; see also McKenney Decl., Ex. 25.)  Adopting plaintiffs'
calculations, I recommend that RICO damages against IG&NAT be reduced to $331,843.72.

### 3. Fraud Damages

Plaintiffs also seek damages under their fraud claims.  (Pls.' Mem. at 37-38;
McKenney Decl. ¶ 41, Ex. 25.)  Since plaintiffs have demonstrated liability on their fraud claims,
they are entitled to damages in the entire amount they paid to defendants, unless they are already
recovering damages against that defaulting defendant for a RICO violation.  See Gov't Emps.
Ins. Co. v. Esses, No. 12 CV 4424, 2013 WL 5972481, at *10, n.3 (E.D.N.Y. Nov. 5, 2013)
(adopting report and recommendation) ("Since the award of damages under RICO wholly
compensates the plaintiffs and the award having been trebled, the plaintiffs are not entitled to
separate awards of damages on the claim[] for common law fraud[.]").  I therefore recommend
that plaintiffs be awarded compensatory damages of $6,324.38 from AVA; $32,635.99 from
Almatcare; and $794,690.34 from Daily Medical.[5]  (See McKenney Decl., Exs. 20-23, 25.)

---

[5] New York law provides for joint and several liability for fraudulent acts where defendants
acted jointly or concurrently to produce a single injury.  See Gov't Emps Ins. Co. v. Parkway
Med. Care, P.C., No. 15 CV 3670, 2017 WL 1133282, at *14 (E.D.N.Y. Feb. 21, 2017), report
and recommendation adopted, 2017 WL 1131901 (E.D.N.Y. Mar. 24, 2017); Gov't Emps. Ins.
Co. v. Infinity Health Products, Ltd., No. 10 CV 5611, 2012 WL 1427796, at *10 (E.D.N.Y.
Apr. 6, 2012), report and recommendation adopted, 2012 WL 1432213 (E.D.N.Y. Apr. 25,
2012).  Here, plaintiffs allege that the Retail Owners submitted (or caused to be submitted)
fraudulent claims to plaintiffs through their respective companies.  Thus, Avetisyan, Matlyuk,
and Miller are jointly and severally liable for common law damages with the entities through
which they directly participated in submitting claims – Avetisyan is jointly and severally liable
with AVA; Matlyuk is jointly and severally liable with Almatcare; and Miller is jointly and
severally liable with Daily Medical.  See Allstate Ins. Co. v. A & F Med. P.C., No. 14 CV 6756,
(continued….)

4. <u>Prejudgment Interest</u>

In addition, plaintiffs request prejudgment interest at the rate of nine percent per year.  (Pls.' Mem. at 39-40.)  "An award of prejudgment interest is mandatory for state law fraud, but not under RICO."  <u>Allstate Ins. Co. v. Kumar</u>, No. 10 CV 8166, 2013 WL 2395748, at *4 (S.D.N.Y. June 3, 2013) (citing <u>Bingham v. Zolt</u>, 810 F. Supp. 100, 102 (S.D.N.Y. 1993)).  Under RICO, prejudgment interest "is awarded at the discretion of the Court."  <u>Abutova</u>, 2017 WL 1185222, at *9.  "Courts in this circuit generally only award prejudgment interest in civil RICO actions where treble damages do not adequately compensate for plaintiff's losses."  <u>Id.</u> (quoting <u>Afanasyev</u>, 2016 WL 1156769, at *14 (collecting cases)); <u>see also</u> <u>Kumar</u>, 2013 WL 2395748, at *4 ("Prejudgment interest is not necessary where trebled damages have sufficiently compensated the plaintiff and where there are no extraordinary circumstances that would otherwise warrant compelling defendants to pay interest.").  I find that plaintiffs are already sufficiently compensated by the award of treble damages for their RICO claims, and thus an award of prejudgment interest from the RICO defendants is inappropriate.

However, plaintiffs are entitled to prejudgment interest on their fraud claims.  "In diversity cases, the award of prejudgment interest is a substantive issue, governed . . . by New York law."  <u>Gov't Emps. Ins. Co. v. IAV Med. Supply, Inc.</u>, No. 11 CV 4261, 2013 WL 764735, at *8 (E.D.N.Y. Feb. 8, 2013), <u>report and recommendation adopted</u>, 2013 WL 765190 (E.D.N.Y. Feb. 28, 2013).  New York law provides for prejudgment interest on fraud claims at the rate of nine percent per year, <u>id.</u>, and dictates that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed," N.Y. C.P.L.R. § 5001(b).  In the insurance fraud

---

2019 WL 7842516, at *8 (E.D.N.Y. Sept. 11, 2019) (citing <u>Parkway Med.</u>, 2017 WL 1133282, at *15), <u>report and recommendation adopted</u>, 2020 WL 132387 (E.D.N.Y. Jan. 13, 2020).

context, however, "prejudgment interest accrues from the date the insurance company makes payment." IAV Med. Supply, 2013 WL 764735, at *9 (quotations omitted).

    In their motion, plaintiffs request less interest than New York law allows; they request that interest be calculated "from the first day of the year following the date of Plaintiffs' first payment to the relevant Retailer's enterprise." (Pls.' Mem. at 40-41; see also Prejudgment Interest Chart, annexed to the McKenney Decl. as Ex. 24, Dkt. No. 274-27.) I recommend that plaintiffs be awarded prejudgment interest at nine percent per year, beginning on the first day of the year following each payment through May 1, 2020. (See Prejudgment Interest Chart ("Interest is calculated from January 1st of the year following the year in which each payment was made by Plaintiffs through May 1, 2020."); see also, e.g., Allstate Ins. Co. v. Williams, No. 13 CV 2893, 2015 WL 5560543, at *8 (E.D.N.Y. Aug. 28, 2015); IAV Med. Supply, 2013 WL 764735, at *9; Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C., No. 12 CV 4295, 2013 WL 5131057, at *9 (E.D.N.Y. Sept. 12, 2013). I therefore recommend that the nine percent per annum interest rate be awarded in the following amounts: $1,557.95 from AVA; $5,248.81 from Almatcare; and $30,889.15 from Daily Medical. (See McKenney Decl., Ex. 24.)

    C. Declaratory Judgment

    Plaintiffs also seek a declaratory judgment relieving them from any obligation to pay the unpaid fraudulent claims made by Retailers Almatcare, AVA, and Daily Medical (the "Retail defendants"). (Pls.' Mem. at 41-44; Am. Compl. ¶¶ 1121-1127; Bruno Decl. ¶¶ 5-8.) A party seeking a declaratory judgment must allege that there is a "substantial controversy, between parties with adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996) (quotations and emphasis omitted). "The

controversy must be real and substantial such that declaratory relief will provide 'specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" <u>Williams</u>, 2015 WL 5560543, at *6 (quoting <u>E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.</u>, 241 F.3d 154, 177 (2d Cir. 2001)). "Declaratory relief is appropriate '(1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.'" <u>Id.</u> (quoting <u>Md. Cas. Co. v. Rosen</u>, 445 F.2d 1012, 1014 (2d Cir. 1971)). However, "a court has broad discretion to decide whether to render a declaratory judgment." <u>Id.</u> (citing <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u>, 4 F.3d 1095, 1100 (2d Cir. 1993)).

Plaintiffs argue that the relief sought will resolve the issue of the Retail defendants' fraudulent bills and terminate the controversy with respect to over $720,000 in pending and outstanding no-fault claims. (<u>See</u> Bruno Decl. ¶ 6.) According to plaintiffs, the Retail defendants continue to file and pursue collections proceedings "with 177 suits and arbitrations currently pending." (Pls.' Mem. at 43; McKenney Decl., Ex. 26.) They contend that, in the six months prior to July 2020, the Retail defendants "obtained judgments and/or arbitration awards in at least eight collections actions pending during the course of the instant RICO action." (Pls.' Mem. at 43; McKenney Decl. ¶ 50, Ex. 30.) During that same time period, plaintiffs issued payments on eight fraudulent claims, including a payment of $6,702.54 to Almatcare in April 2020. (<u>See</u> McKenney Decl. ¶ 51, Ex. 31.) In their pending collection matters, the Retail defendants are seeking payment for the same DME and/or orthotic devices that plaintiffs allege were fraudulently billed. (<u>Id.</u> ¶¶ 49-50.) This supports plaintiffs' claim that

there remains an actual case and controversy with each of the Retail defendants, who are deemed to have admitted the allegations in the Amended Complaint.

Courts in this district have granted declaratory relief in numerous cases where the defendants, including Daily Medical and Miller, were involved in similar schemes to defraud insurers for charges that are not permissible under the no-fault law.  See, e.g., State Farm Mut. Auto. Ins. Co. v. Jamaica Wellness Med., P.C., 16 CV 4948, 2019 WL 3330240, at *7 (E.D.N.Y. May 31, 2019), report and recommendation adopted, 2019 WL 2723548 (E.D.N.Y. July 1, 2019); Gov't Emp. Ins. Co. v. Active Care Med. Supply Corp., No. 12 CV 5632, 2015 WL 7281630 (E.D.N.Y. Nov. 16, 2015); IAV Med. Supply, 2013 WL 764735; Gov't Emps. Ins. Co. v. Infinity Health Products, Ltd., No. 10 CV 5611, 2012 WL 1427796 (E.D.N.Y. Apr. 6, 2012), report and recommendation adopted, 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012); State Farm Mut. Auto. Ins. Co. v. Cohan, 09 CV 2990, 2009 WL 10449036 (E.D.N.Y. Dec. 30, 2009).  I therefore find that plaintiffs are entitled to a declaration that they are not obligated to pay these outstanding claims and recommend that their request for declaratory relief be granted.

## CONCLUSION

For the reasons stated above, I respectfully recommend that plaintiffs' motion for default judgment be granted, and that plaintiffs be awarded: (1) RICO treble damages of $17,858.04 from Avetisyan; $96,336 from Matlyuk; $2,384,071.02 from Miller; and $331,843.72 from IG&NAT; (2) compensatory damages of $6,324.38 from AVA; $32,635.99 from Almatcare; and $794,690.34 from Daily Medical; and (3) prejudgment interest of $1,557.95 from AVA; $5,248.81 from Almatcare; and $30,889.15 from Daily Medical.  The following summarizes the total judgment recommended for each defendant:

| Defendant | Total Judgment Amount |
|---|---|
| Almatcare Medical Supply, Inc. | $37,884.8 |
| AVA Custom Supply, Inc. | $7,882.33 |
| Daily Medical Equipment Distribution Center, Inc. | $825,579.49 |
| IG&NAT Services, Inc. | $331,843.72 |
| Artur Avetisyan | $17,858.04 |
| Alexandra Matlyuk | $96,336.00 |
| Gregory Miller | $2,384,071.02 |

I further recommend that plaintiffs' request for a declaratory judgment relieving them from any obligation to pay the unpaid fraudulent claims made by AVA, Almatcare, and Daily Medical be granted.

Plaintiffs are directed to serve a copy of this report and recommendation on each defaulting defendant and file proof of such service on the record. Any objections to this report and recommendation must be filed electronically, or filed with the Clerk of the Court, within fourteen (14) days. Failure to file objections within the specified time waives the right to appeal the district court's order. See 28 U.S.C. § 636(b)(1)(C) (2009); FED. R. CIV. P. 72, 6(a).

Respectfully submitted,

/s/
_____

ROBERT M. LEVY
United States Magistrate Judge

Dated:  Brooklyn, New York
        March 5, 2021